1  FRANK E. ROGOZIENSKI, ESQ., California Bar No. 51445
2  FRANK E. ROGOZIENSKI, INC.
3  A Professional Corporation
   Attorneys at Law
4  Coronado Professional Square
   1203 Second Street
5  Coronado, CA 92118
6  Telephone: (619)437-1878
7  Facsimile: (619)437-4894

F I L E D
Clerk of the Superior Court

JUL 1 - 2005

By: BARBARA JARRATT, Deputy

8  Attorneys for Plaintiff, FRANK E. ROGOZIENSKI

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                   FOR THE COUNTY OF SAN DIEGO

12

13

14  FRANK E. ROGOZIENSKI,          )      Case No. GIC843843
                                    )
15              Plaintiff,          )      NOTICE OF LODGEMENT OF NON-
                                    )      CALIFORNIA CASES [CRC 313(h)]
16          v.                      )
                                    )
17  JAMES D. ALLEN, S. MICHAEL      )
18  LOVE and DOES 1 through 10,     )
    inclusive,                      )      Date: 07/15/05
19                                  )      Time: 11:00 a.m.
                                    )      Dept: 61
20              Defendants.         )
21                                  )
                                    )
22  _____)      DEPT. 61
                                           HON. John S. Meyer
23

24       Pursuant to California Rules of Court 313(h), Plaintiff herewith lodges non-California

25  cases cited in his Points and Authorities.

26  ////

27

28  _____
    NOTICE OF LODGEMENT OF NON-CALIFORNIA CASES
    [CRC 313(h)]

**EXHIBIT 2 PAGE 415**

276

LOVE00789

1

2

3        <u>TAB</u>                                   <u>CASE</u>

4        1            Butz v. Economou (1978) 438 U.S. 478

5
         2            Dennis v. Sparks (1980) 449 U.S. 24
6

7        3            Reynolds v. County of San Diego (1996) 84 F.3d 1162

8        4            Stump v. Sparkman (1978) 435 U.S. 349

9

10      Dated: July 1, 2005

11                                         FRANK E. ROGOZIENSKI, INC.

12
                                           By: _____
13                                                Frank E. Rogozienski
                                                  Attorney for Plaintiff
14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                 **EXHIBIT 2 PAGE 416**

28      _____
        NOTICE OF LODGEMENT OF NON-CALIFORNIA CASES
        [CRC 313(h)]
                                                                277

                                    2

CORONADO PROFESSIONAL SQUARE
POST OFFICE BOX 181010
1205 SECOND STREET, SUITE "A"
CORONADO, CALIFORNIA 92118-1417
(619) 437-1079

L0VE00790

1

**EXHIBIT 2 PAGE 417**

278

LOVE00791

98 S.Ct. 2894
438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895
(Cite as: 438 U.S. 478, 98 S.Ct. 2894)
▷

Briefs and Other Related Documents

Supreme Court of the United States
Earl L. BUTZ et al., Petitioners,
v.
Arthur N. ECONOMOU et al.
No. 76-709.

Argued Nov. 7, 1977.
Decided June 29, 1978.

Former registered futures commission merchant brought action against Department of Agriculture and others seeking damages on ground that defendant had wrongfully initiated administrative proceedings against merchant and his company. The United States District Court for the Southern District of New York dismissed action, and plaintiff appealed. The Court of Appeals, 535 F.2d 688, affirmed in part and reversed in part, and certiorari was granted. The Supreme Court, Mr. Justice White, held that: (1) federal executive officials exercising discretion are entitled only to qualified immunity, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for conduct of public business; (2) persons performing adjudicatory functions within federal agencies are entitled to absolute immunity from damages liability for their judicial acts; (3) agency officials who perform functions analogous to those of a prosecutor are entitled to absolute immunity from damages liability for their parts in the decision to initiate or continue a proceeding, and (4) agency attorney who arranges for presentation of evidence on the record in course of an adjudication is absolutely immune from suits based on introduction of such evidence.

Judgment vacated; cause remanded with instructions.

Mr. Justice Rehnquist concurred in part and dissented in part and filed opinion in which Mr. Chief Justice Burger, Mr. Justice Stewart and Mr. Justice Stevens joined.

Opinion after remand, 466 F.Supp. 1351.

West Headnotes

[1] United States ⬅⬆50.1

393k50.1
    (Formerly 393k50(1), 393k50)
Whatever level of protection from state interference is appropriate for federal officials executing their duties under federal law, such officials, even when acting pursuant to congressional authorization, are subject to restraints imposed by Federal Constitution.

[2] United States ⬅⬆50.5(4)
393k50.5(4)
    (Formerly 393k50)
Prior Supreme Court decision holding that a false and damaging publication, the issuance of which was otherwise within federal official's authority, was not itself actionable and would not become so by being issued maliciously did not purport to abolish the liability of federal officials for actions manifestly
beyond their line of duty; if federal officials are accountable when they stray beyond plain limits of their statutory authority, it would be incongruous to hold that they may nevertheless willfully or knowingly violate constitutional rights without fear of liability.

[3] Civil Rights ⬅⬆1376(1)
78k1376(1)
    (Formerly 78k214(1), 78k13.8(1))
In absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for constitutional infringement than is accorded state officials when sued for the identical violation under civil rights statute; federal officials should enjoy no greater zone of protection when they violate federal constitutional rules than do state officers. 42 U.S.C.A. § 1983.

[4] Civil Rights ⬅⬆1373
78k1373
    (Formerly 78k211.1, 78k211, 78k13.8(1))
Purpose of statute that mandated that any person who under color of law subjected another to deprivation of his constitutional rights would be liable to the injured party in an action at law was not to abolish immunities available at common law, but to insure that federal courts would have jurisdiction of constitutional claims against state officials. Act March 3, 1875, 18 Stat. 470.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 418

LOVE00792

98 S.Ct. 2894
(Cite as: 438 U.S. 478, 98 S.Ct. 2894)

**[5] United States ⚚127(1)**
393k127(1)
    (Formerly 393k127)
Presence or absence of congressional authorization for suits against federal officials is relevant to the question of whether to infer a right of action for damages for a particular violation of the Constitution.

**[6] United States ⚚50.1**
393k50.1
    (Formerly 393k50(1), 393k50)
Having determined that plaintiff is entitled to a remedy in damages from federal official for constitutional violation, court then must address how best to reconcile plaintiff's right to compensation with the need to protect decision-making processes of an executive department.

**[7] United States ⚚50.5(1)**
393k50.5(1)
    (Formerly 393k50)
Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law; in light of such principle, federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear burden of showing that public policy requires an exemption of that scope.

**[8] United States ⚚50.5(3)**
393k50.5(3)
    (Formerly 393k50)
In a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to qualified immunity, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business.

**[9] United States ⚚50.1**
393k50.1
    (Formerly 393k50(1), 393k50)
Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law; but there is no substantial basis for holding that executive officers generally may with impunity discharge their duties in a way that is known to them to violate the Constitution or in a manner that they should know transgresses a clearly established constitutional rule.

**[10] United States ⚚50.5(2)**
393k50.5(2)
    (Formerly 393k50)
Although qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, there are some officials whose special functions require a full exemption from liability.

**[11] Judges ⚚36**
227k36
Judges have absolute immunity not because of their particular location within government, but because of the special nature of their responsibilities.

**[12] United States ⚚50.10(1)**
393k50.10(1)
    (Formerly 393k50)
In light of safeguards provided in agency adjudication to assure that hearing examiner or administrative judge exercises his independent judgment on the evidence before him, free from pressures by parties or other officials within agency, risk of an unconstitutional act by one presiding at agency hearing is outweighed by importance of preserving such independent judgment, and therefore, persons subject to such restraints in performing adjudicatory functions within federal agency are entitled to absolute immunity from damages liability for their judicial acts.

**[13] United States ⚚50.10(1)**
393k50.10(1)
    (Formerly 393k50)
Because legal remedies already available to defendant in agency enforcement proceeding provide sufficient checks on agency zeal, agency officials who perform certain functions analogous to those of a prosecutor and who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.

**[14] United States ⚚50.10(2)**
393k50.10(2)
    (Formerly 393k50)
Because there is no substantial difference between function of agency attorney in presenting evidence in agency hearing and function of prosecutor who brings evidence before court and because administrative agencies can act in the public interest only if they can adjudicate on the basis of complete

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280

**EXHIBIT 2 PAGE 419**

LOVE00793

98 S.Ct. 2894
(Cite as: 438 U.S. 478, 98 S.Ct. 2894)

record, agency attorney who arranges for a presentation of evidence on the record in the course of an adjudication are absolutely immune from suits based on the introduction of such evidence.

**2896 *478 Syllabus [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

After an unsuccessful Department of Agriculture proceeding to revoke or suspend the registration of respondent's commodity futures commission company, respondent filed an action for damages in District Court against petitioner officials (including the Secretary and Assistant Secretary of Agriculture, the Judicial Officer, the Chief Hearing Examiner who had recommended sustaining the administrative complaint, and the Department attorney who had prosecuted the enforcement proceeding), alleging, *inter alia*, that by instituting unauthorized proceedings against him they had violated various of his constitutional rights. The District Court dismissed the action on the ground that the individual defendants, as federal officials, were entitled to absolute immunity for all discretionary acts within the scope of their authority. The Court of Appeals reversed, holding that the defendants were entitled only to the qualified immunity available to their counterparts in state government. *Held* :

1. Neither *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, nor *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780, supports petitioners' contention that all of the federal officials sued in this case are absolutely immune from any liability for damages even if in the course of enforcing the relevant statutes they infringed respondent's constitutional rights and even if the violation was knowing and deliberate. Nor did either of those cases purport to abolish the liability of federal officers for actions manifestly beyond their line of duty; if they are accountable when they stray beyond the plain limits of their statutory authority, it would be incongruous to hold that they may nevertheless willfully or knowingly violate constitutional rights without fear of liability. Pp. 2900-2905.

2. Without congressional directions to the

contrary, it would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under 42 U.S.C. § 1983, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, and suits brought directly under the Constitution against federal officials, *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619. *Federal* officials should enjoy no greater zone of protection when they violate *federal* constitutional rules than do *state* officers. Pp. 2905-2910.

*479 3. In a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer v. Rhodes, supra,* subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business. While federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law, there is no substantial basis for holding that executive officers generally may with impunity discharge their duties in a way that is known to them to violate the Constitution or in a manner that they should know transgresses a clearly established constitutional rule. Pp. 2910-2911.

4. Although a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, there are some officials whose special functions require a full exemption from liability. Pp. 2911-2916.

(a) In light of the safeguards provided in agency adjudication to assure that the hearing examiner or administrative law judge exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency, the risk of an unconstitutional act by one presiding at the agency hearing is clearly outweighed by the importance of **2897 preserving such independent judgment. Therefore, persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Pp. 2912-2915.

(b) Agency officials who perform functions analogous to those of a prosecutor must make the decision to move forward with an administrative proceeding free from intimidation or harassment. Because the legal remedies already available to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 420

LOVE00794

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *479, 98 S.Ct. 2894, **2897)

Page 4

defendant in such a proceeding provide sufficient checks on agency zeal, those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision. Pp. 2915-2916.

(c) There is no substantial difference between the function of an agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court, and since administrative agencies can act in the public interest only if they can adjudicate on the basis of a complete record, an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence. P. 2916.

5. The case is remanded for application of the foregoing principles *480 to the claims against the particular petitioner-defendants involved. P. 2916.

535 F.2d 688, vacated and remanded.

Daniel M. Friedman, Washington, D. C., for petitioner.

David C. Buxbaum, New York City, for respondents.

Mr. Justice WHITE delivered the opinion of the Court.

This case concerns the personal immunity of federal officials in the Executive Branch from claims for damages arising from their violations of citizens' constitutional rights. Respondent [FN1] filed suit against a number of officials in the Department of Agriculture claiming that they had instituted an investigation and an administrative proceeding against him in retaliation for his criticism of that agency. The District Court dismissed the action on the ground that the individual defendants, as federal officials, were entitled to absolute immunity for all discretionary acts within the scope of their authority. The Court of Appeals reversed, holding that the defendants were entitled only to the qualified immunity available to their counterparts in state government. *Economou v. U. S. Dept. of Agriculture*, 535 F.2d 688 (1976). Because of *481 the importance of immunity doctrine to both the vindication of

constitutional guarantees and the effective functioning of government, we granted certiorari. 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534.

FN1. The individual Arthur N. Economou, his corporation Arthur N. Economou and Co., and another corporation which he heads, the American Board of Trade, Inc., were all plaintiffs in this action and are all respondents in this Court. For convenience, however, we refer to Arthur N. Economou and his interests in the singular, as "respondent."

I

Respondent controls Arthur N. Economou and Co., Inc., which was at one time registered with the Department of Agriculture as a commodity futures commission merchant. Most of respondent's factual allegations in this lawsuit focus on an earlier administrative proceeding in which the Department of Agriculture sought to revoke or suspend the company's registration. On February 19, 1970, following an audit, the Department of Agriculture issued an administrative complaint alleging that respondent, while a registered merchant, had willfully failed to maintain the minimum financial requirements prescribed by the Department. After another audit, an amended complaint was issued on June 22, 1970. A **2898 hearing was held before the Chief Hearing Examiner of the Department, who filed a recommendation sustaining the administrative complaint. The Judicial Officer of the Department, to whom the Secretary had delegated his decisional authority in enforcement proceedings, affirmed the Chief Hearing Examiner's decision. On respondent's petition for review, the Court of Appeals for the Second Circuit vacated the order of the Judicial Officer. It reasoned that "the essential finding of willfulness . . . was made in a proceeding instituted without the customary warning letter, which the Judicial Officer conceded might well have resulted in prompt correction of the claimed insufficiencies." *Economou v. U. S. Department of Agriculture*, 494 F.2d 519 (1974).

While the administrative complaint was pending before the Judicial Officer, respondent filed this lawsuit in Federal District Court. Respondent sought initially to enjoin the progress of the administrative proceeding, but he was unsuccessful in that regard. On March 31, 1975, respondent filed a second *482 amended complaint seeking damages. Named as defendants were the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

282

**EXHIBIT 2 PAGE 421**

LOVE00795

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *482, 98 S.Ct. 2894, **2898)

Page 5

individuals who had served as Secretary and Assistant Secretary of Agriculture during the relevant events; the Judicial Officer and Chief Hearing Examiner; several officials in the Commodity Exchange Authority; [FN2] the Agriculture Department attorney who had prosecuted the enforcement proceeding; and several of the auditors who had investigated respondent or were witnesses against respondent. [FN3]

> FN2. These individuals included the Administrator of the Commodity Exchange Authority, the Director of its Compliance Division, the Deputy Director of its Registration and Audit Division, and the Regional Administrator for the New York Region.

> FN3. Also named as defendants were the United States, the Department of Agriculture and the Commodity Exchange Authority.

The complaint stated that prior to the issuance of the administrative complaints respondent had been "sharply critical of the staff and operations of Defendants and carried on a vociferous campaign for the reform of Defendant Commodity Exchange Authority to obtain more effective regulation of commodity trading." App. 157-158. The complaint also stated that, some time prior to the issuance of the February 19 complaint, respondent and his company had ceased to engage in activities regulated by the defendants. The complaint charged that each of the administrative complaints had been issued without the notice or warning required by law; that the defendants had furnished the complaints "to interested persons and others without furnishing respondent's answers as well"; and that following the issuance of the amended complaint, the defendants had issued a "deceptive" press release that "falsely indicated to the public that [respondent's] financial resources had deteriorated, when Defendants knew that their statement was untrue and so acknowledge[d] previously that said assertion was untrue." Ibid. [FN4]

> FN4. More detailed allegations concerning many of the incidents charged in the complaint were contained in an affidavit filed by respondent in connection with his earlier efforts to obtain injunctive relief.

The complaint then presented 10 "causes of action," some *483 of which purported to state claims for damages under the United States

Constitution. For example, the first "cause of action" alleged that respondent had been denied due process of law because the defendants had instituted unauthorized proceedings against him without proper notice and with the knowledge that respondent was no longer subject to their regulatory jurisdiction. The third "cause of action" stated that by means of such actions "the Defendants discouraged and chilled the campaign of criticism [plaintiff] directed against them, and thereby deprived the [plaintiff] of [his] rights to free expression **2899 guaranteed by the First Amendment of the United States Constitution." [FN5]

> FN5. In the second "cause of action," respondent stated that the defendants had issued administrative orders "illegal and punitive in nature" against him when he was no longer subject to their authority. The fourth "cause of action" alleged, inter alia, that respondent's rights to due process of law and to privacy as guaranteed by the Federal Constitution had been infringed by the furnishing of the administrative complaints to interested persons without respondent's answers. The fifth "cause of action" similarly alleged as a violation of due process that defendants had issued a press release containing facts the defendants knew or should have known were false. Respondent's remaining "causes of action" allege common-law torts: abuse of legal process, malicious prosecution, invasion of privacy, negligence, and trespass.

The defendants moved to dismiss the complaint on the ground that "as to the individual defendants it is barred by the doctrine of official immunity . . . ." Id., at 163. The defendants relied on an affidavit submitted earlier in the litigation by the attorney who had prosecuted the original administrative complaint against respondent. He stated that the Secretary of Agriculture had had no involvement with the case and that each of the other named defendants had acted "within the course of his official duties." Id., at 42-149.

The District Court, apparently relying on the plurality opinion in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), held that the individual defendants would be entitled to immunity if they could show that "their alleged unconstitutional acts were *484 within the outer perimeter of their authority and discretionary." App. to Pet. for Cert. 25a. After examining the nature of the acts alleged in the complaint, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

283

**EXHIBIT 2 PAGE 422**

LOVE00796

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *484, 98 S.Ct. 2894, **2899)

District Court concluded: "Since the individual defendants have shown that their alleged unconstitutional acts were both within the scope of their authority and discretionary, we dismiss the second amended complaint as to them." [FN6] Id., at 28a.

> FN6. The District Court held that the complaint was barred as to the Government agency defendants by the doctrine of sovereign immunity.

The Court of Appeals for the Second Circuit reversed the District Court's judgment of dismissal with respect to the individual defendants. Economou v. U. S. Department of Agriculture, 535 F.2d 688 (1976). The Court of Appeals reasoned that Barr v. Matteo, supra, did not "represen[t] the last word in this evolving area," 535 F.2d, at 691, because principles governing the immunity of officials of the Executive Branch had been elucidated in later decisions dealing with constitutional claims against state officials. E. g., Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). These opinions were understood to establish that officials of the Executive Branch exercising discretionary functions did not need the protection of an absolute immunity from suit, but only a qualified immunity based on good faith and reasonable grounds. The Court of Appeals rejected a proposed distinction between suits against state officials sued pursuant to 42 U.S.C. § 1983 and suits against federal officials under the Constitution, noting that "[o]ther circuits have also concluded that the Supreme Court's development of official immunity doctrine in § 1983 suits against state officials applies with equal force to federal officers sued on a cause of action derived directly from the Constitution, since both types of suits serve the same function of protecting citizens against violations of their constitutional rights by government officials." 535 F.2d, at 695 n. 7. The Court of Appeals recognized that *485 under Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), state prosecutors were entitled to absolute immunity from § 1983 damages liability but reasoned that Agriculture Department officials performing analogous functions did not require such an immunity because their cases turned more on documentary proof than on the veracity of witnesses and because their work did not generally involve the same constraints of **2900 time and information present in criminal cases. 535 F.2d, at 696 n. 8. The court concluded that all of the defendants were "adequately protected by permitting them to avail themselves of the defense of qualified 'good faith', reasonable grounds' immunity of the type approved by the Supreme Court in Scheuer and Wood." Id., at 696. After noting that summary judgment would be available to the defendants if there were no genuine factual issues for trial, the Court of Appeals remanded the case for further proceedings.

II

The single submission by the United States on behalf of petitioners is that all of the federal officials sued in this case are absolutely immune from any liability for damages even if in the course of enforcing the relevant statutes they infringed respondent's constitutional rights and even if the violation was knowing and deliberate. Although the position is earnestly and ably presented by the United States, we are quite sure that it is unsound and consequently reject it.

In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the victim of an arrest and search claimed to be violative of the Fourth Amendment brought suit for damages against the responsible federal agents. Repeating the declaration in Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803), that " '[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws,' " 403 U.S., at 397, 91 S.Ct., at 2005, and stating that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," id., at 395, 91 S.Ct., at 2004, we rejected the claim *486 that the plaintiff's remedy lay only in the state court under state law, with the Fourth Amendment operating merely to nullify a defense of federal authorization. We held that a violation of the Fourth Amendment by federal agents gives rise to a cause of action for damages consequent upon the unconstitutional conduct. Ibid. [FN7]

> FN7. Although we had noted in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief," id., at 684, 66 S.Ct., at 777, the specific question faced in Bivens had been reserved.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 423**

L0VE00797

*Bivens* established that compensable injury to a constitutionally protected interest could be vindicated by a suit for damages invoking the general federal-question jurisdiction of the federal courts, [FN8] but we reserved the question whether the agents involved were "immune from liability by virtue of their official position," and remanded the case for that determination.   On remand the Court of Appeals for the Second Circuit, as has every other Court of Appeals that has faced the question, [FN9] held that the agents were not absolutely immune and that the public interest would be sufficiently protected by according the agents and their superiors a qualified immunity.

FN8. The Court's opinion in *Bivens* concerned only a Fourth Amendment claim and therefore did not discuss what other personal interests were similarly protected by provisions of the Constitution.  We do not consider that issue here.  Cf. *Doe v. McMillan*, 412 U.S. 306, 325, 93 S.Ct. 2018, 2031, 36 L.Ed.2d 912 (1973).

FN9. *Black v. United States*, 534 F.2d 524 (C.A. 2 1976); *States Marine Lines v. Shultz*, 498 F.2d 1146 (C.A. 4 1974); *Mark v. Groff*, 521 F.2d 1376 (C.A. 9 1975); *G. M. Leasing Corp. v. United States*, 560 F.2d 1011 (C.A. 10 1977); *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974); see *Paton v. La Prade*, 524 F.2d 862 (C.A. 3 1975); *Weir v. Muller*, 527 F.2d 872 (C.A. 5 1976); *Brubaker v. King*, 505 F.2d 534 (C.A. 7 1974); *Jones v. United States*, 536 F.2d 269 (C.A. 8 1976).

In our view, the Courts of Appeals have reached sound results.   We cannot agree with the United States that our prior cases are to the contrary and support the rule it now urges us to embrace.   Indeed, as we see it, the Government's *487 submission is contrary to the course of decision in this Court from the very early days of the Republic.

**2901 The Government places principal reliance on *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).   In that case, the acting director of an agency had been sued for malicious defamation by two employees whose suspension for misconduct he had announced in a press release.   The defendant claimed an absolute or qualified privilege, but the trial court rejected both and the jury returned a verdict for plaintiff.

In the 1958 Term, [FN10] the Court granted

certiorari in *Barr* "to determine whether in the circumstances of this case petitioner's claim of absolute privilege should have stood as a bar to maintenance of the suit despite the allegations of malice made in the complaint." *Id.*, at 569, 79 S.Ct., at 1338.   The Court was divided in reversing the judgment of the Court of Appeals, and there was no opinion for the Court. [FN11]   The plurality opinion inquired whether the conduct complained of was among those *488 "matters committed by law to [the official's] control" and concluded, after an analysis of the specific circumstances, that the press release was within the "outer perimeter of [his] line of duty" and was "an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." *Id.*, at 575, 79 S.Ct., at 1341.   The plurality then held that under *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), the act was privileged and that the officer could not be held liable for the tort of defamation despite the allegations of malice. [FN12]   *Barr* clearly held that a false and damaging publication, the issuance of which was otherwise within the official's authority, was not itself actionable and would not become so by being issued maliciously.   The Court did not choose to discuss whether the director's privilege would be defeated by showing that he was without reasonable grounds for believing his release was true or that he knew that it was false, although the issue was in the case as it came from the Court of Appeals. [FN13]

FN10. The case had been before the Court once before, during the 1957 Term.  After the trial, the defendant had appealed only the denial of an absolute privilege.  The Court of Appeals affirmed the judgment against him on the ground that the press release exceeded his authority. *Barr. v. Matteo*, 100 U.S.App.D.C. 319, 244 F.2d 767 (1957).  This Court vacated that judgment, 355 U.S. 171, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957), directing the Court of Appeals to consider the qualified-privilege question.  This the Court of Appeals did, 103 U.S.App.D.C. 176, 256 F.2d 890 (1958), holding as this Court described it, that "the press release was protected by a qualified privilege, but that there was evidence from which a jury could reasonably conclude that petitioner had acted maliciously, or had spoken with lack of reasonable grounds for believing that his statement was true, and that either conclusion would defeat the qualified privilege." 360 U.S., at 569, 79 S.Ct., at 1338.   Because the case was remanded for a new trial, the defendant sought certiorari a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 424**

LOVE00798

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *488, 98 S.Ct. 2894, **2901)

Page 8

second time.

FN11. Mr. Justice Harlan's opinion in *Barr* was joined by three other Justices. The majority was formed through the concurrence in the judgment of Mr. Justice Black, who emphasized in a separate opinion the strong public interest in encouraging federal employees to ventilate their ideas about how the Government should be run. *Id.*, at 576, 79 S.Ct., at 1342.

FN12. The Court wrote a similar opinion and entered a similar judgment in a companion case, *Howard v. Lyons*, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). There a complaint for defamation under state law alleged the publication of a deliberate and knowing falsehood by a federal officer. Judgment was entered for the officer before trial on the ground that the release was within the limits of his authority. The judgment was reversed in part by the Court of Appeals on the ground that in some respects the defendant was entitled to only a qualified privilege. This Court reversed, ruling that *Barr* controlled.

FN13. See n. 10, *supra*. The question presented in the Government's petition for certiorari was broadly framed:
"Whether the absolute immunity from defamation suits, accorded officials of the Government with respect to acts done within the scope of their official authority, extends to statements to the press by high policy-making officers, below cabinet or comparable rank, concerning matters committed by law to their control or supervision." Pet. for Cert. in *Barr v. Matteo*, O.T. 1958, No. 350, p. 2. This question might be viewed as subsuming the question whether the official's immunity extended to situations in which the official had no reasonable grounds for believing that a statement was true.

*489 **2902 *Barr* does not control this case. It did not address the liability of the acting director had his conduct not been within the outer limits of his duties, but from the care with which the Court inquired into the scope of his authority, it may be inferred that had the release been unauthorized, and surely if the issuance of press releases had been expressly forbidden by statute, the claim of absolute immunity would not have been upheld. The inference is supported by the fact that Mr. Justice STEWART, although agreeing with the principles announced by Mr. Justice Harlan, dissented and would have rejected the immunity claim because the press release, in his view, was not action in the line of duty. 360 U.S., at 592, 79 S.Ct., at 1350. It is

apparent also that a quite different question would have been presented had the officer ignored an express statutory or constitutional limitation on his authority.

*Barr* did not, therefore, purport to depart from the general rule, which long prevailed, that a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers. The immunity of federal executive officials began as a means of protecting them in the execution of their federal statutory duties from criminal or civil actions based on state law. See *Osborn v. Bank of United States*, 9 Wheat. 738, 865-866, 6 L.Ed. 204 (1824). [FN14] A federal *490 official who acted outside of his federal statutory authority would be held strictly liable for his trespassory acts. For example, *Little v. Barreme*, 2 Cranch 170, 2 L.Ed. 243 (1804), held the commander of an American warship liable in damages for the seizure of a Danish cargo ship on the high seas. Congress had directed the President to intercept any vessels reasonably suspected of being en route *to* a French port, but the President had authorized the seizure of suspected vessels whether going *to* or *from* French ports, and the Danish vessel seized was en route *from* a forbidden destination. The Court, speaking through Mr. Chief Justice Marshall, held that the President's instructions could not "change the nature of the transaction, or legalize an act which, without those instructions, would have been a plain trespass." *Id.*, at 179. Although there was probable cause to believe that the ship was engaged in traffic with the French, the seizure at issue was not among that class of seizures that the Executive had been authorized by statute to effect. See also *Wise v. Withers*, 3 Cranch 331, 2 L.Ed. 457 (1806)

FN14. Mr. Chief Justice Marshall explained:
"An officer, for example, is ordered to arrest an individual. It is not necessary, nor is it usual, to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing for an act of congress to imply, without expressing, this very exemption from State control . . . The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted that all who are employed in them are protected while in the line of duty; and yet this protection is not expressed in any act of congress. It is incidental to, and is implied in, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

286

**EXHIBIT 2 PAGE 425**

LOVE00799

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *490, 98 S.Ct. 2894, **2902)

several acts by which these institutions are created, and is secured to the individuals employed in them by the judicial power alone . . . ."

*Bates v. Clark*, 95 U.S. 204, 24 L.Ed. 471 (1877) , was a similar case. The relevant statute directed seizures of alcoholic beverages in Indian country, but the seizure at issue, which was made upon the orders of a superior, was not made in Indian country. The "objection fatal to all this class of defenses is that in that locality [the seizing officers] were utterly without any authority in the premises" and hence were answerable in damages. *Id.*, at 209.

As these cases demonstrate, a federal official was protected for action tortious under state law only if his acts were authorized by controlling federal law. "To make out his defence he must show that his authority was sufficient in law to protect him." *Cunningham v. Macon & Brunswick R. Co.*, 109 U.S. 446, 452, 3 S.Ct. 292, 297, 27 L.Ed. 992 (1883); *Belknap v. Schild*, 161 U.S. 10, 19, 16 S.Ct. 443, 446, 40 L.Ed. 599 (1896). Since an unconstitutional act, even if authorized by statute, was viewed as not **2903 authorized in contemplation of *491 law, there could be no immunity defense. [FN15] *SecunitED STATES v. leE*, 106 u.s. 196, 218-223, 1 S.CT. 240, 258-263, 27 L.Ed. 171 (1882); *Virginia Coupon Cases*, 114 U.S. 269, 285-292, 5 S.Ct. 903, 911-915, 29 L.Ed. 185 (1885). [FN16]

FN15. Indeed, there appears to have been some doubt as to whether even an Act of Congress would immunize federal officials from suits seeking damages for constitutional violations.  See *Milligan v. Hovey*, 17 F.Cas. 380 (No. 9,605) (CC Ind.1871); *Griffin v. Wilcox*, 21 Ind. 370, 372-373 (1863).   See generally Engdahl, Immunity and Accountability for Positive Governmental Wrongs, 44 U.Colo.L.Rev. 1, 50-51 (1972).

FN16. While the *Virginia Coupon Cases*, like *United States v. Lee*, involved a suit for the return of specific property, the principles espoused therein are equally applicable to a suit for damages and were later so applied. *Atchison, Topeka & Santa Fe R. Co. v. O'Connor*, 223 U.S. 280, 287, 32 S.Ct. 216, 217, 56 L.Ed. 436 (1912).

In both *Barreme* and *Bates*, the officers did not merely mistakenly conclude that the circumstances warranted a particular seizure, but failed to observe the limitations on their authority by making seizures not within the category or type of seizures they were authorized to make.  *Kendall v. Stokes*, 3 How. 87, 11 L.Ed. 506 (1845), addressed a different situation.  The case involved a suit against the Postmaster General for erroneously suspending payments to a creditor of the Post Office. Examining and, if necessary, suspending payments to creditors were among the Postmaster's normal duties, and it appeared that he had simply made a mistake in the exercise of the discretion conferred upon him.  He was held not liable in damages since "a public officer, acting to the best of his judgment and from a sense of duty, in a matter of account with an individual [is not] liable in an action for an error of judgment."  *Id.*, at 97-98.   Having the "right to examine into this account" and the right to suspend it in the proper circumstances, *id.*, at 98, the officer was not liable in damages if he fell into error, provided, however, that he acted "from a sense of public duty and without malice." *Id.*, at 99.

Four years later, in a case involving military discipline, the Court issued a similar ruling, exculpating the defendant *492 officer because of the failure to prove that he had exceeded his jurisdiction or had exercised it in a malicious or willfully erroneous manner: "[I]t is not enough to show he committed an error of judgment, but it must have been a malicious and wilful error." *Wilkes v. Dinsman*, 7 How. 89, 131, 12 L.Ed. 618 (1849).

In *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), on which the Government relies, the principal issue was whether the malicious motive of an officer would render him liable in damages for injury inflicted by his official act that otherwise was within the scope of his authority. The Postmaster General was sued for circulating among the postmasters a notice that assertedly injured the reputation of the plaintiff and interfered with his contractual relationships.  The Court first inquired as to the Postmaster General's authority to issue the notice.   In doing so, it "recognize[d] a distinction between action taken by the head of a Department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision."  *Id.*, at 498, 16 S.Ct., at 637. Concluding that the circular issued by the Postmaster General "was not unauthorized by law,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 426

LOVE00800

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *492, 98 S.Ct. 2894, **2903)

Page 10

nor beyond the scope of his official duties," the Court then addressed the major question in the case—whether the action could be "maintained because of the allegation that what the officer did was done maliciously?" *Id.*, at 493, 16 S.Ct., at 635. Its holding was that the head of a department could not be "held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority," however improper his motives might have been. *Id.*, at 498, 16 S.Ct., at 637. Because the Postmaster General in issuing the circular **2904 in question "did not exceed his authority, nor pass the line of his duty," *id.*, at 499, 16 S.Ct., at 637, it was irrelevant that he might have acted maliciously. [FN17]

> FN17. An individual might be viewed as acting maliciously where "the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals." 161 U.S., at 499, 16 S.Ct., at 499.

*493 *Spalding* made clear that a malicious intent will not subject a public officer to liability for performing his authorized duties as to which he would otherwise not be subject to damages liability. [FN18] But *Spalding* did not involve conduct manifestly or otherwise beyond the authority of the official, nor did it involve a mistake of either law or fact in construing or applying the statute. [FN19] It did not purport to immunize officials *494 who ignore limitations on their authority imposed by law. Although the "manifestly or palpably" standard for examining the reach of official power may have been suggested as a gloss on *Barrème*, *Bates*, *Kendall*, and *Wilkes*, none of those cases was overruled. [FN20] It is also evident that *Spalding* presented no claim that the officer was liable in damages because he had acted in violation of a limitation placed upon his conduct by the United States Constitution. If any inference is to be drawn from *Spalding* in any of these respects, it is that the official would not be excused from liability if he failed to observe obvious statutory or constitutional limitations on his powers or if his conduct was a manifestly erroneous application of the statute.

> FN18. In addressing the liability of the Postmaster General, the Court referred to *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872), which the Court described as holding that "judges of courts of superior or general jurisdiction [are] not liable to civil suits for their judicial acts, even when such

acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." 161 U.S., at 493, 16 S.Ct., at 635. The Court was of the view that "the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law." *Id.*, at 498, 16 S.Ct., at 637. The Court plainly applied *Bradley v. Fisher* principles in holding that proof of malice would not subject an executive officer to liability for performing an act which he was authorized to perform by federal law. These principles, however, were not said to be completely applicable; and, as indicated in the text, the Court revealed no intention to overrule *Kendall v. Stokes* or *Wilkes* or to immunize an officer from liability for a willful misapplication of his authority. Also, on the face of the *Spalding* opinion, it would appear that an executive officer would be vulnerable if he took action "manifestly or palpably" beyond his authority or ignored a clear limitation on his enforcement powers.

> FN19. Mr. Justice BRENNAN, dissenting in *Barr v. Matteo*, 360 U.S., at 587 n. 3, 79 S.Ct., at 1348 n. 3, emphasized this point:
> "The suit in *Spalding* seems to have been as much, if not more, a suit for malicious interference with advantageous relationships as a libel suit. The Court reviewed the facts and found no false statement. See 161 U.S., at 487-493, 16 S.Ct., at 633. The case may stand for no more than the proposition that where a Cabinet officer publishes a statement, not factually inaccurate, relating to a matter within his Department's competence, he cannot be charged with improper motives in publication. The Court's opinion leaned heavily on the fact that the contents of the statement (which were not on their face defamatory) were quite accurate, in support of its conclusion that publishing the statement was within the officer's discretion, foreclosing inquiry into his motives. *Id.*, at 489-493, 16 S.Ct., at 637."
> The *Barr* plurality did not disagree with this characterization of the lawsuit in *Spalding*. See also Gray, Private Wrongs of Public Servants, 47 Calif.L.Rev. 303, 336 (1959).

> FN20. Indeed, *Barrème* and *Bates* were cited with approval in a decision that was under submission with *Spalding* and was handed down a scant month before the judgment in *Spalding* was announced. *Belknap v. Schild*, 161 U.S. 10, 18, 16 S.Ct. 443,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 427**

L0VE00801

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *494, 98 S.Ct. 2894, **2904)

445 (1896).

[1] Insofar as cases in this Court dealing with the immunity or privilege of federal officers are concerned, [FN21] this is where the **2905 matter stood until *Barr v. Matteo*. there, as we have set out above, immunity was granted even though the publication contained a factual error, which was not the case inspalding. the plurality Opinion and judgment in *barr* also appear-- *495 salthough without any discussion of the matter--to have extended absolute immunity to an officer who was authorized to issue press releases, who was assumed to know that the press release he issued was false and who therefore was deliberately misusing his authority.   Accepting this extension of immunity with respect to state tort claims, however, we are confident that *Barr* did not purport to protect an official who has not only committed a wrong under local law, but also violated those fundamental principles of fairness embodied in the Constitution. [FN22] Whatever level of protection from state interference is appropriate for federal officials executing their duties under federal law, it cannot be doubted that these officials, even when acting pursuant to congressional authorization, are subject to the restraints imposed by the Federal Constitution.

FN21. During the period prior to *Barr*, the lower federal courts broadly extended *Spalding* in according absolute immunity to federal officials sued for common-law torts.  E. g., *Jones v. Kennedy*, 73 App.D.C. 292, 121 F.2d 40, cert. denied, 314 U.S. 665, 62 S.Ct. 130, 86 L.Ed. 532 (1941); *Papagianakis v. The Samos*, 186 F.2d 257 (C.A.4 1950), cert. denied, 341 U.S. 921, 71 S.Ct. 741, 95 L.Ed. 1354 (1951).   See cases collected in Gray, *supra* n. 19, at 337-338.

FN22. We view this case, in its present posture, as concerned only with constitutional issues.   The District Court memorandum focused exclusively on respondent's constitutional claims.   It appears from the language and reasoning of its opinion that the Court of Appeals was also essentially concerned with respondent's constitutional claims. See, e. g., 535 F.2d, at 695 n. 7.   The Second Circuit has subsequently read *Economou* as limited to that context.   See *Huntington Towers, Ltd. v. Franklin Nat. Bank*, 559 F.2d 863, 870, and n. 2 (1977), cert. denied *sub nom. Huntington Towers, Ltd. v. Federal Reserve Bank of N. Y.*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978).   The argument before us as well has focused on

respondent's constitutional claims, and our holding is so limited.

[2] The liability of officials who have exceeded constitutional limits was not confronted in either *Barr* or *Spalding*.  Neither of these cases supports the Government's position.  Beyond that, however, neither case purported to abolish the liability of federal officers for actions manifestly beyond their line of duty;  and if they are accountable when they stray beyond the plain limits of their statutory authority, it would be incongruous to hold that they may nevertheless willfully or knowingly violate constitutional rights without fear of liability.

Although it is true that the Court has not dealt with this *496 issue with respect to federal officers, [FN23] we have several times addressed the immunity of state officers when sued under 42 U.S.C.  § 1983 for alleged violations of constitutional rights.   These decisions are instructive for present purposes.

FN23. *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), did involve a constitutional claim for invasion of privacy--but in the special context of the Speech or Debate Clause. The Court held that the executive officials would be immune from suit only to the extent that the legislators at whose behest they printed and distributed the documents could claim the protection of the Speech or Debate Clause.

III

*Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), decided that § 1983 was not intended to abrogate the immunity of state judges which existed under the common law and which the Court had held applicable to federal judges in *Bradley v. Fisher*, 13 Wall. 335 (1872).  *Pierson* also presented the issue "whether immunity was available to that segment of the executive branch of a state government that is . . . most frequently exposed to situations which can give rise to claims under § 1983--the local police officer."  *Scheuer v. Rhodes*, 416 U.S., at 244-245, 94 S.Ct., at 1690. Relying on the common law, we held that police officers were entitled to a defense of "good faith and probable cause," even though an arrest might subsequently be proved to be unconstitutional.   We observed, however, that "[t]he common law has never granted police officers an absolute and unqualified immunity, and the officers in this case do not claim that they are entitled to one."  386

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

289

EXHIBIT 2 PAGE 428

L0VE00802

U.S., at 555, 87 S.Ct., at 1218.

**2906 In *Scheuer v. Rhodes, supra,* the issue was whether "higher officers of the executive branch" of state governments were immune from liability under § 1983 for violations of constitutionally protected rights. 416 U.S., at 246, 94 S.Ct., at 1691. There, the Governor of a State, the senior and subordinate officers of the state National Guard, and a state university president had been sued on the allegation that they had suppressed a civil disturbance *497 in an unconstitutional manner. We explained that the doctrine of official immunity from § 1983 liability, although not constitutionally grounded and essentially a matter of statutory construction, was based on two mutually dependent rationales:

"(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." 416 U.S., at 240, 94 S.Ct., at 1688.

The opinion also recognized that executive branch officers must often act swiftly and on the basis of factual information supplied by others, constraints which become even more acute in the "atmosphere of confusion, ambiguity, and swiftly moving events" created by a civil disturbance. *Id.,* at 246-247, 94 S.Ct., at 1691. Although quoting at length from *Barr v. Matteo,* [FN24] we did not believe that there was a need for absolute immunity from § 1983 liability for these high-ranking state officials. Rather the considerations discussed above indicated:

FN24. 416 U.S., at 247, 94 S.Ct., at 1691, quoting *Barr v. Matteo,* 360 U.S., at 573-574, 79 S.Ct., at 1340-1341. The Court spoke of *Barr v. Matteo* as arising "[i]n a context other than a § 1983 suit." 416 U.S., at 247, 94 S.Ct., at 1692. Elsewhere in the opinion, however, the Court discussed *Barr* as arising "in the somewhat parallel" context of the privilege of public officers from defamation actions." 416 U.S., at 242, 94 S.Ct., at 1689. The Court also relied on *Spalding v. Vilas,* 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 47 (1896), without mentioning that that decision concerned federal officials. 416 U.S., at 242 n. 7, 246 n. 8, 94 S.Ct., at 1689 n. 7, 1691 n. 8.

"[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the *498 existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." 416 U.S., at 247- 248, 94 S.Ct., at 1692.

Subsequent decisions have applied the *Scheuer* standard in other contexts. In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), school administrators were held entitled to claim a similar qualified immunity. A school board member would lose his immunity from a § 1983 suit only if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." 420 U.S., at 322, 95 S.Ct., at 1001. In *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), we applied the same standard to the superintendent of a state hospital. In *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), we held that prison administrators would be adequately protected by the qualified immunity outlined in *Scheuer* and *Wood.* We emphasized, however, that, at least in the absence of some showing of malice, an official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was "clearly established" at the time of the violation.

None of these decisions with respect to state officials furnishes any support for the **2907 submission of the United States that federal officials are absolutely immune from liability for their constitutional transgressions. On the contrary, with impressive unanimity, the Federal Courts of Appeals have concluded that federal officials should receive no greater degree of protection from *constitutional* claims than their counterparts in state government. [FN25] Subsequent to *Scheuer,* the *499 Court of Appeals for the Fourth Circuit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290

EXHIBIT 2 PAGE 429

L0VE00803

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *499, 98 S.Ct. 2894, **2907)

Page 13

concluded that "[a]lthough *Scheuer* involved a suit against state executive officers, the court's discussion of the qualified nature of executive immunity would appear to be equally applicable to federal executive officers." *States Marine Lines v. Shultz,* 498 F.2d 1146, 1159 (1974). In the view of the Court of Appeals for the Second Circuit,

> FN25. As early as 1971, Judge, now Attorney General, Bell, concurring specially in a judgment of the Court of Appeals for the Fifth Circuit, recorded his "continuing belief that all police and ancillary personnel in this nation, whether state or federal, should be subject to the same accountability under law for their conduct." *Anderson v. Nosser,* 438 F.2d 183, 205 (1971). He objected to the notion that there should be "one law for Athens and another for Rome." *Ibid.* It appears from a recent decision that the Fifth Circuit has abandoned the view he criticized. See *Weir v. Muller,* 527 F.2d 872 (1976).

"it would be 'incongruous and confusing, to say the least' to develop different standards of immunity for state officials sued under § 1983 and federal officers sued on similar grounds under causes of action founded directly on the Constitution." *Economou v. U. S. Dept. of Agriculture,* 535 F.2d, at 695, n. 7, quoting *Bivens v. Six Unknown Fed. Narcotics Agents,* 456 F.2d 1339, 1346-1347 (C.A.2 1972) (on remand). [FN26]

> FN26. Courts and judges have noted the "incongruity" that would arise if officials of the District of Columbia, who are not subject to § 1983, were given absolute immunity while their counterparts in state government received qualified immunity. *Bivens v. Six Unknown Fed. Narcotics Agents,* 456 F.2d, at 1347; *Carter v. Carlson,* 144 U.S.App.D.C. 388, 401, 447 F.2d 358, 371 (1971) (Nichols, J., concurring), rev'd on other grounds sub nom. *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

The Court of Appeals for the Ninth Circuit has reasoned:

"[Defendants] offer no significant reason for distinguishing, as far as the immunity doctrine is concerned, between litigation under § 1983 against state officers and actions against federal officers alleging violation of constitutional rights under the general federal question statute. In contrast, the practical advantage of having just

one federal *500 immunity doctrine for suits arising under federal law is self-evident. Further, the rights at stake in a suit brought directly under the Bill of Rights are no less worthy of full protection than the constitutional and statutory rights protected by § 1983." *Mark v. Groff,* 521 F.2d 1376, 1380 (1975).

Other courts have reached similar conclusions. *E. g., Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974); *Brubaker v. King,* 505 F.2d 534 (C.A.7 1974); see *Weir v. Muller,* 527 F.2d 872 (C.A.5 1976); *Paton v. La Prade,* 524 F.2d 862 (C.A.3 1975); *Jones v. United States,* 536 F.2d 269 (C.A.8 1976); *G. M. Leasing Corp. v. United States,* 560 F.2d 1011 (C.A.10 1977). [FN27]

> FN27. The First and Sixth Circuits have recently accorded immunity to federal officials sued for common-law torts, without discussion of their views with respect to constitutional claims. *Berberian v. Gibney,* 514 F.2d 790 (C.A.1 1975); *Mandel v. Nouse,* 509 F.2d 1031 (C.A.6 1975).

[3] We agree with the perception of these courts that, in the absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials when sued for the identical violation under § 1983. The constitutional injuries made actionable by § 1983 are of no greater magnitude than those for which federal officials may be responsible. The pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal **2908 officials. [FN28] We see no sense *501 in holding a state governor liable but immunizing the head of a federal department; in holding the administrator of a federal hospital immune where the superintendent of a state hospital would be liable; in protecting the warden of a federal prison where the warden of a state prison would be vulnerable; or in distinguishing between state and federal police participating in the same investigation. Surely, *federal* officials should enjoy no greater zone of protection when they violate *federal* constitutional rules than do *state* officers.

> FN28. In *Apton v. Wilson,* 165 U.S.App.D.C. 22, 32, 506 F.2d 83, 93 (1974), Judge Leventhal compared the Governor of a State with the highest officers of a federal executive department:
> "The difference in office is relevant, for immunity

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291

**EXHIBIT 2 PAGE 430**

LOVE00804

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *501, 98 S.Ct. 2894, **2908)

depends in part upon 'scope of discretion and responsibilities of the office,' *Scheuer v. Rhodes, supra*, 416 U.S., at 247, 94 S.Ct., at 1692. But the difference is not conclusive in this case. Like the highest executive officer of a state, the head of a Federal executive department has broad discretionary authority. Each is called upon to act under circumstances where judgments are tentative and an unambiguously optimal course of action can be ascertained only in retrospect. . Both officials have functions and responsibilities concerned with maintaining the public order; these may impel both officials to make decisions 'in an atmosphere of confusion, ambiguity, and swiftly moving events.' *Scheuer v. Rhodes, supra*, 416 U.S., at 247, 94 S.Ct., at 1691. Having a wider territorial responsibility than the head of a state government, a Federal cabinet officer may be entitled to consult fewer sources and expend less effort, inquiring into the circumstances of a localized problem. But these considerations go to the showing an officer vested with a qualified immunity must make in support of 'good faith belief;' they do not make the qualified immunity itself inappropriate. The head of an executive department, no less than the chief executive of a state, is adequately protected by a qualified immunity."

The Government argues that the cases involving state officials are distinguishable because they reflect the need to preserve the effectiveness of the right of action authorized by § 1983. But as we discuss more fully below, the cause of action recognized in *Bivens v. Six. Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), would similarly be "drained of meaning" if federal officials were entitled to absolute immunity for their constitutional transgressions. Cf. *Scheuer v. Rhodes*, 416 U.S., at 248, 94 S.Ct., at 1692.

[4]  Moreover, the Government's analysis would place undue emphasis on the congressional origins of the cause of action in determining the level of immunity.  It has been observed more than once that the law of privilege as a defense to damages actions against officers of Government has "in large *502 part been of judicial making." *Barr v. Matteo*, 360 U.S., at 569, 79 S.Ct., at 1338; *Doe v. McMillan*, 412 U.S. 306, 318, 93 S.Ct. 2018, 2027, 36 L.Ed.2d 912 (1973). Section 1 of the Civil Rights Act of 1871 [FN29]--the predecessor of § 1983--said nothing about immunity for state officials.  It mandated that any person who under color of state law subjected another to the deprivation of his constitutional rights would be liable to the injured party in an action at law. [FN30]  **2909 This *503 Court nevertheless ascertained and announced what it deemed to be the appropriate type of immunity from § 1983 liability in a variety of contexts. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Scheuer v. Rhodes, supra*. The federal courts are equally competent to determine the appropriate level of immunity where the suit is a direct claim under the Federal Constitution against a federal officer.

FN29. Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, provided in pertinent part:

"[A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law . . . ."

FN30. The purpose of § 1 of the Civil Rights Act was not to abolish the immunities available at common law, see *Pierson v. Ray, supra*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967), but to insure that federal courts would have jurisdiction of constitutional claims against state officials. We explained in *District of Columbia v. Carter*, 409 U.S., at 427-428, 93 S.Ct., at 607:

"At the time this Act was adopted, . . . there existed no general federal-question jurisdiction in the lower federal courts. Rather, 'Congress relied on the state courts to vindicate essential rights arising under the Constitution and federal laws.' *Zwickler v. Koota*, 389 U.S. 241, 245, 88 S.Ct. 391, 394, 19 L.Ed.2d 444 (1967). With the growing awareness that this reliance had been misplaced, however, Congress recognized the need for original federal court jurisdiction as a means to provide at least indirect federal control over the unconstitutional actions of state officials." (Footnotes omitted.)
The situation with respect to federal officials was entirely different: They were already subject to judicial control through the state courts, which were not particularly sympathetic to federal officials, or through the removal jurisdiction of the federal courts.  See generally *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); *Tennessee v. Davis*, 100 U.S. 257, 25 L.Ed. 648 (1880). Moreover, in 1875 Congress vested the circuit courts with general federal-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 431**

LOVE00805

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *503, 98 S.Ct. 2894, **2909)

question jurisdiction, which encompassed many suits against federal officials.    18 Stat. 470. Thus, the absence of a statute similar to § 1983 pertaining to federal officials cannot be the basis for an inference about the level of immunity appropriate to federal officials.

[5]    The presence or absence of congressional authorization for suits against federal officials is, of course, relevant to the question whether to infer a right of action for damages for a particular violation of the Constitution.    In Bivens, the Court noted the "absence of affirmative action by Congress" and therefore looked for "special factors counselling hesitation."  403 U.S., at 396, 91 S.Ct., at 2004. Absent congressional authorization, a court may also be impelled to think more carefully about whether the type of injury sustained by the plaintiff is normally compensable in damages, 403 U.S., at 397, 91 S.Ct., at 2005, and whether the courts are qualified to handle the types of questions raised by the plaintiff's claim, see id., at 409, 91 S.Ct., at 2011 (Harlan, J., concurring in judgment).

[6]·  But once this analysis is completed, there is no reason to return again to the absence of congressional authorization in resolving the question of immunity.    Having determined that the plaintiff is entitled to a remedy in damages for a constitutional violation, the court then must address how best to reconcile the plaintiff's right to compensation with the need to protect the decisionmaking processes of an executive department.    Since our decision in Scheuer was intended to guide the federal courts in resolving this tension in the myriad factual situations in which it might arise, we see no reason why it should not supply the governing principles for resolving this dilemma in the case of federal officials.    The Court's opinion in Scheuer relied on precedents dealing with federal as well as state officials, analyzed the issue of executive immunity *504 in terms of general policy considerations, and stated its conclusion, quoted supra, in the same universal terms.    The analysis presented in that case cannot be limited to actions against state officials.

Accordingly, without congressional directions to the contrary, we deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.    The § 1983 action was provided to vindicate federal constitutional rights.    That

Congress decided, after the passage of the Fourteenth Amendment, to enact legislation specifically requiring state officials to respond in federal court for their failures to observe the constitutional limitations on their powers is hardly a reason for excusing their federal counterparts for the identical constitutional transgressions.    To create a system in which the Bill of Rights monitors more closely the conduct of state officials than it does that of federal officials is to stand the constitutional design on its head.

IV

As we have said, the decision in Bivens established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-**2910 question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official. As Mr. Justice Harlan, concurring in the judgment, pointed out, the action for damages recognized in Bivens could be a vital means of providing redress for persons whose constitutional rights have been violated.    The barrier of sovereign immunity is frequently impenetrable. [FN31]  Injunctive or declaratory relief is useless to a person who has already been injured. "For *505 people in Bivens' shoes, it is damages or nothing."  403 U.S., at 410, 91 S.Ct., at 2012.

> FN31. At the time of the Bivens decision, the Federal Tort Claims Act prohibited recovery against the Government for
> "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."  28 U.S.C. § 2680(h).
> The statute was subsequently amended in light of Bivens to lift the bar against some of these claims when arising from the act of federal law enforcement officers.    See 28 U.S.C. § 2680(h) (1976 ed.).

Our opinion in Bivens put aside the immunity question; but we could not have contemplated that immunity would be absolute. [FN32]  If, as the Government argues, all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs.    Moreover, no compensation would be available from the Government, for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

293

EXHIBIT 2 PAGE 432

LOVE00806

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *505, 98 S.Ct. 2894, **2910)

Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused. [FN33]

FN32. Mr. Justice Harlan, the author of the plurality opinion in *Barr*, noted that although "interests in efficient law enforcement . . . argue for a protective zone with respect to many types of Fourth Amendment violations . . . at the very least . . . a remedy would be available for the most flagrant and patently unjustified sorts of police conduct." *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S., at 411, 91 S.Ct., at 2012 (concurring in judgment). 403 U.S. 411, 91 S.Ct. 2012 (Harlan, J., concurring).

FN33. Pursuant to 28 U.S.C. § 2680 (1976 ed.), the Government is immune from

"(a) Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. See generally *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

The extension of absolute immunity from damages liability to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees. The broad authority possessed by these officials enables them to direct their subordinates to undertake a wide range of projects--including some which may infringe such important personal interests as liberty, property, and free speech. It makes *506 little sense to hold that a Government agent is liable for warrantless and forcible entry into a citizen's house in pursuit of evidence, but that an official of higher rank who actually orders such a burglary is immune simply because of his greater authority. Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees.

[7] Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:
"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the

officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee*, 106 U.S., at 220, 1 S.Ct., at 261.

See also *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803); *Scheuer v. Rhodes*, 416 U.S., at 239-240, 94 S.Ct., at 1687-1688. In **2911 light of this principle, federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.

[8] This is not to say that considerations of public policy fail to support a limited immunity for federal executive officials. We consider here, as we did in *Scheuer*, the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. Yet *Scheuer* and other cases have recognized that it is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not *507 unduly interfere with the exercise of official judgment. We therefore hold that, in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer*, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business. [FN34]

FN34. The Government argued in *Bivens* that the plaintiff should be relegated to his traditional remedy at state law. "In this scheme the Fourth Amendment would serve merely to limit the extent to which the agents could defend the state law tort suit by asserting that their actions were a valid exercise of federal power: if the agents were shown to have violated the Fourth Amendment, such a defense would be lost to them and they would stand before the state law merely as private individuals." 403 U.S., at 390-391, 91 S.Ct., at 2002. Although, as this passage makes clear, traditional doctrine did not accord immunity to officials who transgressed constitutional limits, we believe that federal officials sued by such traditional means should similarly be entitled to a *Scheuer* immunity.

[9] The *Scheuer* principle of only qualified

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

294

**EXHIBIT 2 PAGE 433**

LOVE00807

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *507, 98 S.Ct. 2894, **2911)

immunity for constitutional violations is consistent with *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896); and *Kendall v. Stokes*, 3 How. 87, 11 L.Ed. 506 (1847). Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law. But we see no substantial basis for holding, as the United States would have us do, that executive officers generally may with impunity discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule. The principle should prove as workable in suits against federal officials as it has in the context of suits against state officials. Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive *508 a motion to dismiss. Moreover, the Court recognized in *Scheuer* that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity. [FN35] See 416 U.S., at 250, 94 S.Ct., at 1693. In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.

> FN35. The defendant official may also be able to assert on summary judgment some other common-law or constitutional privilege. For example, in this case the defendant officials may be able to argue that their issuance of the press release was privileged as an accurate report on a matter of public record in an administrative proceeding. See Handler & Klein, The Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv.L.Rev. 44, 61-62, 75-76 (1960). Of course, we do not decide this issue at this time.

V

[10] Although a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, our decisions recognize that there are some officials whose special functions require a full exemption **2912 from liability. E. g., *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872); *Imbler v.*

*Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In each case, we have undertaken "a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Id.*, at 421, 96 S.Ct., at 990.

In *Bradley v. Fisher*, the Court analyzed the need for absolute immunity to protect judges from lawsuits claiming that their decisions had been tainted by improper motives. The Court began by noting that the principle of immunity for acts done by judges "in the exercise of their judicial functions" had been "the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country." 13 Wall., at 347. The Court explained that the value of this rule was proved by experience. *509 Judges were often called to decide "[c]ontroversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings." *Id.*, at 348. Such adjudications invariably produced at least one losing party, who would "accep[t] anything but the soundness of the decision in explanation of the action of the judge." *Ibid.* "Just in proportion to the strength of his convictions of the correctness of his own view of the case is he apt to complain of the judgment against him, and from complaints of the judgment to pass to the ascription of improper motives to the judge." *Ibid.* If a civil action could be maintained against a judge by virtue of an allegation of malice, judges would lose "that independence without which no judiciary can either be respectable or useful." *Id.*, at 347. Thus, judges were held to be immune from civil suit "for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction." *Id.*, at 354. [FN36]

> FN36. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), we recognized that state judges sued on constitutional claims pursuant to § 1983 could claim a similar absolute immunity. The Court reasoned:
>
> "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 434**

L0VE00808

98 S.Ct. 2894

Page 18

(Cite as: 438 U.S. 478, *509, 98 S.Ct. 2894, **2912)

principled and fearless decision-making but to intimidation." *Id.*, at 554, 87 S.Ct., at 1218.

The principle of *Bradley* was extended to federal prosecutors through the summary affirmance in *Yaselli v. Goff*, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), aff'g 12 F.2d 396 (C.A.2 1926). The Court of Appeals in that case discussed in detail the common-law precedents extending absolute immunity to parties participating in the judicial process: judges, grand jurors, petit jurors, advocates, and witnesses. Grand jurors had received absolute immunity " 'lest they should be biased with the fear of being *510 harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse).' " *Id.*, at 403, quoting 1 W. Hawkins, Pleas of the Crown 349 (6th ed. 1787). The court then reasoned that " '[t]he public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.' " 12 F.2d, at 404, quoting *Smith v. Parman*, 101 Kan. 115, 116, 165 P. 663 (1917). The court held the prosecutor in that case immune from suit for malicious prosecution and this Court, citing *Bradley v. Fisher, supra,* affirmed.

We recently reaffirmed the holding of *Yaselli v. Goff* in *Imbler v. Pachtman, supra,* a suit against a state prosecutor under § 1983. The Court's examination of the leading precedents led to the conclusion that "[t]he common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." 424 U.S., **2913 at 422-423, 96 S.Ct., at 991. The prosecutor's role in the criminal justice system was likely to provoke "with some frequency" retaliatory suits by angry defendants. *Id.*, at 425, 96 S.Ct., at 992. A qualified immunity might have an adverse effect on the functioning of the criminal justice system, not only by discouraging the initiation of prosecutions, see *id.*, at 426 n. 24, 96 S.Ct., at 993, but also by affecting the prosecutor's conduct of the trial.

"Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence. . . . If prosecutors

were hampered in exercising their judgment as to the use of . . . witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence." *Id.*, at 426, 96 S.Ct., at 993.

*511 In light of these and other practical considerations, the Court held that the defendant in that case was entitled to absolute immunity with respect to his activities as an advocate, "activities [which] were intimately associated with the judicial phase of the criminal process; and thus were functions to which the reasons for absolute immunity apply with full force." *Id.*, at 430, 96 S.Ct., at 995. [FN37]

> FN37. The *Imbler* Court specifically reserved the question "whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." 424 U.S., at 430-431, 96 S.Ct., at 995.

Despite these precedents, the Court of Appeals concluded that all of the defendants in this case—including the Chief Hearing Examiner, Judicial Officer, and prosecuting attorney—were entitled to only a qualified immunity. The Court of Appeals reasoned that officials within the Executive Branch generally have more circumscribed discretion and pointed out that, unlike a judge, officials of the Executive Branch would face no conflict of interest if their legal representation was provided by the Executive Branch. The Court of Appeals recognized that "some of the Agriculture Department officials may be analogized to criminal prosecutors, in that they initiated the proceedings against [respondent], and presented evidence therein," 535 F.2d, at 696 n. 8, but found that attorneys in administrative proceedings did not face the same "serious constraints of time and even information" which this Court has found to be present frequently in criminal cases. See *Imbler v. Pachtman*, 424 U.S., at 425, 96 S.Ct., at 992.

[11] We think that the Court of Appeals placed undue emphasis on the fact that the officials sued here are—from an administrative perspective—employees of the Executive Branch. Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities. This point is underlined by the fact that prosecutors—themselves members of the Executive *512

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

296

**EXHIBIT 2 PAGE 435**

LOVE00809

98 S.Ct. 2894                                                                    Page 19
(Cite as: 438 U.S. 478, *512, 98 S.Ct. 2894, **2913)

Branch—are also absolutely immune. "It is the functional comparability of their judgments to those of the judge that has resulted in both grand jurors and prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well." *Id.*, at 423 n. 20, 96 S.Ct., at 991.

The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location. As the *Bradley* Court suggested, 13 Wall., at 348-349, controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. *See Pierson v. Ray,* 386 U.S., at 554, 87 S.Ct., at 1217. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

**2914 [12] At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. [FN38] Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

FN38. See generally Handler & Klein, *supra* n. 35, at 54-55.

We think that adjudication within a federal administrative *513 agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages. The conflicts

which federal hearing examiners seek to resolve are every bit as fractious as those which come to court. As the *Bradley* opinion points out: "When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision, often finds vent in imputations of [malice]." 13 Wall., at 348, 20 L.Ed. 646. Moreover, federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversary in nature. See 5 U.S.C. § 555(b) (1976 ed.). They are conducted before a trier of fact insulated from political influence. See § 554(d). A party is entitled to present his case by oral or documentary evidence, § 556(d), and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. § 556(e). The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record. § 557(c).

There can be little doubt that the role of the modern federal hearing examiner or administrative law judge within this framework is "functionally comparable" to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See § 556(c). More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency. Prior to the Administrative Procedure Act, there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because *514 they were required to perform prosecutorial and investigative functions as well as their judicial work, see, e. g., *Wong Yang Sung v. McGrath,* 339 U.S. 33, 36-41, 70 S.Ct. 445, 447-450, 94 L.Ed. 616 (1950), and because they were often subordinate to executive officials within the agency, see *Ramspeck v. Federal Trial Examiners Conference,* 345 U.S. 128, 131, 73 S.Ct. 570, 572, 97 L.Ed. 872 (1953). Since the securing of fair and competent hearing personnel was viewed as "the heart of formal administrative adjudication," Final Report of the Attorney General's Committee

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

297

**EXHIBIT 2 PAGE 436**

LOVE00810

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *514, 98 S.Ct. 2894, **2914)

Page 20

on Administrative Procedure 46 (1941), the Administrative Procedure Act contains a number of provisions designed to guarantee the independence of hearing examiners. They may not perform duties inconsistent with their duties as hearing examiners. 5 U.S.C. § 3105 (1976 ed.). When conducting a hearing under § 5 of the APA, 5 U.S.C. § 554 **2915 (1976 ed.), a hearing examiner is not responsible to, or subject to the supervision or direction of, employees or agents engaged in the performance of investigative or prosecution functions for the agency. 5 U.S.C. § 554(d)(2) (1976 ed.). Nor may a hearing examiner consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate. § 554(d)(1). Hearing examiners must be assigned to cases in rotation so far as is practicable. § 3105. They may be removed only for good cause established and determined by the Civil Service Commission after a hearing on the record. § 7521. Their pay is also controlled by the Civil Service Commission.

In light of these safeguards, we think that the risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women. We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Those who complain of error in such proceedings must seek agency or judicial review.

*515 [13]  We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought. The Commodity Futures Trading Commission, for example, may initiate proceedings whenever it has "reason to believe" that any person "is violating or has violated any of the provisions of this chapter or of the rules, regulations, or orders of the Commission." 7 U.S.C. § 9 (1976 ed.). A range of sanctions is open to it. Ibid.

The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete. Cf. Imbler v. Pachtman, 424 U.S., at 426 n. 24, 96 S.Ct., at 993 n. 24. While there is not likely to be anyone willing and legally able to seek damages from the officials if they do not authorize the administrative proceeding, cf. id., at 438, 96 S.Ct., at 998 (WHITE, J., concurring in judgment), there is a serious danger that the decision to authorize proceedings will provoke a retaliatory response. An individual targeted by an administrative proceeding will react angrily and may seek vengeance in the courts. A corporation will muster all of its financial and legal resources in an effort to prevent administrative sanctions. "When millions may turn on regulatory decisions, there is a strong incentive to counter-attack." [FN39]

FN39. Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution, 184 U.S.App.D.C. 397, 401, 566 F.2d 289, 293 (1977), cert. pending, No. 76-418.

The defendant in an enforcement proceeding has ample opportunity to challenge the legality of the proceeding. An *516 administrator's decision to proceed with a case is subject to scrutiny in the proceeding itself. The respondent may present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified. His claims that the proceeding is unconstitutional may also be heard by the courts. Indeed, respondent in this case was able to quash the administrative order entered against him by means of judicial review. See Economou v. U. S. Department of Agriculture, 494 F.2d 519 (C.A.2 1974).

We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment. Because the legal **2916 remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal, we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

298

**EXHIBIT 2 PAGE 437**

LOVE00811

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *516, 98 S.Ct. 2894, **2916)

[14]   We turn finally to the role of an agency attorney in conducting a trial and presenting evidence on the record to the trier of fact.   We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court. [FN40]   In either case, the evidence *517 will be subject to attack through cross-examination, rebuttal, or reinterpretation by opposing counsel.   Evidence which is false or unpersuasive should be rejected upon analysis by an impartial trier of fact.   If agency attorneys were held personally liable in damages as guarantors of the quality of their evidence, they might hesitate to bring forward some witnesses or documents.   "This is particularly so because it is very difficult if not impossible for attorneys to be absolutely certain of the objective truth or falsity of the testimony which they present."   Imbler v. Pachtman, supra, 424 U.S., at 440, 96 S.Ct., at 999 (WHITE, J., concurring in judgment).   Apart from the possible unfairness to agency personnel, the agency would often be denied relevant evidence.   Cf. Imbler v. Pachtman, supra, at 426, 96 S.Ct., at 993.   Administrative agencies can act in the public interest only if they can adjudicate on the basis of a complete record.   We therefore hold that an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence.

FN40.   That prosecutors act under "serious constraints of time and even information" was not central to our decision in Imbler, for the same might be said of a wide variety of state and federal officials who enjoy only qualified immunity.   See Scheuer v. Rhodes, 416 U.S., at 246-247, 94 S.Ct., at 1691.     Nor do we think that administrative enforcement proceedings may be distinguished from criminal prosecutions on the ground that the former often turn on documentary proof.     The key point is that administrative personnel, like prosecutors, "often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence."   Imbler, 424 U.S. at 426 n. 24, 96 S.Ct., at 993.   The complexity and quantity of documentary proof that may be adduced in a full-scale enforcement proceeding may make this decision even more difficult than the decision to prosecute a suspect.

VI
There remains the task of applying the foregoing principles to the claims against the particular petitioner-defendants involved in this case.   Rather than attempt this here in the first instance, we vacate the judgment of the Court of Appeals and remand the case to that court with instructions to remand the case to the District Court for further proceedings consistent with this opinion.

*So ordered.*

Mr. Justice REHNQUIST, with whom THE CHIEF JUSTICE, Mr. Justice STEWART, and Mr. Justice STEVENS join, concurring in part and dissenting in part.

I concur in that part of the Court's judgment which affords absolute immunity to those persons performing adjudicatory functions within a federal agency, ante, at 2915, *518 those who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication, ante, at 2916, and those agency personnel who present evidence on the record in the course of an adjudication, ante, at 2916.   I cannot agree, however, with the Court's conclusion that in a suit for damages arising from allegedly unconstitutional action federal executive officials, regardless of their rank or the scope of their responsibilities, are entitled to only qualified immunity even when acting within the outer limits of their authority. The Court's protestations to the **2917 contrary notwithstanding,     this     decision     seriously misconstrues our prior decisions, finds little support as a matter of logic or precedent, and perhaps most importantly, will, I fear, seriously "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."   Gregoire v. Biddle, 177 F.2d 579, 581 (C.A.2 1949) (Learned Hand, J.).

Most noticeable is the Court's unnaturally constrained reading of the landmark case of Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896).   The Court in that case did indeed hold that the actions taken by the Postmaster General were within the authority conferred upon him by Congress, and went on to hold that even though he had acted maliciously in carrying out the duties conferred upon him by Congress he was protected by official immunity.   But the Court left no doubt that it would have reached the same result had it been alleged the official acts were unconstitutional.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 438**

L0VE00812

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *518, 98 S.Ct. 2894, **2917)

"We are of the opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply, to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be *519 accorded to them in respect of their official acts." *Id.*, at 498, 16 S.Ct., at 637.

The Court today attempts to explain away that language by observing that *Spalding* indicated no intention to overrule *Kendall v. Stokes*, 3 How. 87, 11 L.Ed. 506 (1845), or *Wilkes v. Dinsman*, 7 How. 89, 12 L.Ed. 618 (1849). See *ante*, at 2904 n. 18. But as the Court itself observes, the Postmaster General was held *not* "liable in an action for an error of judgment" in *Kendall*, *supra*, at 98. The Court in *Wilkes*, *supra*, likewise exonerated the defendant. The Court did indicate in dictum in both those cases that a federal officer might be liable if he acted with malice, *Kendall*, *supra*, at 99; *Wilkes*, *supra*, at 131, but the holding in *Spalding* was, as even the Court is forced to admit today, see *ante*, at 2903-2904, directly contrary to those cases on that point. In short, *Spalding* clearly and inescapably stands for the proposition that high-ranking executive officials acting within the outer limits of their authority are absolutely immune from suit.

Indeed, the language from *Spalding* quoted above unquestionably applies with equal force in the case at bar. No one seriously contends that the Secretary of Agriculture or the Assistant Secretary, who are being sued for $32 million in damages, had wandered completely off the official reservation in authorizing prosecution of respondent for violation of regulations promulgated by the Secretary for the regulation of "futures commission merchants," 7 U.S.C. § 6 (1976 ed.). This is precisely what the Secretary and his assistants were empowered and required to do. That they would on occasion be mistaken in their judgment that a particular merchant had in fact violated the regulations is a necessary concomitant of any known system of administrative adjudication; that they acted "maliciously" gives no support to respondent's claim against them unless we are to overrule *Spalding*.

The Court's attempt to distinguish *Spalding* may be predicated *520 on a simpler but equally erroneous concept of immunity. At one point the Court observes that even under *Spalding* "an executive officer would be vulnerable if he took action 'manifestly or palpably' beyond his authority or ignored a clear limitation on his enforcement powers." *Ante*, at 2904 n. 18. From that proposition, which is undeniably accurate, the Court appears to conclude that anytime a plaintiff can paint his grievance in constitutional colors, the official is subject to damages unless he can prove he acted in good faith. After all, Congress would never "authorize" an official to engage in unconstitutional conduct. That this notion in fact underlies the Court's decision is strongly suggested by its discussion of numerous **2918 cases which supposedly support its position, but all of which in fact deal not with the question of what level of immunity a federal official may claim when acting within the outer limits of his authority, but rather with the question of whether he was in fact so acting. See *ante*, at 2902-2903.

Putting to one side the illogic and impracticability of distinguishing between constitutional and common-law claims for purposes of immunity, which will be discussed shortly, this sort of immunity analysis badly misses the mark. It amounts to saying that an official has immunity until someone alleges he has acted unconstitutionally. But that is no immunity at all: The "immunity" disappears at the very moment when it is needed. The critical inquiry in determining whether an official is entitled to claim immunity is not whether someone has in fact been injured by his action; that is part of the plaintiff's case in chief. The immunity defense turns on whether the action was one taken "when engaged in the discharge of duties imposed upon [the official] by law," *Spalding*, 161 U.S., at 498, 16 S.Ct., at 637, or in other words, whether the official was acting within the outer bounds of his authority. Only if the immunity inquiry is approached in this manner does it have any meaning. That such a rule may occasionally result in individual injustices has never been doubted, but at least until *521 today, immunity has been accorded nevertheless: As Judge Learned Hand said in *Gregoire v. Biddle*, 177 F.2d, at 581:

"The justification for doing so is that it is impossible to know whether the claim is well

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 439**

LOVE00813

98 S.Ct. 2894                                                                                    Page 23
(Cite as: 438 U.S. 478, *521, 98 S.Ct. 2894, **2918)

founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . ."

Indeed, in that very case Judge Hand laid bare the folly of approaching the question of immunity in the manner suggested today by the Court.

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the *522 whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." Ibid.

Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), unfortunately fares little better at the Court's hand than Spalding. Here the Court at least recognizes and reaffirms the minimum proposition for which Barr stands--that executive officials are absolutely immune at least from actions predicated on common-law claims as long as they are acting within the outer limits of their authority. See ante, at 2905. Barr is distinguished, however, on the ground that it did

not involve a violation **2919 of "those fundamental principles of fairness embodied in the Constitution." Ibid. But if we allow a mere allegation of unconstitutionality, obviously unproved at the time made, to require a Cabinet-level official, charged with the enforcement of the responsibilities to which the complaint pertains, to lay aside his duties and defend such an action on the merits, the defense of official immunity will have been abolished in fact if not in form. The ease with which a constitutional claim may be pleaded in a case such as this, where a violation of statutory or judicial limits on agency action may be readily converted by any legal neophyte into a claim of denial of procedural due process under the Fifth Amendment, will assure that. The fact that the claim fails when put to trial will not prevent the consumption of time, effort, and money on the part of the defendant official in defending his actions on the merits. The result can only be damage to the "interests of the people," Spalding, supra, 161 U.S., at 498, 16 S.Ct., at 637, which "require [s] that due protection be accorded to [Cabinet officials] in respect of their official acts."

It likewise cannot seriously be argued that an official will be less deterred by the threat of liability for unconstitutional *523 conduct than for activities which might constitute a common-law tort. The fear that inhibits is that of a long, involved lawsuit and a significant money judgment, not the fear of liability for a certain type of claim. Thus, even viewing the question functionally--indeed, especially viewing the question functionally-- the basis for a distinction between constitutional and common-law torts in this context is open to serious question. Even the logical justification for raising such a novel distinction is far from clear. That the Framers thought some rights sufficiently susceptible of legislative derogation that they should be enshrined in the Constitution does not necessarily indicate that the Framers likewise intended to establish an immutable hierarchy of rights in terms of their importance to individuals. The most heinous common-law tort surely cannot be less important to, or have less of an impact on, the aggrieved individual than a mere technical violation of a constitutional proscription.

The Court purports to find support for this distinction, and therefore this result, in the principles supposedly underlying Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803) and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.                                301

EXHIBIT 2 PAGE 440

LOVE00814

98 S.Ct. 2894

Page 24

(Cite as: 438 U.S. 478, *523, 98 S.Ct. 2894, **2919)

*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the fact that cognate state officials are not afforded absolute immunity for actions brought under 42 U.S.C. § 1983. Undoubtedly these rationales have some superficial appeal, but none withstands careful analysis. *Marbury v. Madison*, *supra*, leaves no doubt that the high position of a Government official does not insulate his actions from judicial review. But that case, like numerous others which have followed, involved equitable-type relief by way of mandamus or injunction. In the present case, respondent sought damages in the amount of $32 million. There is undoubtedly force to the argument that injunctive relief, in these cases where a court determines that an official defendant has violated a legal right of the plaintiff, sets the matter right only as to the future. But there is at least as much force to the argument *524 that the threat of injunctive relief without the possibility of damages in the case of a Cabinet official is a better tailoring of the competing need to vindicate individual rights, on the one hand, and the equally vital need, on the other, that federal officials exercising discretion will be unafraid to take vigorous action to protect the public interest.

The Court also suggests in sweeping terms that the cause of action recognized in *Bivens* would be " 'drained of meaning' if federal officials were entitled to absolute immunity for their constitutional transgressions." *Ante*, at 2908. But *Bivens* is a slender reed on which to rely when abrogating official immunity for Cabinet-level officials. In the first place, those officials most susceptible to claims under *Bivens* have historically been given only a qualified immunity. As the Court observed in *Pierson v. **2920 Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), "[t]he common law has never granted police officers an absolute and unqualified immunity . . . ." In any event, it certainly does not follow that a grant of absolute immunity to the Secretary and Assistant Secretary of Agriculture requires a like grant to federal law enforcement officials. But even more importantly, on the federal side, when Congress thinks redress of grievances is appropriate, it can and generally does waive sovereign immunity, allowing an action directly against the United States. This allows redress for deprivations of rights, while at the same time limiting the outside influences which might inhibit an official in the free and considered exercise of his official powers. In fact,

Congress, making just these sorts of judgments with respect to the very causes of action which the Court suggests require abrogation of absolute immunity, has amended the Federal Tort Claims Act, see 28 U.S.C. § 2680(h) (1976 ed.), to allow suits against the United States on the basis of certain intentional torts if committed by federal "investigative or law enforcement officers."

The Court also looks to the question of immunity of state officials for causes arising under § 1983 and, quoting a concurring *525 opinion in *Anderson v. Nosser*, 438 F.2d 183, 205 (CA 5 1971), to the effect that there should not be "one law for Athens and another for Rome," finds no reason why those principles should not likewise apply when federal officers are the target. Homilies cannot replace analysis in this difficult area, however. And even a moment's reflection on the nature of the *Bivens* -type action and the purposes of § 1983, as made abundantly clear in this Court's prior cases, supplies a compelling reason for distinguishing between the two different situations. In the first place, as made clear above, a grant of absolute immunity to high-ranking executive officials on the federal side would not eviscerate the cause of action recognized in *Bivens*. The officials who are the most likely defendants in a *Bivens* -type action have generally been accorded only a qualified immunity. But more importantly, Congress has expressly waived sovereign immunity for this type of suit. This permits a direct action against the Government, while limiting those risks which might "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." And the Federal Government can internally supervise and check its own officers. The Federal Government is not so situated that it can control state officials or strike this same balance, however. Hence the necessity of § 1983 and the differing standards of immunity. As the Court observed in *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973):

"Although there are threads of many thoughts running through the debates on the 1871 Act, it seems clear that § 1 of the Act, with which we are here concerned, was designed primarily in response to unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others." *Id.*, at 426, 93 S.Ct., at 607.

"[T]he [basic] rationale underlying Congress'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

302

**EXHIBIT 2 PAGE 441**

L0VE00815

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *525, 98 S.Ct. 2894, **2920)

decision not to enact legislation similar to § 1983 with respect to *526 federal officials [was] the assumption that the Federal Government could keep its own officers under control . . . ." *Id.,* at 429-430, 93 S.Ct., at 609.

The Court attempts to avoid the force of this argument by suggesting that the statute which vests federal courts with general federal-question jurisdiction is basically the equivalent of § 1983. *Ante,* at 2908-2909 n. 30. But that suggestion evinces a basic misunderstanding of the difference between a statute which vests jurisdiction in federal courts, which are, as a constitutional matter, courts of limited jurisdiction, and a statute, or even a constitutional provision, which creates a private right of action. As even the Court's analysis in *Bivens* made clear, a statute giving jurisdiction to federal courts does not, in and of itself, create a **2921 right of action. And to date, the Court has not held that the Constitution itself creates a private right of action for damages except when federal law enforcement officials arrest someone and search his premises in violation of the Fourth Amendment. Thus, the Court's attempt to equate § 1983 and 28 U.S.C. § 1331 (1976 ed.) simply fails, and its further observation--that there should be no difference in immunity between state and federal officials--remains subject to serious doubt.

My biggest concern, however, is not with the illogic or impracticality of today's decision, but rather with the potential for disruption of Government that it invites. The steady increase in litigation, much of it directed against governmental officials and virtually all of which could be framed in constitutional terms, cannot escape the notice of even the most casual observer. From 1961 to 1977, the number of cases brought in the federal courts under civil rights statutes increased from 296 to 13,113. See Director of the Administrative Office of the United States Courts Ann.Rep. 189, Table 11 (1977); Ann.Rep. 173, Table 17 (1976). It simply defies logic and common experience to suggest that officials will not have this in the back of their minds when considering *527 what official course to pursue. It likewise strains credulity to suggest that this threat will only inhibit officials from taking action which they should not take in any event. It is the cases in which the grounds for action are doubtful, or in which the actor is timid, which will be affected by today's decision.

The Court, of course, recognizes this problem and suggests two solutions. First, judges, ever alert to the artful pleader, supposedly will weed out insubstantial claims. *Ante,* at 2911. That, I fear, shows more optimism than prescience. Indeed, this very case, unquestionably frivolous in the extreme, belies any hope in that direction. And summary judgment on affidavits and the like is even more inappropriate when the central, and perhaps only, inquiry is the official's state of mind. See C. Wright, Law of Federal Courts 493 (3d ed. 1976) (It "is not feasible to resolve on motion for summary judgment cases involving state of mind"); *Subin v. Goldsmith,* 224 F.2d 753 (C.A.2 1955).

The second solution offered by the Court is even less satisfactory. The Court holds that in those special circumstances "where it is demonstrated that absolute immunity is essential for the conduct of the public business," absolute immunity will be extended. *Ante,* at 2911. But this is a form of "absolute immunity" which in truth exists in name only. If, for example, the Secretary of Agriculture may never know until inquiry by a trial court whether there is a possibility that vexatious constitutional litigation will interfere with his decision-making process, the Secretary will obviously think not only twice but thrice about whether to prosecute a litigious commodities merchant who has played fast and loose with the regulations for his own profit. Careful consideration of the rights of every individual subject to his jurisdiction is one thing; a timorous reluctance to prosecute any of such individuals who have a reputation for using litigation as a defense weapon is quite another. Since Cabinet officials are mortal, *528 it is not likely that we shall get the precise judgmental balance desired in each of them, and it is because of these very human failings that the principles of *Spalding,* 161 U.S., at 498, 16 S.Ct., at 637, dictate that absolute immunity be accorded once it be concluded by a court that a high level executive official was "engaged in the discharge of duties imposed upon [him] by law." [FN*]

FN* The ultimate irony of today's decision is that in the area of common-law official immunity, a body of law fashioned and applied by judges, absolute immunity within the federal system is extended only to judges and prosecutors functioning in the judicial system. See *Bradley v. Fisher,* 13 Wall. 335, 20 L.Ed. 646 (1872); *Yaselli v. Goff,* 12 F.2d 396 (C.A.2 1926),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 442

L0VE00816

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *528, 98 S.Ct. 2894, **2921)

Page 26

summarily aff'd, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). Similarly, where this Court has interpreted 42 U.S.C. § 1983 in the light of common-law doctrines of official immunity, again only judges and prosecutors are accorded absolute immunity. See *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed. 128 (1976). If one were to hazard an informed guess as to why such a distinction in treatment between judges and prosecutors, on the one hand, and other public officials on the other, obtains, mine would be that those who decide the common law know through personal experience the sort of pressures that might exist for such decisionmakers in the absence of absolute immunity, but may not know or may have forgotten that similar pressures exist in the case of nonjudicial public officials to whom difficult decisions are committed. But the cynical among us might not unreasonably feel that this is simply another unfortunate example of judges treating those who are not part of the judicial machinery as "lesser breeds without the law."

**2922 Today's opinion has shouldered a formidable task insofar as it seeks to justify the rejection of the views of the first Mr. Justice Harlan expressed in his opinion for the Court in *Spalding v. Vilas, supra,* and those of the second Mr. Justice Harlan expressed in his opinions in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and its companion case of *Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). In terms of juridical jousting, if not in terms of placement in the judicial hierarchy, it has taken on at least as formidable a task when it disregards the powerful statement of Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579 (CA 2 1949).

*529 History will surely not condemn the Court for its effort to achieve a more finely ground product from the judicial mill, a product which would both retain the necessary ability of public officials to govern and yet assure redress to those who are the victims of official wrongs. But if such a system of redress for official wrongs was indeed capable of being achieved in practice, it surely would not have been rejected by this Court speaking through the first Mr. Justice Harlan in 1896, by this Court speaking through the second Mr. Justice Harlan in 1959, and by Judge Learned Hand speaking for the Court of Appeals for the Second

Circuit in 1948. These judges were not inexperienced neophytes who lacked the vision or the ability to define immunity doctrine to accomplish that result had they thought it possible. Nor were they obsequious toadies in their attitude toward high-ranking officials of coordinate branches of the Federal Government. But they did see with more prescience than the Court does today, that there are inevitable trade-offs in connection with any doctrine of official liability and immunity. They forthrightly accepted the possibility that an occasional failure to redress a claim of official wrongdoing would result from the doctrine of absolute immunity which they espoused, viewing it as a lesser evil than the impairment of the ability of responsible public officials to govern.

But while I believe that history will look approvingly on the motives of the Court in reaching the result it does today, I do not believe that history will be charitable in its judgment of the all but inevitable result of the doctrine espoused by the Court in this case. That doctrine seeks to gain and hold a middle ground which, with all deference, I believe the teachings of those who were at least our equals suggest cannot long be held. That part of the Court's present opinion from which I dissent will, I fear, result in one of two evils, either one of which is markedly worse than the effect of according absolute immunity to the Secretary and the Assistant Secretary in this *530 case. The first of these evils would be a significant impairment of the ability of responsible public officials to carry out the duties imposed upon them by law. If that evil is to be avoided after today, it can be avoided only by a necessarily unprincipled and erratic judicial "screening" of claims such as those made in this case, an adherence to the form of the law while departing from its substance. Either one of these evils is far worse than the occasional failure to award damages caused by official wrongdoing, frankly and openly justified by the rule of *Spalding v. Vilas, Barr v. Matteo,* and *Gregoire v. Biddle.*

438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895

Briefs and Other Related Documents (Back to top)

. 1977 WL 189174T1 (Appellate Brief) Supplemental Memorandum for the Respondents (Nov. 25, 1977)

. 1977 WL 189173T1 (Appellate Brief)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 443**

LOVE00817

98 S.Ct. 2894
(Cite as: 438 U.S. 478, *530, 98 S.Ct. 2894, **2922)

Page 27

Supplemental Memorandum for the Petitioners
(Nov. 16, 1977)

. 1977 WL 189171T1 (Appellate Brief) Reply Brief
for the Petitioners (Nov. 02, 1977)

. 1977 WL 189170T1 (Appellate Brief) Brief of the
Respondents (Aug. 24, 1977)

. 1977 WL 189168T1 (Appellate Brief) Brief for the
Petitioners (Jun. 13, 1977)

. 1977 WL 189166T1 (Appellate Brief) Reply
Memorandum for Petitioners (Feb. 04, 1977)

END OF DOCUMENT

**EXHIBIT 2 PAGE 444**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

305

L0VE00818

2

**EXHIBIT 2 PAGE 445**

306

101 S.Ct. 183
449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185
(Cite as: 449 U.S. 24, 101 S.Ct. 183)
▷

Page 1

Briefs and Other Related Documents

Supreme Court of the United States
Orville E. DENNIS, Petitioner,
v.
Sidney SPARKS and R. L. Lynd, d/b/a Sidney A.
Sparks, Trustee.
No. 79-1186.

Argued Oct. 8, 1980.
Decided Nov. 17, 1980.

Civil rights action was brought against state court judge and others who were alleged to have conspired to bribe the judge to obtain an injunction. The district court dismissed. The Court of Appeals for the Fifth Circuit, 588 F.2d 124, affirmed. On rehearing en banc, the Court of Appeals, 604 F.2d 976, reversed and certiorari was granted. The United States Supreme Court, Justice White, held that: (1) fact that the action was properly dismissed as to the immune state court judge did not require dismissal of the action against the remaining private parties accused of conspiring with the judge, and (2) allegations that an official act of the state court judge was the product of a corrupt conspiracy involving bribery of the judge were sufficient to assert action under color of state law on the part of the private parties.

Affirmed.

West Headnotes

[1] Civil Rights ⬅1341
78k1341
      (Formerly 78k204.1, 78k204, 78k13.7)

[1] Conspiracy ⬅13
91k13
Fact that the state court judge who issued the challenged injunction had been dismissed from the civil rights action on grounds of immunity did not preclude maintenance of the action against the private parties who were accused to have conspired with the judge to obtain the injunction in violation of the plaintiff's civil rights. 42 U.S.C.A. § 1983.

[2] Civil Rights ⬅1326(5)
78k1326(5)
      (Formerly 78k198(4), 78k13.5(4))

"To act under color of state law" for purposes of civil rights statute does not require that the defendant be an officer of the state; it is enough that he is a willful participant in joint action with the state or its agents; private persons, jointly engaged with state officials in the challenged action, are acting under color of law for purposes of the civil rights statute. 42 U.S.C.A. § 1983.

[3] Civil Rights ⬅1396
78k1396
      (Formerly 78k236, 78k13.12(8))

[3] Conspiracy ⬅18
91k18
Allegation that an official act of a state court judge was the product of a corrupt conspiracy involving bribery of the judge was sufficient to assert that the private parties who conspired with the judge were acting under color of state law for purposes of the civil rights statute. 42 U.S.C.A. § 1983.

[4] Judges ⬅38
227k38
State judge may be found criminally liable for violation of civil rights even though the judge may be immune from damages under the civil statute. 18 U.S.C.A. § 242; 42 U.S.C.A. § 1983.

[5] Civil Rights ⬅1376(3)
78k1376(3)
      (Formerly 78k214(3), 78k13.8(2))
The immunities of state officials recognized for purposes of the federal civil rights statute are the equivalents of those that were recognized at the common law. 42 U.S.C.A. § 1983.

[6] Civil Rights ⬅1407
78k1407
      (Formerly 78k240(5), 78k13.13(1))
Burden is on the state official claiming immunity in the civil rights action to demonstrate his entitlement. 42 U.S.C.A. § 1983.

[7] Witnesses ⬅68
410k68
Historically, doctrine of judicial immunity does not preclude a judge from responding as a witness when his coconspirators are sued.

[8] Judges ⬅36

**EXHIBIT 2 PAGE 446**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

307

101 S.Ct. 183
(Cite as: 449 U.S. 24, 101 S.Ct. 183)

Page 2

227k36
Judicial immunity arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of the case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption.

**\*184 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

\*24 After a Texas state court's injunction against respondents' production of minerals from certain oil leases was dissolved by an appellate court as having been illegally issued, respondents filed suit in Federal District Court alleging a cause of action for damages under 42 U.S.C. § 1983 against the judge who issued the injunction, the corporation that had obtained the injunction, its owner, and the sureties on the injunction bond (one of whom is the petitioner). Respondents claimed that the injunction had been corruptly issued as the result of a conspiracy between the judge and the other defendants, thus causing a deprivation of property without due process of law. The District Court dismissed the action, holding that the judge was immune from liability in a § 1983 suit because the injunction was a judicial act within the jurisdiction of the state court, and that with the dismissal of the judge the remaining defendants could not be said to have conspired "under color" of state law within the meaning of § 1983. The Court of Appeals agreed that the judge was immune from suit, but ultimately reversed as to the dismissal of the claims against the other defendants.

*Held:* The action against the private parties accused of conspiring with the judge is not subject to dismissal. Private persons, jointly engaged with state officials in a challenged action, are acting "under color" of law for purposes of § 1983 actions. And the judge's immunity from damages liability for an official act that was allegedly the product of a corrupt conspiracy involving bribery of the judge does not change the character of his action or that of his co-conspirators. Historically at common law, judicial **\*185 immunity does not insulate from damages liability those private persons who corruptly conspire with a judge. Nor has the

doctrine of judicial immunity been considered historically as excusing a judge from responding as a witness when his co-conspirators are sued, even though a charge of conspiracy and judicial corruption will be aired and decided. *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 distinguished. The potential harm to the public from denying immunity to co-conspirators if the factfinder mistakenly upholds a charge of a corrupt conspiracy is outweighed by the benefits of providing a remedy \*25 against those private persons who participate in subverting the judicial process and in so doing inflict injury on other persons. Pp. 186-188.

5th Cir., 604 F.2d 976, affirmed.

Finley L. Edmonds, Corpus Christi, Tex., for petitioner.

Garland F. Smith, Weslaco, Tex., for respondents.

Justice WHITE delivered the opinion of the Court.

In January 1973, a judge of the 229th District Court of Duval County, Tex., enjoined the production of minerals from certain oil leases owned by respondents. In June 1975, the injunction was dissolved by an appellate court as having been illegally issued. Respondents then filed a complaint in the United States District Court purporting to state a cause of action for damages under 42 U.S.C. § 1983. [FN1] Defendants were the Duval County Ranch Co., Inc., which had obtained the injunction, the sole owner of the corporation, the judge who entered the injunction, and the two individual \*26 sureties on the injunction bond, one of whom is now petitioner in this Court. Essentially, the claim was that the injunction had been corruptly issued as the result of a conspiracy between the judge and the other defendants, thus causing a deprivation of property, i. e., two years of oil production, without due process of law.

FN1. Title 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

308

**EXHIBIT 2 PAGE 447**

LOVE00821

101 S.Ct. 183

Page 3

(Cite as: 449 U.S. 24, *26, 101 S.Ct. 183, **185)

All defendants moved to dismiss, the judge asserting judicial immunity and the other defendants urging dismissal for failure to allege action "under color" of state law, a necessary component of a § 1983 cause of action. The District Court concluded that because the injunction was a judicial act within the jurisdiction of the state court, the judge was immune from liability in a § 1983 suit, whether or not the injunction had issued as the result of a corrupt conspiracy. Relying on *Haldane v. Chagnon*, 345 F.2d 601 (CA9 1965), the District Court also ruled that with the dismissal of the judge the remaining defendants could not be said to have conspired under color of state law within the meaning of § 1983. The action against them was accordingly dismissed "for failure to state a claim upon which relief can be granted."

In a *per curiam* opinion, a panel of the Court of Appeals for the Fifth Circuit affirmed, agreeing that the judge was immune from suit and that because "the remaining defendants, who are all private citizens, did not conspire with any person against whom a valid § 1983 suit can be stated," *Sparks v. Duval County Ranch Co.*, 588 F.2d 124, 126 (1979), existing authorities in the Circuit required dismissal of the claims against these defendants as well. [FN2] The case was reconsidered en banc, prior Circuit authority was overruled and the District Court judgment **186 was reversed insofar as it had dismissed claims against the defendants other than the judge. *Sparks v. Duval County Ranch Co.*, 604 F.2d *27 976 (1979). The court ruled that there was no good reason in law, logic, or policy for conferring immunity on private persons who persuaded the immune judge to exercise his jurisdiction corruptly. Because the judgment below was inconsistent with the rulings of other Courts of Appeals [FN3] and involves an important issue, we granted the petition for certiorari. 445 U.S. 942, 100 S.Ct. 1336, 63 L.Ed.2d 775. We now affirm.

FN2. *Slavin v. Curry*, 574 F.2d 1256 (1978); *Perez v. Borchers*, 567 F.2d 285 (1978); *Humble v. Foreman*, 563 F.2d 780 (1977); *Hill v. McClellan*, 490 F.2d 859 (1974); *Guedry v. Ford*, 431 F.2d 660 (1970).

FN3. *Kurz v. Michigan*, 548 F.2d 172 (CA6 1977) ; *Hazo v. Geltz*, 537 F.2d 747 (CA3 1976); *Hansen v. Ahlgrimm*, 520 F.2d 768 (CA7 1975); *Sykes v. California*, 497 F.2d 197 (CA9 1974). See also *Haldane v. Chagnon*, 345 F.2d 601,

604-605 (CA9 1965); but see *Briley v. California*, 564 F.2d 849, 858, n.10 (CA9 1977). The Court of Appeals for the First Circuit has for some time held the present views of the Fifth Circuit. *Slotnick v. Staviskey*, 560 F.2d 31 (1977); *Kermit Construction Corp. v. Banco Credito y Ahorro Ponceno*, 547 F.2d 1 (1976). The Court of Appeals of the Eighth Circuit has recently agreed. *White v. Bloom*, 621 F.2d 276 (1980).

[1] Based on the doctrine expressed in *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872), this Court has consistently adhered to the rule that "judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities. *Pierson v. Ray*, 386 U.S. 547 [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967); *Stump v. Sparkman*, 435 U.S. 349 [98 S.Ct. 1099, 55 L.Ed.2d 331] (1978)." *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 734-735, 100 S.Ct. 1967, 1976, 64 L.Ed.2d 641 (1980). The courts below concluded that the judicial immunity doctrine required dismissal of the § 1983 action against the judge who issued the challenged injunction, and as the case comes to us, the judge has been properly dismissed from the suit on the immunity grounds. It does not follow, however, that the action against the private parties accused of conspiring with the judge must also be dismissed.

[2][3][4] As the Court of Appeals correctly understood our cases to hold, to act "under color of" state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged *28 with state officials in the challenged action, are acting see "under color" of law for purposes of § 1983 actions. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966). [FN4] Of course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge. But here the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

309

**EXHIBIT 2 PAGE 448**

LOVE00822

101 S.Ct. 183
(Cite as: 449 U.S. 24, *28, 101 S.Ct. 183, **187)

Page 4

Immunity does not change the character of **187 the judge's action or that of his co-conspirators. [FN5] Indeed, his *29 immunity is dependent on the challenged conduct being an official judicial act within his statutory jurisdiction, broadly construed. *Stump v. Sparkman,* 435 U.S. 349, 356, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978); *Bradley v. Fisher, supra,* at 352, 357. Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983 as it has been construed in our prior cases. The complaint in this case was not defective for failure to allege that the private defendants were acting under color of state law, and the Court of Appeals was correct in rejecting its prior case authority to the contrary.

FN4. In this respect, our holding in *Adickes v. S. H. Kress & Co.* was as follows:

"The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or unlawful: *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961); see *United States v. Classic,* 313 U.S. 299, 326 [61 S.Ct. 1031, 1043, 85 L.Ed. 1368] (1941); *Screws v. United States,* 325 U.S. 91, 107-111 [65 S.Ct. 1031, 1038- 1040, 89 L.Ed.2d 1495] (1945); *Williams v. United States,* 341 U.S. 97, 99-100 [71 S.Ct. 576, 578, 95 L.Ed. 774] (1951). Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. 'Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents,' *United States v. Price,* 383 U.S. 787, 794 [86 S.Ct. 1152, 1156, 16 L.Ed.2d 267] (1966) ." 398 U.S., at 152, 90 S.Ct., at 1605 (Footnote omitted.)

FN5. Title 18 U.S.C. § 242, the criminal analog of § 1983, also contains a color-of-state-law requirement and we have interpreted the color-of-state-law requirement in these sections coextensively. *Adickes v. S. H. Kress & Co., supra,* at 152, n.7, 90 S.Ct., at 1605 n.7. A state judge can be found criminally liable under § 242 although that judge may be immune from damages under § 1983. See *Imbler v. Pachtman,* 424 U.S. 409, 429, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976); *O'Shea v. Littleton,* 414 U.S. 488, 503,

94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974). In either case, the judge has acted under color of state law.

[5][6] Petitioner nevertheless insists that unless he is held to have an immunity derived from that of the judge, the latter's official immunity will be seriously eroded. We are unpersuaded. The immunities of state officials that we have recognized for purposes of § 1983 are the equivalents of those that were recognized at common law. *Owen v. City of Independence,* 445 U.S. 622, 637-638, 100 S.Ct. 1398, 1408-1409, 63 L.Ed.2d 673 (1980); *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976); *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and the burden is on the official claiming immunity to demonstrate his entitlement. Cf. *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). Thus, in *Owen v. City of Independence, supra,* a municipality's claim that it could assert the immunity of its officers and agents in a § 1983 damages action was rejected since there was no basis for such a right at common law. Here, petitioner has pointed to nothing indicating that, historically, judicial immunity insulated from damages liability those private persons who corruptly conspire with the judge. [FN6]

FN6. Insofar as the immunity issue is concerned, it is interesting to note that petitioner observes that he would not be immune in the Texas courts, even if the judge is. Brief for Petitioner 28.

In *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), we recognized that the Speech or Debate Clause conferred immunity *30 upon a Senator's aide as well as the Senator, but only in those situations where the conduct of the aide would be a protected legislative act if performed by the Senator himself. *Id.,* at 618, 92 S.Ct. at 2623. Here, there could be no claim that petitioner or any of the other private parties was actually performing a judicial act or was in any sense an official aide of the judge. Not surprisingly, petitioner does not argue that judges must conspire with private parties in order that judicial duties may be properly accomplished.

[7] It is urged that if petitioner and other private co-conspirators of the judge are to be subject to § 1983 damages actions and if a case such as this is to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310

EXHIBIT 2 PAGE 449

LOVE00823

101 S.Ct. 183

Page 5

(Cite as: 449 U.S. 24, *30, 101 S.Ct. 183, **187)

go to trial, the charge of conspiracy and judicial corruption will necessarily be aired and decided, the consequence being that the judge, though not a party and immune from liability, will be heavily involved, very likely as a witness forced to testify about and defend his judicial conduct. It is true that, based on the Speech or Debate Clause, we have held that Members of Congress need not respond to questions about their legislative acts, *Gravel v. United States, supra*, at 616-617, 92 S.Ct., at 2622-2623; and, in general, the scope of state legislative immunity for purposes of § 1983 has been patterned after immunity under the Speech or Debate Clause. *Supreme Court of Virginia v. Consumers **188 Union*, 446 U.S., at 732-734, 100 S.Ct., at 1974-1976. But there is no similar constitutionally based privilege immunizing judges from being required to testify about their judicial conduct in third-party litigation. Nor has any demonstration been made that historically the doctrine of judicial immunity not only protected the judge from liability but also excused him from responding as a witness when his co-conspirators are sued. Even if the judge were excused from testifying, it would not follow that actions against private parties must be dismissed.

Of course, testifying takes time and energy that otherwise might be devoted to judicial duties; and, if cases such as this *31 survive initial challenge and go to trial, the judge's integrity and that of the judicial process may be at stake in such cases. But judicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens. *O'Shea v. Littleton*, 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974). Neither are we aware of any rule generally exempting a judge from the normal obligation to respond as a witness when he has information material to a criminal or civil proceeding. [FN7] Cf. *United States v. Nixon*, 418 U.S. 683, 705-707, 94 S.Ct. 3090, 3106-07, 41 L.Ed.2d 1039 (1974).

> FN7. Whether the federal courts should be especially alert to avoid undue interference with the state judicial system flowing from demands upon state judges to appear as witnesses need not be addressed at this time.

[8] Judicial immunity arose because it was in the public interest to have judges who were at liberty to

exercise their independent judgment about the merits of a case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption. *Pierson v. Ray, supra*, at 554, 87 S.Ct., at 1217-1218; *Bradley v. Fisher*, 13 Wall., at 349, 350 n. In terms of undermining a judge's independence and his judicial performance, the concern that his conduct will be examined in a collateral proceeding against those with whom he allegedly conspired, a proceeding in which he cannot be held liable for damages and which he need not defend, is not of the same order of magnitude as the prospects of being a defendant in a damages action from complaint to verdict with the attendant possibility of being held liable for damages if the factfinder mistakenly upholds the charge of malice or of a corrupt conspiracy with others. These concerns are not insubstantial, either for the judge or for the public, but we agree with the Court of Appeals that the potential harm to the public from denying immunity to private co-conspirators *32 is outweighed by the benefits of providing a remedy against those private persons who participate in subverting the judicial process and in so doing inflict injury on other persons.

The judgment of the Court of Appeals is

*Affirmed*.

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

Briefs and Other Related Documents (Back to top)

. 1980 WL 339381T1 (Appellate Brief) Motion of the American Civil Liberties Union for Leave to File, and Brief Amici Curiae (Jun. 10, 1980)

. 1980 WL 339380T1 (Appellate Brief) Reply Brief of Respondents (May. 21, 1980)

. 1980 WL 339379T1 (Appellate Brief) Brief for the Petitioner (May. 08, 1980)

. 1980 WL 339382T1 (Appellate Brief) Brief of Amicus Curiae State of Florida (May. 05, 1980)

. 1980 WL 339383T1 (Appellate Brief) Brief of the State of Texas As Amicus Curiae in Support of Petitioner (May. 05, 1980)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

311

**EXHIBIT 2 PAGE 450**

101 S.Ct. 183                                                                Page 6
(Cite as: 449 U.S. 24, *32, 101 S.Ct. 183, **188)

END OF DOCUMENT

**EXHIBIT 2 PAGE 451**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

312

LOVE00825

3

**EXHIBIT 2 PAGE 452**    313

LOVE00826

84 F.3d 1162

84 F.3d 1162, 96 Cal. Daily Op. Serv. 3752, 96 Daily Journal D.A.R. 6115
(Cite as: 84 F.3d 1162)

▶

Page 1

Briefs and Other Related Documents

United States Court of Appeals,
Ninth Circuit.
Jeanette REYNOLDS, as Administrator of the
Estate of Paul Reynolds, deceased,
and individually, Plaintiff-Appellant,
v.
COUNTY OF SAN DIEGO; Jeffrey Jackson, Jim
Roache, Sheriff, Defendants-
Appellees.
Denise REYNOLDS, Plaintiff-Appellant,
v.
COUNTY OF SAN DIEGO; Jeffrey Jackson, Jim
Roache, Sheriff, Defendants-
Appellees.
No. 94-56262.

Argued and Submitted March 6, 1996.
Decided May 28, 1996.

Estate of shooting victim brought civil rights action against police officer. The United States District Court for the Southern District of California, John Rhoades, Sr., J., entered judgment for officer, and estate appealed. The Court of Appeals, George, Chief Judge, sitting by designation, held that: (1) officer acted reasonably in shooting erratic, armed person, and (2) state law claims should have been dismissed.

Affirmed in part and remanded in part.

Pregerson, Circuit Judge, dissented and filed opinion.

West Headnotes

[1] Federal Courts ⬥➞776
170Bk776
Decision to grant a motion for summary judgment is reviewed de novo. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[2] Federal Courts ⬥➞759.1
170Bk759.1
Reviewing court may affirm on any ground supported by the record.

[3] Civil Rights ⬥➞1376(6)
78k1376(6)

(Formerly 78k214(6))
Deputy acted reasonably in using deadly force and, therefore was entitled to qualified immunity from civil rights claims asserted by shooting victim's estate, where victim was behaving erratically and had a weapon. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[4] Federal Civil Procedure ⬥➞2470
170Ak2470

[4] Federal Civil Procedure ⬥➞2470.4
170Ak2470.4
Summary judgment is not proper unless pleadings, discovery, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[5] Federal Civil Procedure ⬥➞2543
170Ak2543
In considering motion for summary judgment, court must examine all evidence in the light most favorable to nonmovant. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[6] Federal Civil Procedure ⬥➞2546
170Ak2546

[6] Federal Civil Procedure ⬥➞2552
170Ak2552
In ruling on motion for summary judgment, court must view evidence through the prism of the substantive evidentiary burden, while leaving to the jury credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[7] Federal Civil Procedure ⬥➞2544
170Ak2544
Once summary judgment movant meets its initial burden, nonmovant must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists and that a reasonable jury could return verdict for nonmovant. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[8] Civil Rights ⬥➞1376(2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

314

**EXHIBIT 2 PAGE 453**

LOVE00827

84 F.3d 1162
(Cite as: 84 F.3d 1162)

78k1376(2)
　　　(Formerly 78k214(2))
To hold official liable for violating an individual's constitutional rights, contours of the right must be sufficiently clear that reasonable official would understand that what he is doing violates that right. 42 U.S.C.A. § 1983.

[9] Civil Rights ☞1376(2)
78k1376(2)
　　　(Formerly 78k214(2))
Qualified immunity protects officials from liability if a reasonable officer could have believed his actions were lawful in light of clearly established law and the information the officer possessed. 42 U.S.C.A. § 1983.

[10] Civil Rights ☞1373
78k1373
　　　(Formerly 78k211.1)
Immunity issues should be determined by the district court at the earliest possible point in civil rights action. 42 U.S.C.A. § 1983.

[11] Arrest ☞68(4)
35k68(4)
Apprehension by use of deadly force is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. U.S.C.A. Const.Amend. 4.

[12] Civil Rights ☞1376(2)
78k1376(2)
　　　(Formerly 78k214(2))
Reasonable officer's belief that his conduct was lawful must be analyzed under an objective reasonableness standard, for qualified immunity purposes. 42 U.S.C.A. § 1983.

[13] Civil Rights ☞1376(1)
78k1376(1)
　　　(Formerly 78k214(1))
In conducting qualified immunity analysis, court must balance the nature and quality of the intrusion against the governmental interests at stake. 42 U.S.C.A. § 1983.

[14] Arrest ☞68(2)
35k68(2)
Court's inquiry on claim of excessive force is whether the totality of the circumstances (taking into consideration the facts and circumstances of the particular case; including the severity of the crime at issue; whether the suspect poses an immediate

threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade arrest by flight) justified the particular type of seizure. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[15] Civil Rights ☞1088(2)
78k1088(2)
　　　(Formerly 78k132.1)
All determinations of unreasonable force, in civil rights actions, must embody allowance for fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[16] Federal Civil Procedure ☞2491.5
170Ak2491.5
Speculation and extrapolation based on witness' "understanding of human nature and human factors and working in gunshot cases" did not suffice to create genuine issue of material fact with regard to reasonableness of police officer's decision to use deadly force and thus did not preclude summary judgment for officer on grounds of qualified immunity from civil rights claim. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[17] Federal Civil Procedure ☞2491.5
170Ak2491.5
Genuine issue of material fact, as would preclude summary judgment, was not created by minor discrepancy, in civil rights action, between officer's testimony that he shot from six inches away and medical evidence that victim suffered a contact wound. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A

[18] Civil Rights ☞1376(2)
78k1376(2)
　　　(Formerly 78k214(2))
Fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable, for purposes of qualified immunity from civil rights claim. 42 U.S.C.A. § 1983.

[19] Civil Rights ☞1719
78k1719
　　　(Formerly 78k449)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 454

LOVE00828

84 F.3d 1162
(Cite as: 84 F.3d 1162)

California Civil Code provision creating state civil rights action does not provide substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations. West's Ann.Cal.Civ.Code § 52.1.

[20] Federal Courts ⊜=18
170Bk18
Upon entry of summary judgment on federal civil rights claims, state law claims should have been dismissed without prejudice and should not have been disposed of by summary judgment. Fed.Rules Civ.Proc.Rules 12, 15(c), 28 U.S.C.A.

*1163 Michael L. Crowley, San Diego, California, for plaintiffs-appellants.

Gerald P. Schneeweis, Douglas J. Collodel, and Richard H. Nakamura, Jr., Morris, Polich & Purdy, San Diego, California, for defendant-appellee Jackson.

Appeal from the United States District Court for the Southern District of California, *1164 John S. Rhoades, District Judge, Presiding. D.C. Nos. CV-92-01342-JSR, CV-93-0194-JSR.

Before: PREGERSON, T.G. NELSON, Circuit Judges, and GEORGE, [FN*] District Judge.

> FN* Honorable Lloyd D. George, Chief United States District Judge for the District of Nevada, sitting by designation.

Opinion by Judge GEORGE; Dissent by Judge PREGERSON.

GEORGE, District Judge:

Paul Reynolds ("Reynolds") was shot to death by Deputy Jeffrey Jackson ("Jackson") during an altercation near a gas station. Plaintiffs-appellants Jeanette and Denise Reynolds, decedent's wife and mother respectively, challenge the district court's determination that defendant-appellee Deputy Jackson was entitled to summary judgment against their civil rights claims because he was protected from liability under the doctrine of qualified immunity. Appellants also dispute the district court's holding that there is no basis for liability against Jackson under California Civil Code Section 52.1 nor under state tort claims for negligence and wrongful death. This court has jurisdiction over appeals from final judgments under 28 U.S.C. §§

1291 and 1294. We affirm in part and remand in part.

I. FACTS AND PROCEDURAL BACKGROUND

At approximately 1:00 a.m. on February 18, 1992, Joseph Kirchevel, a gas station attendant, noticed the decedent, Paul Reynolds, behaving in a strange manner near the gas pumps. As Reynolds approached the window, Kirchevel asked if he could help Reynolds. Reynolds responded, "Yes, I think you can," and placed his face up against the glass of the service window. Reynolds then walked away from the window, picked up a squeegee, and started swinging it back and forth. Reynolds placed the squeegee on the cashier's tray at the service window, Kirchevel asked Reynolds to replace the squeegee and called the Sheriff's department. After calling the department, Kirchevel noticed that Reynolds had drawn a knife. [FN1] Kirchevel contacted the Sheriff's department again and informed them that Reynolds now had a weapon.

> FN1. The district court noted that Reynolds's weapon is referred to by the parties as both a "marlin spike" and a "knife." A marlin spike is a spike-shaped tool used for untying nautical knots. Reynolds's weapon is somewhat similar to a marlin spike. It has a blade that folds like a pocketknife and a spiked portion that is approximately three and one-half inches long. Thus, the weapon is referred to as both a "knife" and a "marlin spike."

At this time, appellee Deputy Jeffrey Jackson was on routine patrol in the area. Thomas Cornish, a passerby, stopped Deputy Jackson and told him that someone was acting strangely down the road and appeared to have some type of bottle in his hand. Deputy Jackson proceeded to the location specified by Cornish. As Deputy Jackson approached the gas station he noticed Reynolds's car stopped in the roadway, blocking traffic with the driver's side door open.

Deputy Jackson exited his vehicle and proceeded toward Reynolds's car on foot. While he was standing next to Reynolds's car, Robert Wapnowski, a truck driver who was delivering gasoline to the station, yelled at Jackson to stop Reynolds. Wapnowski also indicated that Reynolds had some kind of knife. Jackson saw Reynolds being chased from the gas truck by Wapnowski. Jackson drew his gun and told Reynolds to stop. Jackson noticed that Reynolds was holding a knife and ordered him to put his hands in the air.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

316

**EXHIBIT 2 PAGE 455**

LOVE00829

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1164)

Page 4

Reynolds complied, and about this time, Michael Tucker, a passing motorist, stopped to observe the incident.

After Reynolds placed his hands in the air, he walked to the middle of the road. Deputy Jackson followed and told Reynolds to get on the ground, Reynolds complied. Jackson then moved toward Reynolds and told him to drop the knife. Reynolds put the knife on the ground next to his body. According to Wapnowski, Jackson then slowly approached Reynolds, repeatedly telling Reynolds not to move. Nevertheless, as Jackson moved closer, *1165 it is undisputed that Reynolds suddenly sat up and grabbed the knife.

Deputy Jackson alleges that he then moved behind Reynolds and attempted to disarm Reynolds by kicking him, but that he missed. Wapnowski, however, did not see Jackson's attempt to kick Reynolds. In addition, in his first interview after the incident, Jackson did not mention that he tried to disarm Reynolds by kicking him.

Deputy Jackson continued to move toward Reynolds from behind and eventually put his knee in Reynolds's back and his gun on Reynolds's neck. Again, Jackson ordered Reynolds to drop the knife. Instead, it is undisputed that Reynolds twisted his body and made a sudden, backhanded, upward swing toward Jackson with his right hand which was holding the knife. According to Wapnowski, "[Reynolds's] whole body—it looked like his whole body has twisted to the right. Just—that's all I can say. He just turned to his right real quick like that. And that was after he was warned not to move." Michael Tucker, the motorist who stopped to observed the incident, saw the weapon in Reynolds's hand and Reynolds "swinging" it toward Deputy Jackson.

At this time, Deputy Jackson stated that he feared for his life and pulled the trigger on his gun, but the gun did not fire. Jackson immediately pulled the trigger again. According to Jackson, he took half a step back before pulling the trigger again and fired the gun approximately six inches from Reynolds's neck. This time the gun fired. Reynolds died of a single gunshot wound to the neck.

Richard Whalley, a forensic criminologist and one of appellants' experts, speculates that Jackson's gun did not fire the first time because it was pressed too

hard into Reynolds's neck. In addition, Whalley believes that the fatal wound was made while the gun was actually in contact with Reynolds's neck, rather than six inches away.

Following the incident, Jeanette and Denise Reynolds, the decedent's wife and mother respectively, each filed a civil rights action against Deputy Jackson, San Diego County Sheriff Jim Roach, and the County of San Diego, alleging that Jackson's use of force was unreasonable and that Roach and the County were liable for Jackson's actions because they failed to enforce laws and regulations pertaining to the use of deadly force. Both appellants also invoked the district court's pendent jurisdiction to consider claims under California Civil Code Section 52.1 and various state law claims including wrongful death, excessive force, assault and battery, negligence, and negligent hiring. Jeanette Reynolds also sued for loss of consortium and violation of the California Public Records Act. Appellants' actions were consolidated.

Deputy Jackson filed a motion for summary judgment, which the County of San Diego and Sheriff Jim Roach joined. According to the district court, the joinder did not properly specify which of Jackson's legal arguments applied to the County and which applied to Roach. Therefore, the district court denied the County of San Diego's and Roach's motions for summary judgment. [FN2]

> FN2. At least as to the federal civil rights claims, if Deputy Jackson's actions were reasonable, there can be no municipal liability. "While liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights." *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir.1994), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995).

The district court granted Deputy Jackson's motion for summary judgment for all allegations directed against Jackson in the complaint. *Reynolds v. County of San Diego*, 858 F.Supp. 1064 (1994). The court determined that Jackson was immune from liability for the appellants' civil rights claims because he acted reasonably under the circumstances. In addition, the court ruled that Deputy Jackson was immune from appellants' state law claims for negligence and assault and battery, and Jeanette Reynolds's claim of wrongful death. Moreover, the court ruled that Denise Reynolds did not have standing under California state law to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

317

**EXHIBIT 2 PAGE 456**

L0VE00830

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1165)

bring a state law wrongful death action because she is neither the intestate heir of the decedent nor was she dependent on the decedent. Finally, the court found that Jeanette *1166 Reynolds could not maintain a cause of action under California Civil Code Section 52.1. [FN3]

> FN3. The district court's order discusses only Jeanette Reynolds's allegations under California Civil Code Section 52.1. Denise Reynolds's complaint also mentions 52.1 as a basis of liability. The district court's order did not specifically address whether Denise Reynolds lacked standing to pursue a claim under 52.1. Because appellants do not address in their opening brief whether Denise Reynolds has a cause of action under 52.1, the court may consider the issue waived. Nevertheless, the issues related to 52.1 are the same for both appellants.

## II. STANDARD OF REVIEW

[1][2] The district court's decision to grant a motion for summary judgment is reviewed de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). The court may affirm on any ground supported by the record. *In re Apple Computer Secs. Litig.,* 886 F.2d 1109, 1112 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

## III. DISCUSSION

[3] Appellants appeal the district court's grant of summary judgment in favor of Jackson on their federal civil rights claims. They contend that because there are genuine issues of material fact regarding the reasonableness of Jackson's conduct, the district court erred in determining that Jackson was entitled to summary judgment on the issue of qualified immunity. Additionally, Jeanette Reynolds maintains that the district court erred in determining that she has no cause of action under California Civil Code Section 52.1. Appellants also state that the district court erred in granting summary judgment to Jackson on appellants' negligence and wrongful death actions. [FN4] Appellants, however, do not argue that the district court's finding that Denise Reynolds lacks standing to pursue a wrongful death claim was error. Therefore, the court considers that issue waived. *See Miller v. Fairchild Industries, Inc.,* 797 F.2d 727, 738 (9th Cir.1986), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

> FN4. Appellants do not address the district court's

finding that summary judgment was proper on their claims for assault and battery and excessive force. Nor does appellant Jeanette Reynolds dispute the district court's finding that summary judgment in favor of Deputy Jackson was appropriate for her violation of the California Public Records Act claim.

### A. Summary Judgment Standard

[4][5][6][7] Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is only proper where the pleadings, discovery, and affidavits show that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), while leaving "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" to the jury. *Id.* at 255, 106 S.Ct. at 2513. Once the moving party meets its initial burden, a nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists and that a reasonable jury could return a verdict for the nonmoving party. *Hughes v. United States,* 953 F.2d 531, 541-42 (9th Cir.1992); *Lindahl v. Air France,* 930 F.2d 1434, 1436-37 (9th Cir.1991) (citing *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986)); Fed.R.Civ.P. 56(e).

### B. Civil Rights Claims

[8][9][10] The Supreme Court has ruled that to hold an official liable for violating an individual's constitutional rights, "the contours of *1167 the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Hunter v. Bryant,* 502 U.S. 224, 226, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 457**

LOVE00831

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1167)

(qualified immunity protects officials from liability if a reasonable officer could have believed his actions were lawful in light of clearly established law and the information the officer possessed). The Court has given further instruction on this standard by stating that, viewed in light of pre-existing law, the unlawfulness of the official action must be apparent. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.   The standard therefore provides that " 'regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the appellant was "not clearly established" or the officer could have reasonably believed that his particular conduct was lawful.' " *DeNieva v. Reyes*, 966 F.2d 480, 484-85 (9th Cir.1992) (quoting *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.1991)).   Finally, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227, 112 S.Ct. at 536 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).   We thus have acknowledged that immunity issues should be "determined by the district court at the earliest possible point in the litigation" and "[w]here the underlying facts are undisputed, a district court must determine the issue on a motion for summary judgment." *Act Up!/ Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993).

Given this interpretation, we make three inquiries to determine whether the defense of qualified immunity is available to an officer.   First, we identify the right which was allegedly violated. Second, we determine whether the law governing the official's conduct is clearly enough established to alert a reasonable officer to its constitutional parameters.   Third, we consider whether, under that law, a reasonable officer could have believed that his conduct was lawful *DeNieva*, 966 F.2d at 484-85; *Act Up!/Portland*, 988 F.2d at 871.

[11] Appellants allege that Deputy Jackson violated their constitutional rights because he wrongfully used deadly force in his encounter with Reynolds, thereby depriving them of his companionship. "There is no question that the apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir.1991), *cert. denied*, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992).

Appellants dispute only the third prong of the test, maintaining that a reasonable officer in Jackson's situation would not have believed that the use of deadly force was lawful.

[12][13][14][15] A reasonable officer's belief that his conduct was lawful must be analyzed under an objective reasonableness standard.   *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872-73, 104 L.Ed.2d 443 (1989).   In conducting such an analysis, the court must balance the nature and quality of the intrusion against the governmental interests at stake.   *Curnow*, 952 F.2d at 324-25.   "The court's inquiry is therefore whether the totality of the circumstances (taking into consideration the facts and circumstances of the particular case; including the severity of the crime at issue;   whether the suspect poses an immediate threat to the safety of the officers or others;   and whether he is actively resisting arrest or attempting to evade arrest by flight) justified the particular type of seizure." *Id.* at 325.   The Supreme Court has held that an officer's use of deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985).   All determinations of unreasonable force, however, "must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97, 109 S.Ct. at 1872.

*1168 Under this standard, Deputy Jackson's use of deadly force was reasonable.   Given Reynolds's erratic behavior and the fact that he had a weapon, it was reasonable for Jackson to attempt to restrain him.   Cornish had told Jackson of Reynolds's strange behavior.   Upon arriving at the scene, Jackson heard Wapnowski call out at him to stop Reynolds.   The gas station attendant also perceived Reynolds as a threat—twice calling the Sheriff's Department to report Reynolds's behavior.   It was thus reasonable for Jackson to consider Reynolds a threat to the people in the area.   Moreover, it was reasonable for Jackson to attempt to disarm Reynolds by approaching him from behind and by telling him to drop the weapon.   Reynolds was not in a confined area and there were other people in the vicinity.   Finally, under the circumstances, it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 458**

LOVE00832

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1168)

Page 7

was reasonable for Deputy Jackson to fire his weapon. He had warned Reynolds to drop the weapon and not move. Up to that point, Reynolds had complied with some of Jackson's commands. Jackson, therefore, had no reason to believe Reynolds did not understand his orders. By suddenly swinging at Jackson with the knife, Reynolds threatened Jackson's life or at least put him in fear of great bodily injury. Therefore, the district court correctly ruled that Jackson was immune from liability.

Appellants argue that the trial court erroneously extended the doctrine of qualified immunity. According to appellants, it was error for the district court to find that immunity questions should be resolved at the earliest possible stage of litigation. [FN5] Appellants contend that in *Sloman v. Tadlock,* 21 F.3d 1462, 1468 (9th Cir.1994), the court questioned whether the ultimate determination of the objective reasonableness of an officer's actions should be left to the judge or the jury. In *Sloman,* the court stated that there is no reason to think that having the jury rather than the judge assess the reasonableness of officer's conduct would be inimical to the policies that govern immunity. However, this observation was made in the context of a discussion about whether the judge or jury should make the reasonableness determination where "officials are forced to go to trial because their right to immunity turns on the resolution of disputed facts"--not in the context of a summary judgment which is intended to test the existence of genuine issues of fact. Indeed, in *Sloman,* we reiterated that in the context of a motion for summary judgment, "immunity 'ordinarily should be decided by the court' and should not 'routinely' be sent to the jury," 21 F.3d at 1467 (quoting *Hunter v. Bryant,* 502 U.S. at 228, 112 S.Ct. at 537), and that in "the 'ordinary' or routine case it should be decided at the earliest possible moment to spare the appellee the trauma of trial or its anticipation." *Id.* at 1468.

FN5. The district court explained that, "the [Supreme] Court in *Hunter* noted that 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " *Reynolds,* 858 F.Supp. at 1070 (citing *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

Appellants also maintain that summary judgment in favor of Jackson was inappropriate because genuine

issues of material fact exist regarding the reasonableness of Jackson's conduct. They claim that the expert testimony of criminologist Richard Whalley and police tactics expert Lou Reiter creates a genuine issue of material fact regarding the reasonableness of Jackson's conduct.

In his deposition, Whalley testified that Jackson caused Reynolds to make the sudden movement by pressing his gun so hard into Reynolds's neck. According to Whalley, Reynolds was turning around to see what was pressing into his neck. Whalley also concluded that Reynolds's wound was a contact wound, suggesting that Jackson's gun was actually touching Reynolds's neck when it was fired rather than being six inches away as Deputy Jackson had reported. According to appellants, "[i]f the jury was to believe the findings and testimony of Whalley they would have to disbelieve Deputy Jackson's testimony in whole or at least in part and would likely find for the appellants."

[16] Whalley's conclusion that Jackson caused Reynolds to move suddenly fails to raise an issue of material fact about the reasonableness of Jackson's conduct. Whalley conducted tests on the same type of gun Jackson used and determined that the gun *1169 would not fire when eight pounds of pressure were on a mechanism of part of the gun. Whalley speculates that the same amount of pressure must have been applied to Reynolds's neck when Jackson first pulled the trigger and the gun did not fire. Whalley then extrapolates that Reynolds suddenly moved in response to the pressure that was placed on his neck. Whalley bases this conclusion not on any scientific or medical knowledge, but rather on this "understanding of human nature and human factors and working in gunshot cases." The tests Whalley conducted may raise an issue of fact regarding why the gun did not fire-an immaterial issue; however, the conclusions about why Reynolds moved are nothing more than speculation and fail to raise an issue of fact about the reasonableness of Jackson's conduct-a material issue. *United States v. Various Slot Machines on Guam,* 658 F.2d 697, 700 (9th Cir.1981) ("in the context of a motion for summary judgment, an expert must base his opinion with specific facts"); *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985) (a party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support his conclusory

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

320

**EXHIBIT 2 PAGE 459**

LOVE00833

allegations).

While we have recognized that a claim of excessive force may be based on a showing that officers "used excessive force in creating the situation which caused [the decedent] to take the actions he did," *Alexander v. City of and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir.1994), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995), such a claim must be analyzed under the reasonableness standard. *Id.* ("a police officer's use of force in apprehending a suspect violates the Fourth Amendment if it is unreasonable in light of the facts and circumstances confronting the officer") (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)). In *Alexander*, we determined that a factual issue existed regarding whether police officers used excessive force when they stormed the house of a man who they knew to be a mentally ill, elderly, half-blind recluse who had threatened to shoot anyone who entered. *Id.* at 1366-67.

Nevertheless, as the Supreme Court explained in *Graham*, when assessing the reasonableness of an officer's conduct, the court must allow for the fact that officers are forced to make split second decisions in tense situations. An officer cannot be expected to accurately anticipate all of the possible responses a subject may have to his commands and then tailor his actions accordingly in order for his conduct to fall into the category of what is considered reasonable. Thus, even if Jackson was applying some pressure to Reynolds's neck with his gun, his conduct still falls within the parameters of what is reasonable given that he was in a rapidly evolving situation and was dealing with a subject who was behaving strangely, had a weapon, and posed a threat of serious injury to others in the area.

[17] Appellants contend that the discrepancy between Jackson's statement that he shot from six inches away and Whalley's conclusion that Reynolds suffered a contact wound would cause a reasonable jury to discount Jackson's testimony and find for the appellants. This alleged discrepancy fails to raise a genuine issue of material fact regarding the reasonableness of Jackson's use of force. Cases involving an officer's use of deadly force can pose difficult problems for determining the reasonableness of the officer's conduct because the officer appellee is often the only surviving eyewitness. *See Hopkins v. Andaya*, 958 F.2d 881,

885-88 (9th Cir.1992), *cert. denied*, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995). In such cases, the court must examine all of the evidence in the record as well as any expert testimony to determine if the officer's story is internally consistent and consistent with other known facts. *Id.* Here, however, the material aspects of Jackson's version of events is corroborated by two independent eyewitnesses. Both Wapnowski and Tucker testified that Reynolds suddenly swung at Jackson. Furthermore, appellants fail to explain how the inconsistency regarding the distance of the gun from Reynolds when fired suggests that the use of force was unreasonable. Illuminating a potential minor inconsistency in Deputy Jackson's version of events is insufficient to raise a genuine issue *1170 of material fact regarding the reasonableness of the use of force, particularly given the independent eyewitness testimony. *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1369 (9th Cir.), *cert. denied*, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992) (a party cannot defeat a summary judgment motion by producing a "mere scintilla of evidence to support its case"); *Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir.1978) (while summary judgment is improper if sufficient evidence supporting a claimed factual dispute is adduced, "this evidence must be 'significantly probative' of the disputed fact").

Similarly, appellants allege that police tactics expert Lou Reiter's testimony creates a genuine issue of material fact regarding the reasonableness of Jackson's use of deadly force. In his deposition, Reiter stated that Jackson used "reckless" tactics to restrain Reynolds. Reiter concluded that Jackson should have called for back-up, talked to Reynolds in calm tones, and refrained from approaching Reynolds while he had the knife. Plaintiffs argue that Reiter's testimony creates a genuine issue of material fact regarding whether his conduct was objectively reasonable.

[18] Reiter's findings, however, are insufficient to raise a genuine issue of material fact regarding the reasonableness of Jackson's use of force. The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable. The inquiry is not "whether another reasonable or more reasonable interpretation of events can be constructed ... after the fact." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537. Rather, the issue is whether

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 460**

LOVE00834

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1170)

a reasonable officer could have believed that his conduct was justified. "This is so notwithstanding that reasonable officers could disagree on the issue." *Act Up!/Portland,* 988 F.2d. at 872. Given that Reynolds was behaving in a strange manner and wielded a knife, it was reasonable for Jackson to try to confine and attempt to disarm him. In addition, because Reynolds's sudden swing at Jackson threatened the officer with death or at least great bodily injury and, if successful in disabling the police officer, others in the area could have been in great danger, it was reasonable for Jackson to respond with deadly force. The fact that Reiter disagrees with the steps Jackson took is not enough to raise a genuine issue of material fact regarding the reasonableness of Jackson's conduct.

### C. *Claims under California Civil Code Section 52.1*

[19] Appellants appeal the district court's ruling that summary judgment was proper as to Jeanette Reynolds's claim under California Civil Code Section 52.1. Appellants maintain that California Civil Code Section 52.1 "by its terms creates a cause of action under the California Constitution" and that the statute "represents an independent state basis for liability." Appellants argue that the district court erred in dismissing the claim because there is "no authority for the proposition that federal qualified immunity standards apply to the California Constitution."

Appellants misinterpret the reasoning of the district court on this issue. California Civil Code Section 52.1 provides that:
(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own behalf a civil action for damages including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right secured or rights secured.
As the district court explained, Section 52.1 does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations. Appellants, however, fail to specify any conduct of Jackson's that constituted a violation of the state constitution but not the

federal constitution. In other words, appellants have not accused Jackson of violating any state constitutional right which is separate and distinct from federal protections. Therefore, because there is no federal constitutional violation and no conduct specified which constitutes a state constitutional violation, *1171 there is no conduct upon which to base a claim for liability under 52.1. Thus, the district court properly granted summary judgment in favor of Jackson as to Jeanette Reynolds's Section 52.1 claim.

### D. *State Tort Law Claims*

[20] Appellants also appeal the district court's grant of summary judgment in favor of Jackson on plaintiffs' state tort law claims.

In *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court noted the existence of pendent jurisdiction over related state law claims, but stressed that the power to assert pendent jurisdiction need not be exercised. *Id.* at 725-26, 86 S.Ct. at 1138-39. The Court explained, "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* In *Hodge v. Mountain States Tel. & Tel. Co.,* 555 F.2d 254, 261 (9th Cir.1977), a district court had granted summary judgment on a plaintiff's federal and state claims. Relying on different reasons than the district court, we affirmed the summary judgment in favor of the defendant as to the federal claims. However, following *Gibbs,* we explained, "[i]n light of our disposition of the federal claims, we feel that it is appropriate to remand the state law claims to the district court with instructions to dismiss for want of federal jurisdiction." *Id.*

More recently, the Circuit vacated a district court's judgment dismissing both state and federal claims. We determined that the district court did not err in dismissing the pendent state law claims after all of the federal claims were dismissed, but vacated "the judgment with instructions that it be modified to make clear that dismissal of the pendent claims [was] without prejudice." *Gini v. Las Vegas Metropolitan Police Dept.,* 40 F.3d 1041, 1046 (9th Cir.1994). The court explained that " '[i]n the *usual* case in which federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 461**

LOVE00835

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1171)

over the remaining state law claims.' " *Id.* (quoting *Schneider v. TRW, Inc.*, 938 F.2d 986, 993 (9th Cir.1991)); *see also Wren v. Sletten Const. Co.*, 654 F.2d 529, 536 (9th Cir.1981) ("When the state issues apparently predominate and all federal claims are dismissed before trial, the *proper exercise of discretion requires dismissal of the state claim.*" (emphasis added)).

Similar to *Hodge*, in this case the district court granted summary judgment on plaintiffs' federal and state claims. Instead, after granting summary judgment on the civil rights claim, the court should have dismissed the state law claims without prejudice. Therefore the state tort law claims are REMANDED to the district court with instructions to dismiss without prejudice for want of federal jurisdiction.

AFFIRMED in part and REMANDED in part.

PREGERSON, Circuit Judge, dissenting:

This case raises the question whether Deputy Jackson was entitled to qualified immunity when he used deadly force against Paul Reynolds. The answer to that question depends on whether "the totality of the circumstances ... justified the particular type of seizure" that sadly was carried out by Deputy Jackson. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.1991). Because material factual questions remain unanswered, I believe a jury should determine whether the totality of the circumstances that Deputy Jackson faced warranted his use of deadly force against Reynolds. *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir.1994). Accordingly, I dissent.

I agree that we should not use the "20/20 vision of hindsight" to second guess the actions of police officers when they use deadly force to defend themselves from imminent harm. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989). But this does not mean that a finding of qualified immunity is automatic. Rather, courts must assess whether the use of deadly force to effect a seizure was reasonable according to the requirements of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Part of this analysis requires us to determine whether the suspect posed "a threat of serious physical harm *1172 either to the officer or

to others." *Id.* at 11, 105 S.Ct. at 1701. This inquiry is usually a question of fact for the jury. *Sloman*, 21 F.3d at 1468; *Hopkins v. Andaya*, 958 F.2d 881, 885 (9th Cir.1992). {FN1}

> FN1. In excessive force cases, the issue of qualified immunity should be considered together with the question whether the use of deadly force was reasonable. As we explained in *Hopkins:*
> Police officers are entitled to assert a defense of qualified immunity from section 1983 liability if they reasonably believed in good faith that their actions were constitutional. In Fourth Amendment unreasonable force cases ... the qualified immunity inquiry is the same as the inquiry made on the merits.
> 958 F.2d at 885 n. 3 (citations omitted).

I am concerned that the facts as stated in the majority opinion leave unanswered factual questions regarding the actual threat of serious physical harm that Reynolds, who was sitting on the ground, posed to Deputy Jackson. Before he used lethal force, Deputy Jackson had his knee in Reynolds's back and the barrel of his gun on Reynolds's neck. Reynolds then suddenly "twisted" to the right, "swinging" a three-inch marlin spike in a backward motion towards Deputy Jackson. Jackson pulled the trigger of his gun, but the gun failed to fire. Jackson then stepped back and successfully fired his gun directly at Reynolds's neck. In these circumstances a jury could reasonably conclude that Deputy Jackson should have dealt with the threat by using a billy club to subdue Reynolds, by stepping back further and trying to talk him into submitting, or by using other non-deadly means to take Reynolds into custody.

A jury could also find that Reynolds posed no threat to the public that would require an immediate deadly seizure of his person. There is no indication that Reynolds was trying to escape. If anything, the facts depict a disoriented individual, perhaps in need of medical attention, rather than someone attempting to kill or commit violent mischief against another person. Given these facts, a reasonable jury could have concluded that Reynolds did not actually pose a "threat of serious physical harm either to the officer or to others." *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701. Such a finding would preclude a grant of qualified immunity in this case. *See Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1356 (9th Cir.1994) (Kozinski, J., concurring) (noting that in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.    323

**EXHIBIT 2 PAGE 462**

LOVE00836

84 F.3d 1162
(Cite as: 84 F.3d 1162, *1172)

dealing with "a half-blind recluse, an eccentric, perhaps in need of medical attention," who posed a non-dangerous nuisance to the community, the use of deadly force was a "massive[ly] disproportional [ ]" response to the problem).

In short, I believe a reasonable jury could conclude that Deputy Jackson's seizure of Reynolds evinced an unwarranted use of deadly force, especially because the facts could support a finding that Reynolds posed no immediate threat of serious physical harm to the officer or other members of the community. I would reverse.

84 F.3d 1162, 96 Cal. Daily Op. Serv. 3752, 96 Daily Journal D.A.R. 6115

Briefs and Other Related Documents (Back to top)

. 1995 WL 17016740T2 (Appellate Brief) Reply Brief for Appellants (Apr. 19, 1995)Original Image of this Document (PDF)

. 1995 WL 17016780T2 (Appellate Brief) Appellee's Brief (Mar. 22, 1995)Original Image of this Document (PDF)

. 1995 WL 17016739T2 (Appellate Brief) Brief for Appellants (Jan. 05, 1995)Original Image of this Document (PDF)

END OF DOCUMENT

**EXHIBIT 2 PAGE 463**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324

L0VE00837

4

**EXHIBIT 2 PAGE 464**   325

LOVE00838

98 S.Ct. 1099
435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331
(Cite as: 435 U.S. 349, 98 S.Ct. 1099)

▷

Page 28

Briefs and Other Related Documents

Supreme Court of the United States
Harold D. STUMP et al., Petitioners,
v.
Linda Kay SPARKMAN and Leo Sparkman.
No. 76-1750.

Argued Jan. 10, 1978.
Decided March 28, 1978.
Rehearing Denied June 5, 1978.
See 436 U.S. 951, 98 S.Ct. 2862.

Woman, who had been sterilized by order of Indiana circuit court when she was 15 years old, and her husband brought civil rights action against her mother, her mother's attorney, the medical practitioners who performed the sterilization and judge who ordered it. The United States District Court for the Northern District of Indiana dismissed the federal claims, holding that the Indiana judge, the only state agent, was absolutely immune from suit. The Court of Appeals, 552 F.2d 172, reversed, and certiorari was granted. The Supreme Court, Mr. Justice White, held that: (1) under the Indiana statute granting a broad general jurisdiction, the circuit court had jurisdiction to consider the petition; (2) neither the procedural errors the judge may have committed nor the lack of a specific statute authorizing his approval of the petition in question rendered him liable in damages, and (3) because the judge who performed the type of act normally performed only by judges and because he did so in his capacity as a circuit court judge, the informality with which he proceeded did not render his action "nonjudicial" for purposes of depriving him of his absolute immunity.

Reversed and remanded.

Opinion on remand, 601 F.2d 261.

Mr. Justice Stewart filed a dissenting opinion in which Mr. Justice Marshall and Mr. Justice Powell joined.

Mr. Justice Powell filed a dissenting opinion.

West Headnotes

[1] Judges ☞36

227k36
Judge will not be deprived of immunity because action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in clear absence of all jurisdiction.

[2] Mental Health ☞57
257Ak57
In view of broad jurisdictional grant given Indiana circuit court, and in view of absence of either statute or case law foreclosing such consideration, Indiana circuit court judge had jurisdiction to consider mother's petition for authority to have her "somewhat retarded" 15-year-old daughter sterilized. IC 1971, 16-13-13-1 to 16-13-13-4; IC 16-8-4-2, 33-4-4-3 (1976 Ed.).

[3] Judges ☞36
227k36
Because Indiana circuit court is court of general jurisdiction, neither procedural errors circuit court judge may have committed in considering sterilization petition, nor lack of specific statute authorizing his approval of petition, rendered him liable in damages for consequences of his actions. IC 1971, 16-13-13-1 to 16-13-13-4; IC 16-8-4-2, 33-4-4-3 (1976 Ed.).

[4] Judges ☞36
227k36
Factors determining whether act by judge is "judicial one", for purposes of conferring judicial immunity, relate to nature of act itself, i. e., whether it is function normally performed by judge, and to expectations of parties, i. e., whether they dealt with judge in his judicial capacity.

[5] Judges ☞36
227k36
Because Indiana circuit court judge, in approving mother's ex parte petition to have her "somewhat retarded" 15-year-old daughter sterilized, acted in his capacity as circuit court judge, and performed type of act normally performed only by judges, lack of formality with which he proceeded did not render his action "nonjudicial" for purposes of depriving him of absolute immunity from damages liability. IC 1971, 16-13-13-1 to 16-13-13-4; IC 16-8-4-2, 33-4-4-3 (1976 Ed.).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

326

EXHIBIT 2 PAGE 465

LOVE00839

98 S.Ct. 1099                                                    Page 29
(Cite as: 435 U.S. 349, 98 S.Ct. 1099)

[6] Judges ☞36
227k36
Disagreement with action taken by judge does not justify depriving that judge of his immunity; fact that issue before judge is controversial one is all the more reason why he should be able to act without fear of suit.

**\*\*1100 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499.

\*349 A mother filed a petition in affidavit form in an Indiana Circuit Court, a court of general jurisdiction under an Indiana statute, for authority to have her "somewhat retarded" 15-year-old daughter (a respondent here) sterilized, and petitioner Circuit \*\*1101 Judge approved the petition the same day in an *ex parte* proceeding without a hearing and without notice to the daughter or appointment of a guardian *ad litem*. The operation was performed shortly thereafter, the daughter having been told that she was to have her appendix removed. About two years later she was married, and her inability to become pregnant led her to discover that she had been sterilized. As a result she and her husband (also a respondent here) filed suit in Federal District Court pursuant to 42 U.S.C. § 1983 against her mother, the mother's attorney, the Circuit Judge, the doctors who performed or assisted in the sterilization, and the hospital where it was performed, seeking damages for the alleged violation of her constitutional rights. Holding that the constitutional claims required a showing of state action and that the only state action alleged was the Circuit Judge's approval of the sterilization petition, the District Court held that no federal action would lie against any of the defendants because the Circuit Judge, the only state agent, was absolutely immune from suit under the doctrine of judicial immunity. The Court of Appeals reversed, holding that the "crucial issue" was whether the Circuit Judge acted within his jurisdiction, that he had not, that accordingly he was not immune from damages liability, and that in any event he had forfeited his immunity "because of his failure to comply with elementary principles of procedural due process." *Held:* The Indiana law vested in the Circuit Judge the power to entertain and act upon the petition for sterilization, and he is, therefore, immune from

damages liability even if his approval of the petition was in error. Pp. 1104-1109.

(a) A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority, but rather he will be subject to liability only when he has acted in the "clear absence of all jurisdiction," *Bradley v. Fisher*, 13 Wall. 335, 351, 20 L.Ed. 646. Pp. 1104-1105.

\*350 b) Here there was not "clear absence of all jurisdiction" in the Circuit Court to consider the sterilization petition. That court had jurisdiction under the Indiana statute granting it broad general jurisdiction, it appearing that neither by statute nor by case law had such jurisdiction been circumscribed to foreclose consideration of the petition. P. 1105.

(c) Because the Circuit Court is a court of general jurisdiction, neither the procedural errors the Circuit Judge may have committed nor the lack of a specific statute authorizing his approval of the petition in question rendered him liable in damages for the consequences of his actions. P. 1106.

(d) The factors determining whether an act by a judge is "judicial" relate to the nature of the act itself (whether it is a function normally performed by a judge) and the expectation of the parties (whether they dealt with the judge in his judicial capacity), and here both of these elements indicate that the Circuit Judge's approval of the sterilization petition was a judicial act, even though he may have proceeded with informality. Pp. 1106-1108.

(e) Disagreement with the action taken by a judge does not justify depriving him of his immunity, and thus the fact that in this case tragic consequences ensued from the judge's action does not deprive him of his immunity; moreover, the fact that the issue before the judge is a controversial one, as here, is all the more reason that he should be able to act without fear of suit. Pp. 1108-1109.

552 F.2d 172, reversed and remanded.

George E. Fruechtenicht, Fort Wayne, Ind., for petitioners.

Richard H. Finley, Kendallville, Ind., for respondents.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 466**

LOVE00840

98 S.Ct. 1099                                                                     Page 30
(Cite as: 435 U.S. 349, *350, 98 S.Ct. 1099, **1101)

*351 Mr. Justice WHITE delivered the opinion of the Court.

This case requires us to consider the scope of a judge's immunity from damages liability when sued under 42 U.S.C. § 1983.

**1102 I

The relevant facts underlying respondents' suit are not in dispute.    On July 9, 1971, Ora Spitler McFarlin, the mother of respondent Linda Kay Spitler Sparkman, presented to Judge Harold D. Stump of the Circuit Court of DeKalb County, Ind., a document captioned "Petition To Have Tubal Ligation Performed On Minor and Indemnity Agreement."    The document had been drafted by her attorney, a petitioner here.    In this petition Mrs. McFarlin stated under oath that her daughter was 15 years of age and was "somewhat retarded," although she attended public school and had been promoted each year with her class.    The petition further stated that Linda had been associating with "older youth or young men" and had stayed out overnight with them on several occasions.    As a result of this behavior and Linda's mental capabilities, it was stated that it would be in the daughter's best interest if she underwent a tubal ligation in order "to prevent unfortunate circumstances . . . ."    In the same document Mrs. McFarlin also undertook to indemnify and hold harmless Dr. John Hines, who was to perform the operation, and the DeKalb Memorial Hospital, where the operation was to take place, against all causes of action that might arise as a result of the performance of the tubal ligation. [FN1]

FN1. The full text of the petition presented to Judge Stump read as follows:

"STATE OF INDIANA) ss:
COUNTY OF DEKALB)

"PETITION TO HAVE TUBAL LIGATION PERFORMED ON
MINOR AND INDEMNITY AGREEMENT
"Ora Spitler McFarlin, being duly sworn upon her oath states that she is the natural mother of and has custody of her daughter, Linda Spitler, age fifteen (15) being born January 24, 1956 and said daughter resides with her at 108 Iowa Street, Auburn, DeKalb County, Indiana.
"Affiant states that her daughter's mentality is such that she is considered to be somewhat retarded although she is attending or has attended the public schools in DeKalb Central School System and has been passed along with other children in her age level even though she does not have what is considered normal mental capabilities and intelligence. Further, that said affiant has had problems in the home of said child as a result of said daughter leaving the home on several occasions to associate with older youth or young men and as a matter of fact having stayed overnight with said youth or men and about which incidents said affiant did not become aware of until after such incidents occurred. As a result of this behavior and the mental capabilities of said daughter, affiant believes that it is to the best interest of said child that a Tubal Ligation be performed on said minor daughter to prevent unfortunate circumstances to occur and since it is impossible for the affiant as mother of said minor child to maintain and control a continuous observation of the activities of said daughter each and every day.
"Said affiant does hereby in consideration of the Court of DeKalb Circuit Court approving the Tubal Ligation being performed upon her minor daughter does hereby [sic] covenant and agree to idemnify and keep idemnified and hold Dr. John Hines, Auburn, Indiana, who said affiant is requesting to perform said operation and the DeKalb Memorial Hospital, Auburn, Indiana, whereas [sic] said operation will be performed, harmless from and against all or any matters or causes of action that could or might arise as a result of the performing of said Tubal Ligation.
"IN WITNESS WHEREOF, said affiant, Ora Spitler McFarlin, has hereunto subscribed her name this 9th day of July, 1971.

"/s/ ORA SPITLER MCFARLIN

    Ora Spitler McFarlin

            Petitioner
"Subscribed and sworn to before me this 9th day of July, 1971.

"/s/ WARREN G. SUNDAY

    Warren G. Sunday

        Notary Public
"My commission expires January 4, 1975.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 467

LOVE00841

"I, Harold D. Stump, Judge of the DeKalb Circuit Court, do hereby approve the above Petition by affidavit form on behalf of Ora Spitler McFarlin, to have Tubal Ligation performed upon her minor daughter, Linda Spitler, subject to said Ora Spitler McFarlin covenanting and agreeing to indemnify and keep indemnified Dr. John Hines and the DeKalb Memorial Hospital from any matters or causes of action arising therefrom.

"/s/ HAROLD D. STUMP

    Judge, DeKalb Circuit Court
"Dated July 9, 1971"

*352   **1103 The petition was approved by Judge Stump on the same day. He affixed his signature as "Judge, DeKalb Circuit Court," to the statement that he did "hereby approve the *353 above Petition by affidavit form on behalf of Ora Spitler McFarlin, to have Tubal Ligation performed upon her minor daughter, Linda Spitler, subject to said Ora Spitler McFarlin covenanting and agreeing to indemnify and keep indemnified Dr. John Hines and the DeKalb Memorial Hospital from any matters or causes of action arising therefrom."

On July 15, 1971, Linda Spitler entered the DeKalb Memorial Hospital, having been told that she was to have her appendix removed. The following day a tubal ligation was performed upon her. She was released several days later, unaware of the true nature of her surgery.

Approximately two years after the operation, Linda Spitler was married to respondent Leo Sparkman. Her inability to become pregnant led her to discover that she had been sterilized during the 1971 operation. As a result of this revelation, the Sparkmans filed suit in the United States District Court for the Northern District of Indiana against Mrs. McFarlin, her attorney, Judge Stump, the doctors who had performed and assisted in the tubal ligation, and the DeKalb Memorial Hospital. Respondents sought damages for the alleged violation of Linda Sparkman's constitutional rights; [FN2] also asserted were pendent state claims for assault *354 and battery, medical malpractice, and loss of potential fatherhood.

    FN2. The District Court gave the following summary of the constitutional claims asserted by

the Sparkmans:

"Whether laid under section 1331 or 1343(3) and whether asserted directly or via section 1983 and 1985, plaintiffs' grounds for recovery are asserted to rest on the violation of constitutional rights. Plaintiffs urge that defendants violated the following constitutional guarantees:
"1. that the actions were arbitrary and thus in violation of the due process clause of the Fourteenth Amendment;
"2. that Linda was denied procedural safeguards required by the Fourteenth Amendment;
"3. that the sterilization was permitted without the promulgation of standards;
"4. that the sterilization was an invasion of privacy;
"5. that the sterilization violated Linda's right to procreate;
"6. that the sterilization was cruel and unusual punishment;
"7. that the use of sterilization as punishment for her alleged retardation or lack of self-discipline violated various constitutional guarantees;
"8. that the defendants failed to follow certain Indiana statutes, thus depriving Linda of due process of law; and
"9. that defendants violated the equal protection clause, because of the differential treatment accorded Linda on account of her sex, marital status, and allegedly low mental capacity." Sparkman v. McFarlin, Civ. No. F 75-129 (ND Ind., May 13, 1976).

Ruling upon the defendants' various motions to dismiss the complaint, the District Court concluded that each of the constitutional claims asserted by respondents required a showing of state action and that the only state action alleged in the complaint was the approval by Judge Stump, acting as Circuit Court Judge, of the petition presented to him by Mrs. McFarlin. **1104 The Sparkmans sought to hold the private defendants liable on a theory that they had conspired with Judge Stump to bring about the allegedly unconstitutional acts. The District Court, however, held that no federal action would lie against any of the defendants because Judge Stump, the only state agent, was absolutely immune from suit under the doctrine of judicial immunity. The court stated that "whether or not Judge Stump's 'approval' of the petition may in retrospect appear to have been premised on an erroneous *355 view of the law, Judge Stump surely had jurisdiction to consider the petition and to act thereon." Sparkman v. McFarlin, Civ. No. F 75-129 (ND Ind., May 13, 1976). Accordingly, under Bradley v. Fisher, 13

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 468**

LOVE00842

98 S.Ct. 1099
(Cite as: 435 U.S. 349, *355, 98 S.Ct. 1099, **1104)

Page 32

Wall. 335, 351, 20 L.Ed. 646 (1872), Judge Stump was entitled to judicial immunity. [FN3]

> FN3. The District Court granted the defendants' motion to dismiss the federal claims for that reason and dismissed the remaining pendent state claims for lack of subject-matter jurisdiction.

On appeal, the Court of Appeals for the Seventh Circuit reversed the judgment of the District Court, [FN4] holding that the "crucial issue" was "whether Judge Stump acted within his jurisdiction" and concluding that he had not. 552 F.2d, at 174. He was accordingly not immune from damages liability under the controlling authorities. The Court of Appeals also held that the judge had forfeited his immunity "because of his failure to comply with elementary principles of procedural due process." Id., at 176.

> FN4. Sparkman v. McFarlin, 552 F.2d 172 (CA7 1977).

We granted certiorari, 434 U.S. 815, 98 S.Ct. 51, 54 L.Ed.2d 70 (1977), to consider the correctness of this ruling. We reverse.

II

The governing principle of law is well established and is not questioned by the parties. As early as 1872, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself." Bradley v. Fisher, supra, at 347. [FN5] For that reason the Court held that "judges *356 of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." [FN6] 13 Wall., at 351. Later we held that this doctrine of judicial immunity was applicable in suits under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, for the legislative record gave no indication that Congress intended to abolish this long-established principle. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

> FN5. Even earlier, in Randall v. Brigham, 7 Wall. 523, 19 L.Ed. 285 (1869), the Court stated that judges are not responsible "to private parties in civil actions for their judicial acts, however

injurious may be those acts, and however much they may deserve condemnation, unless perhaps where the acts are palpably in excess of the jurisdiction of the judges, and are done maliciously or corruptly." Id., at 537. In Bradley the Court reconsidered that earlier statement and concluded that "the qualifying words used were not necessary to a correct statement of the law . . . ." 13 Wall., at 351.

> FN6. In holding that a judge was immune for his judicial acts, even when such acts were performed in excess of his jurisdiction, the Court in Bradley stated:
> "A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But, where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend." Id., at 351-352.

[1] The Court of Appeals correctly recognized that the necessary inquiry in determining **1105 whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him. Because "some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction . . . ," Bradley, supra, at 352, the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only *357 when he has acted in the "clear absence of all jurisdiction." [FN7] 13 Wall., at 351.

> FN7. In Bradley, the Court illustrated the distinction between lack of jurisdiction and excess of jurisdiction with the following examples: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

330

**EXHIBIT 2 PAGE 469**

LOVE00843

98 S.Ct. 1099                                                                                        Page 33
(Cite as: 435 U.S. 349, *357, 98 S.Ct. 1099, **1105)

on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune. *Id.*, at 352.

[2]   We cannot agree that there was a "clear absence of all jurisdiction" in the DeKalb County Circuit Court to consider the petition presented by Mrs. McFarlin.   As an Indiana Circuit Court Judge, Judge Stump had "original exclusive jurisdiction in all cases at law and in equity whatsoever . . . ," jurisdiction over the settlement of estates and over guardianships, appellate jurisdiction as conferred by law, and jurisdiction over "all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer." Ind.Code § 33-4-4-3 (1975). [FN8] This is indeed a broad jurisdictional grant; yet the Court of Appeals concluded that Judge Stump did not have jurisdiction over the petition authorizing Linda Sparkman's sterilization.

>      FN8. Indiana Code § 33-4-4-3 (1975) states as
>      follows:
>      "Jurisdiction.—Said court shall have original
>      exclusive jurisdiction in all cases at law and in
>      equity whatsoever, and in criminal cases and
>      actions for divorce, except where exclusive or
>      concurrent jurisdiction is, or may be conferred by
>      law upon justices of the peace.   It shall also have
>      exclusive jurisdiction of the settlement of
>      decedents' estates and of guardianships: Provided,
>      however, That in counties in which criminal or
>      superior courts exist or may be organized, nothing
>      in this section shall be construed to deprive such
>      courts of the jurisdiction conferred upon them by
>      laws, and it shall have such appellate jurisdiction as
>      may be conferred by law, and it shall have
>      jurisdiction of all other causes, matters and
>      proceedings where exclusive jurisdiction thereof is
>      not conferred by law upon some other court, board
>      or officer."

*358   In so doing, the Court of Appeals noted that the Indiana statutes provided for the sterilization of institutionalized persons under certain circumstances, see Ind.Code §§ 16-13-13-1 through 16-13-4 (1973), but otherwise contained no express authority for judicial approval of tubal ligations.   It is true that the statutory grant of general jurisdiction to the Indiana circuit courts does not itemize types of cases those courts may hear and hence does not expressly mention sterilization petitions presented by the parents of a

minor.   But in our view, it is more significant that there was no Indiana statute and no case law in 1971 prohibiting a circuit court, a court of general jurisdiction, from considering a petition of the type presented to Judge Stump.   The statutory authority for the sterilization of institutionalized persons in the custody of the State does not warrant the inference that a court of general jurisdiction has no power to act on a petition for sterilization of a minor in the custody of her parents, particularly where the parents have authority under the Indiana statutes to "consent to and contract for medical or hospital care or treatment of [the minor] including surgery."   Ind.Code § 16-8-4-2 (1973).   The District Court concluded that Judge Stump had jurisdiction under § 33-4-4-3 to entertain and act upon Mrs. McFarlin's petition.   We agree with the District Court, it appearing that neither by statute nor by case law has the broad jurisdiction granted to the **1106 circuit courts of Indiana been circumscribed to foreclose consideration of a petition for authorization of a minor's sterilization.

The Court of Appeals also concluded that support for Judge Stump's actions could not be found in the common law of Indiana, relying in particular on the Indiana Court of Appeals' intervening decision in *A. L. v. G. R. H.*, 163 Ind.App. 636, 325 N.E.2d 501 (1975).   In that case the Indiana court held that a parent does not have a common-law right to have a minor child sterilized, even though the parent might "sincerely believe the child's adulthood would benefit therefrom."   *Id.*, at 638, 325 N.E.2d, at 502.   The opinion, however, *359 speaks only of the rights of the parents to consent to the sterilization of their child and does not question the *jurisdiction* of a circuit judge who is presented with such a petition from a parent.   Although under that case a circuit judge would err as a matter of law if he were to approve a parent's petition seeking the sterilization of a child, the opinion in *A. L. v. G. R. H.* does not indicate that a circuit judge is without jurisdiction to entertain the petition.   Indeed, the clear implication of the opinion is that, when presented with such a petition, the circuit judge should deny it on its merits rather than dismiss it for lack of jurisdiction.

Perhaps realizing the broad scope of Judge Stump's jurisdiction, the Court of Appeals stated that, even if the action taken by him was not foreclosed under the Indiana statutory scheme, it would still be "an illegitimate exercise of his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

331

**EXHIBIT 2 PAGE 470**

L0VE00844

98 S.Ct. 1099

(Cite as: 435 U.S. 349, *359, 98 S.Ct. 1099, **1106)

common law power because of his failure to comply with elementary principles of procedural due process." 552 F.2d, at 176. This misconceives the doctrine of judicial immunity. A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors. The Court made this point clear in *Bradley*, 13 Wall., at 357, where it stated: "[T]his erroneous manner in which [the court's] jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever . . . ."

[3]  We conclude that the Court of Appeals, employing an unduly restrictive view of the scope of Judge Stump's jurisdiction, erred in holding that he was not entitled to judicial immunity. Because the court over which Judge Stump presides is one of general jurisdiction, neither the procedural errors he may have committed nor the lack of a specific statute authorizing his approval of the petition in question rendered *360 him liable in damages for the consequences of his actions.

The respondents argue that even if Judge Stump had jurisdiction to consider the petition presented to him by Mrs. McFarlin, he is still not entitled to judicial immunity because his approval of the petition did not constitute a "judicial" act. It is only for acts performed in his "judicial" capacity that a judge is absolutely immune, they say. We do not disagree with this statement of the law, but we cannot characterize the approval of the petition as a nonjudicial act.

Respondents themselves stated in their pleadings before the District Court that Judge Stump was "clothed with the authority of the state" at the time that he approved the petition and that "he was acting as a county circuit court judge." Plaintiffs' Reply Brief to Memorandum Filed on Behalf of Harold D. Stump in Support of his Motion to Dismiss in Civ. No. F 75-129, p. 6. They nevertheless now argue that Judge Stump's approval of the petition was not a judicial act because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian

*ad litem*.

This Court has not had occasion to consider, for purposes of the judicial immunity doctrine, the necessary attributes of a judicial act; but it has previously rejected the **1107 argument, somewhat similar to the one raised here, that the lack of formality involved in the Illinois Supreme Court's consideration of a petitioner's application for admission to the state bar prevented it from being a "judicial proceeding" and from presenting a case or controversy that could be reviewed by this Court. *In re Summers*, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945). Of particular significance to the present case, the Court in *Summers* noted the following: "The record does not show that any process issued or that any appearance was made. . . . While no entry was placed by the Clerk in the file, on a docket, or in a judgment roll, the Court took cognizance of the petition and *361 passed an order which is validated by the signature of the presiding officer." *Id.*, at 567, 65 S.Ct., at 1311. Because the Illinois court took cognizance of the petition for admission and acted upon it, the Court held that a case or controversy was presented.

Similarly, the Court of Appeals for the Fifth Circuit has held that a state district judge was entitled to judicial immunity, even though "at the time of the altercation [giving rise to the suit] Judge Brown was not in his judge's robes, he was not in the courtroom itself, and he may well have violated state and/or federal procedural requirements regarding contempt citations." *McAlester v. Brown*, 469 F.2d 1280, 1282 (1972). [FN9] Among the factors relied upon by the Court of Appeals in deciding that the judge was acting within his judicial capacity was the fact that "the confrontation arose directly and immediately out of a visit to the judge in his official capacity." *Ibid.* [FN10]

FN9. In *McAlester* the plaintiffs alleged that they had gone to the courthouse where their son was to be tried by the defendant in order to give the son a fresh set of clothes. When they went into the defendant judge's office, he allegedly ordered them out and had a deputy arrest one of them and place him in jail for the rest of the day. Several months later, the judge issued an order holding the plaintiff in contempt of court, nunc pro tunc.

FN10. Other Courts of Appeals, presented with different fact situations, have concluded that the challenged actions of defendant judges were not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 471**

LOVE00845

98 S.Ct. 1099
(Cite as: 435 U.S. 349, *361, 98 S.Ct. 1099, **1107)

performed as part of the judicial function and that the judges were thus not entitled to rely upon the doctrine of judicial immunity. The Court of Appeals for the Ninth Circuit, for example, has held that a justice of the peace who was accused of forcibly removing a man from his courtroom and physically assaulting him was not absolutely immune. *Gregory v. Thompson*, 500 F.2d 59 (1974). While the court recognized that a judge has the duty to maintain order in his courtroom, it concluded that the actual eviction of someone from the courtroom by use of physical force, a task normally performed by a sheriff or bailiff, was "simply not an act of a judicial nature." *Id.*, at 64. And the Court of Appeals for the Sixth Circuit held in *Lynch v. Johnson*, 420 F.2d 818 (1970), that the county judge sued in that case was not entitled to judicial immunity because his service on a board with only legislative and administrative powers did not constitute a judicial act.

[4][5] *362 The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, *i. e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i. e.*, whether they dealt with the judge in his judicial capacity. Here, both factors indicate that Judge Stump's approval of the sterilization petition was a judicial act. [FN11] **1108 State judges with general jurisdiction not infrequently are called upon in their official capacity to approve petitions relating to the affairs of minors, as for example, a petition to settle a minor's claim. Furthermore, as even respondents have admitted, at the time he approved the petition presented to him by Mrs. McFarlin, Judge Stump was "acting as a county circuit court judge." See *supra*, at 1106. We may infer from the record that it was only because Judge Stump served in that position that Mrs. McFarlin, on the advice of counsel, submitted the petition to him for his approval. Because Judge Stump performed the type of act normally performed only by judges and because he did so in his capacity as a Circuit Court Judge, we find no *363 merit to respondents' argument that the informality with which he proceeded rendered his action nonjudicial and deprived him of his absolute immunity. [FN12]

FN11. Mr. Justice STEWART, in dissent, complains that this statement is inaccurate because it nowhere appears that judges are normally asked to approve parents' decisions either with respect to surgical treatment in general or with respect to sterilizations in particular. Of course, the opinion makes neither assertion. Rather, it is said that Judge Stump was performing a "function" normally performed by judges, and that he was taking "the type of action" judges normally perform. The dissent makes no effort to demonstrate that Judge Stump was without jurisdiction to entertain and act upon the specific petition presented to him. ′ Nor does it dispute that judges normally entertain petitions with respect to the affairs of minors. Even if it is assumed that in a lifetime of judging, a judge has acted on only one petition of a particular kind, this would not indicate that his function in entertaining and acting on it is not the kind of function that a judge normally performs. If this is the case, it is also untenable to claim that in entertaining the petition and exercising the jurisdiction with which the statutes invested him, Judge Stump was nevertheless not performing a judicial act or was engaging in the kind of conduct not expected of a judge under the Indiana statutes governing the jurisdiction of its courts.

FN12. Mr. Justice STEWART'S dissent, *post*, at 1111, suggests that Judge Stump's approval of Mrs. McFarlin's petition was not a judicial act because of the absence of what it considers the "normal attributes of a judicial proceeding." These attributes are said to include a "case," with litigants and the opportunity to appeal, in which there is "principled decisionmaking." But under Indiana law, Judge Stump had jurisdiction to act as he did; the proceeding instituted by the petition placed before him was sufficiently a "case" under Indiana law to warrant the exercise of his jurisdiction, whether or not he then proceeded to act erroneously. That there were not two contending litigants did not make Judge Stump's act any less judicial. Courts and judges often act *ex parte*. They issue search warrants in this manner, for example, often without any "case" having been instituted, without any "case" ever being instituted, and without the issuance of the warrant being subject to appeal. Yet it would not destroy a judge's immunity if it is alleged and offer of proof is made that in issuing a warrant he acted erroneously and without principle.

[6] Both the Court of Appeals and the respondents seem to suggest that, because of the tragic consequences of Judge Stump's actions, he should not be immune. For example, the Court of Appeals noted that "[t]here are actions of purported judicial character that a judge, even when exercising general jurisdiction, is not empowered to take," 552 F.2d, at 176, and respondents argue that Judge Stump's action was "so unfair" and "so totally devoid of judicial concern for the interests and well-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333

EXHIBIT 2 PAGE 472

LOVE00846

being of the young girl involved" as to disqualify it as a judicial act.   Brief for. Respondents 18. Disagreement with the action taken by the judge, however, does not justify depriving that judge of his immunity.   Despite the unfairness to litigants that sometimes results, the doctrine of judicial immunity is thought to be in the best interests of "the proper administration of justice . . . [, for it allows] a judicial officer, in exercising the authority vested in him [to] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 13 *364 Wall., at 347. The fact that the issue before the judge is a controversial one is all the more reason that he should be able to act without fear of suit.   As the Court pointed out in *Bradley* :

"Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision.   It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility." *Id.*, at 348.

The Indiana law vested in Judge Stump the power to entertain and act upon the petition for sterilization.   He is, therefore, under the controlling cases, immune from damages liability even if his approval of the petition was in error. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further **1109 proceedings consistent with this opinion. [FN13]

FN13. The issue is not presented and we do not decide whether the District Court correctly concluded that the federal claims against the other defendants were required to be dismissed if Judge Stump, the only state agent, was found to be absolutely immune.   Compare *Kermit Constr. Corp.. v. Banco Credito y Ahorro Ponceno*, 547 F.2d 1 (CA1 1976), with *Guedry v. Ford*, 431 F.2d 660 (CA5 1970).

It is so ordered.

Mr. Justice BRENNAN took no part in the consideration or decision of this case.

Mr. Justice STEWART, with whom Mr. Justice MARSHALL and Mr. Justice POWELL join,

dissenting.

It is established federal law that judges of general jurisdiction are absolutely immune from monetary liability "for their *365 judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Bradley v. Fisher*, 13 Wall. 335, 351, 20 L.Ed. 646.   It is also established that this immunity is in no way diminished in a proceeding under 42 U.S.C. § 1983. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288.   But the scope of judicial immunity is limited to liability for "judicial acts," and I think that what Judge Stump did on July 9, 1971, was beyond the pale of anything that could sensibly be called a judicial act.

Neither in *Bradley v. Fisher* nor in *Pierson v. Ray* was there any claim that the conduct in question was not a judicial act, and the Court thus had no occasion in either case to discuss the meaning of that term. [FN1] Yet the proposition that judicial immunity extends only to liability for "judicial acts" was emphasized no less than seven times in Mr. Justice Field's opinion for the Court in the *Bradley* case. [FN2] *Cf.* *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128. And if the limitations inherent in that concept have any realistic meaning at all, then I cannot believe that the action of Judge Stump in approving Mrs. McFarlin's petition is protected by judicial immunity.

FN1. In the *Bradley* case the plaintiff was a lawyer who had been disbarred; in the *Pierson* case the plaintiffs had been found guilty after a criminal trial.

FN2. See 13 Wall., at 347, 348, 349, 351, 354, 357.

The Court finds two reasons for holding that Judge Stump's approval of the sterilization petition was a judicial act.   First, the Court says, it was "a function normally performed by a judge."   Second, the Court says, the act was performed in Judge Stump's "judicial capacity."   With all respect, I think that the first of these grounds is factually untrue and that the second is legally unsound.

When the Court says that what Judge Stump did was an act "normally performed by a judge," it is not clear to me whether the Court means that a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 473**

LOVE00847

98 S.Ct. 1099
(Cite as: 435 U.S. 349, *365, 98 S.Ct. 1099, **1109)

judge "normally" is asked to approve a mother's decision to have her child given surgical *366 treatment generally, or that a judge "normally" is asked to approve a mother's wish to have her daughter sterilized. But whichever way the Court's statement is to be taken, it is factually inaccurate. In Indiana, as elsewhere in our country, a parent is authorized to arrange for and consent to medical and surgical treatment of his minor child. Ind.Code Ann. § 16-8- 4-2 (1973). And when a parent decides to call a physician to care for his sick child or arranges to have a surgeon remove his child's tonsils, he does not, "normally" or otherwise, need to seek the approval of a judge. [FN3] On the other hand, **1110 Indiana did in 1971 have statutory procedures for the sterilization of certain people who were *institutionalized*. But these statutes provided for administrative proceedings before a board established by the superintendent of each public hospital. Only if after notice and an evidentiary hearing, an order of sterilization was entered in these proceedings could there be review in a circuit court. See Ind.Code Ann. §§ 16-13-13-1 through 16-13-13-4 (1973). [FN4]

> FN3. This general authority of a parent was held by an Indiana Court of Appeals in 1975 not to include the power to authorize the sterilization of his minor child. *A. L. v. G. R. H.*, 163 Ind.App. 636, 325 N.E.2d 501.
> Contrary to the Court's conclusion, *ante*, at 1106, that case does not in the least demonstrate that an Indiana judge is or ever was empowered to act on the merits of a petition like Mrs. McFarlin's. The parent in that case did not petition for judicial approval of her decision, but rather "filed a complaint for declaratory judgment seeking declaration of her right under the common-law attributes of the parent-child relationship to have her son . . . sterilized." 163 Ind.App., at 636-637, 325 N.E.2d, at 501. The Indiana Court of Appeals' decision simply established a limitation on the parent's common-law rights. It neither sanctioned nor contemplated any procedure for judicial "approval" of the parent's decision.
> Indeed, the procedure followed in that case offers an instructive contrast to the judicial conduct at issue here:
> "At the outset, we thank counsel for their excellent efforts in representing a seriously concerned parent and in providing the guardian ad litem defense of the child's interest." *Id.*, at 638, 325 N.E.2d, at 502.

> FN4. These statutes were repealed in 1974.

*367 In sum, what Judge Stump did on July 9, 1971, was in no way an act "normally performed by a judge." Indeed, there is no reason to believe that such an act has ever been performed by *any* other Indiana judge, either before or since.

When the Court says that Judge Stump was acting in "his judicial capacity" in approving Mrs. McFarlin's petition, it is not clear to me whether the Court means that Mrs. McFarlin submitted the petition to him only because he was a judge, or that, in approving it, he *said* that he was acting as a judge. But however the Court's test is to be understood, it is, I think, demonstrably unsound.

It can safely be assumed that the Court is correct in concluding that Mrs. McFarlin came to Judge Stump with her petition because he was a County Circuit Court Judge. But false illusions as to a judge's power can hardly convert a judge's response to those illusions into a judicial act. In short, a judge's approval of a mother's petition to lock her daughter in the attic would hardly be a judicial act simply because the mother had submitted her petition to the judge in his official capacity.

If, on the other hand, the Court's test depends upon the fact that Judge Stump *said* he was acting in his judicial capacity, it is equally invalid. It is true that Judge Stump affixed his signature to the approval of the petition as "Judge, DeKalb Circuit Court." But the conduct of a judge surely does not become a judicial act merely on his own say-so. A judge is not free, like a loose cannon, to inflict indiscriminate damage whenever he announces that he is acting in his judicial capacity. [FN5]

> FN5. Believing that the conduct of Judge Stump on July 9, 1971, was not a judicial act, I do not need to inquire whether he was acting in "the clear absence of all jurisdiction over the subject matter." *Bradley v. Fisher*, 13 Wall., at 351. "Jurisdiction" is a coat of many colors. I note only that the Court's finding that Judge Stump had jurisdiction to entertain Mrs. McFarlin's petition seems to me to be based upon dangerously broad criteria. Those criteria are simply that an Indiana statute conferred "jurisdiction of all . . . causes, matters and proceedings," and that there was not in 1971 any Indiana law specifically prohibiting what Judge Stump did.

*368 If the standard adopted by the Court is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 474

LOVE00848

98 S.Ct. 1099
(Cite as: 435 U.S. 349, *368, 98 S.Ct. 1099, **1110)

invalid, then what is the proper measure of a judicial act? Contrary to implications in the Court's opinion, my conclusion that what Judge Stump did was not a judicial act is not based upon the fact that he acted with informality, or that he may not have been "in his judge's robes," or "in the courtroom itself." *Ante*, at 1107. And I do not reach this conclusion simply "because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian *ad litem*." *Ante*, at 1106.

It seems to me, rather that the concept of what is a judicial act must take its content from a consideration of the factors that support immunity from liability for the performance of such an act. Those factors **1111 were accurately summarized by the Court in *Pierson v. Ray*, 386 U.S., at 554, 87 S.Ct., at 1218:

"[I]t 'is . . . for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences'. . . . It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decisionmaking but to intimidation."

Not one of the considerations thus summarized in the *Pierson* opinion was present here. There was no "case," controversial *369 or otherwise. There were no litigants. There was and could be no appeal. And there was not even the pretext of principled decision-making. The total absence of *any* of these normal attributes of a judicial proceeding convinces me that the conduct complained of in this case was not a judicial act.

The petitioners' brief speaks of "an aura of deism which surrounds the bench . . . essential to the maintenance of respect for the judicial institution." Though the rhetoric may be overblown, I do not quarrel with it. But if aura there be, it is hardly protected by exonerating from liability such lawless conduct as took place here. And if intimidation

would serve to deter its recurrence, that would surely be in the public interest. [FN6]

> FN6. The only question before us in this case is the scope of judicial immunity. How the absence of a "judicial act" might affect the issue of whether Judge Stump was acting "under color of" state law within the meaning of 42 U.S.C. § 1983, or the issue of whether his act was that of the State within the meaning of the Fourteenth Amendment that need not, therefore, be pursued here.

Mr. Justice POWELL, dissenting.

While I join the opinion of Mr. Justice STEWART, I wish to emphasize what I take to be the central feature of this case—Judge Stump's preclusion of any possibility for the vindication of respondents' rights elsewhere in the judicial system.

*Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872), which established the absolute judicial immunity at issue in this case, recognized that the immunity was designed to further the public interest in an independent judiciary, sometimes at the expense of legitimate individual grievances. *Id.*, at 349; accord, *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967). The *Brady* Court accepted those costs to aggrieved individuals because the judicial system itself provided other means for protecting individual rights:

"Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law *370 has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." 13 Wall., at 354

Underlying the *Bradley* immunity, then, is the notion that private rights can be sacrificed in some degree to the achievement of the greater public good deriving from a completely independent judiciary, because there exist alternative forums and methods for vindicating those rights. [FN1]

> FN1. See Handler & Klein, The Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv.L.Rev. 44, 53-55 (1960); Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 233-235 (1963); Note, Federal Executive Immunity From Civil Liability in Damages: A Reevaluation of *Barr v. Maeto*, 77 Colum.L.Rev. 625, 647 (1977).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336

EXHIBIT 2 PAGE 475

L0VE00849

98 S.Ct. 1099
(Cite as: 435 U.S. 349, *370, 98 S.Ct. 1099, **1111)

But where a judicial officer acts in a manner that precludes all resort to appellate or other judicial remedies that otherwise would be available, the underlying assumption of the *Bradley* doctrine is inoperative. See *Pierson v. Ray, supra,* 386 U.S., at **1112 554, 87 S.Ct., at 1213, 1218. [FN2] In this case, as Mr. Justice STEWART points out, *ante,* at 1111, Judge Stump's unjudicial conduct insured that "[t]here was and could be no appeal." The complete absence of normal judicial process foreclosed resort to any of the "numerous remedies" that "the law has provided for private parties." *Bradley, supra,* at 354.

FN2. In both *Bradley* and *Pierson* any errors committed by the judges involved were open to correction on appeal.

In sum, I agree with Mr. Justice STEWART that petitioner judge's actions were not "judicial," and that he is entitled to no judicial immunity from suit under 42 U.S.C. § 1983.

435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331

Briefs and Other Related Documents (Back to top)

. 1978 WL 206600T1 (Appellate Brief) Motion of the American Civil Liberties Union, the Indiana Civil Liberties Union, and the Mental Health Law Project, to File Brief Amici Curiae and Brief Amici Curiae (Jan. 09, 1978)

. 1978 WL 206601T1 (Appellate Brief) Motion for Leave to File Brief and Brief of the National Center for Law and the Handicapped, Inc. Amicus Curiae (Jan. 09, 1978)

. 1978 WL 206602T1 (Appellate Brief) Motion for Leave to File Brief Amici Curiae and Brief for Amici Curiae American Coalition of Citizens with Disabilities; Epilepsy Foundation of America; Counsel for Handicapped People; Developmental Disabilities Law Project (Jan. 09, 1978)

. 1978 WL 206599T1 (Appellate Brief) Reply Brief for the Petitioners. (Jan. 04, 1978)

. 1977 WL 189264T1 (Appellate Brief) Brief for Respondents (Dec. 16, 1977)

. 1977 WL 189263T1 (Appellate Brief) Brief for the Petitioners. (Nov. 16, 1977)

. 1977 WL 189262T1 (Appellate Brief) Brief of the State of Indiana as Amicus Curiae in Support of Petition for Writ of Certiorari (Jul. 12, 1977)

END OF DOCUMENT

**EXHIBIT 2 PAGE 476**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LOVE00850

17

**EXHIBIT 2 PAGE 477**

LOVE00851

RECEIVED FOR FILE

JUL 0 8 2005

BY:_____

1  Daniel M. White (SBN# 068011)
   Steven G. Amundson (SBN# 073501 )
2  Beth J. Manover (SBN# 215704)
   WHITE & OLIVER
3  A Professional Corporation
   550 West C Street, Suite 950
4  San Diego, California  92101
   Telephone: (619) 239-0300
5  Facsimile: (619) 239-0344

6  Attorneys for Defendant
   S. MICHAEL LOVE
7

8            SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF SAN DIEGO

10 FRANK E. ROGOZIENSKI,                    )  Case No. GIC843843
                                            )
11           Plaintiff,                     )  REPLY IN SUPPORT OF
                                            )  DEMURRER OF DEFENDANT S.
12                                          )  MICHAEL LOVE TO FIRST
       v.                                   )  AMENDED COMPLAINT
13                                          )
                                            )  Date:  July 15, 2005
14 JAMES D. ALLEN, S. MICHAEL LOVE, and     )  Time: 11:00 a.m.
   DOES 1 through 10, inclusive,            )  Dept: 61
15                                          )  The Honorable John S. Meyer
           Defendants.                      )
16 _____ )

17

18

19

20

21

22

23

24

25

26

27

28
                                    **EXHIBIT 2 PAGE 478**

                                                              338

64580.1

REPLY IN SUPPORT OF DEMURRER TO FAC BY DEFENDANT S. MICHAEL LOVE

LOVE00852

I.    **INTRODUCTION**

In his Opposition to the Demurrer of Defendant S. Michael Love ("Love"), Plaintiff Frank E. Rogozienski ("Frank R.") attempts to argue, among other things, that Love owed him a duty of care, a necessary element for a number of causes of action contained his First Amended Complaint ("FAC"). This is not the case. Moreover, Frank R. is simply not able to state facts sufficient to constitute a cause of action as against Love for the claimed violation of Rule of Professional Conduct 5-300(A). As such, Love's demurrer as to each of Frank R.'s causes of action contained in his FAC should be sustained without leave to amend, as there is no possibility that he can cure these deficiencies by amendment.

II.    **LOVE DOES NOT OWE A DUTY OF CARE TO FRANK R.**

Frank R. asserts that Love's alleged "gift" to Allen violated Rule of Professional Conduct 5-300(A). FAC ¶ 120-121. Frank R. was the party adverse to Love's client Shirley in the dissolution proceeding. No matter how it is couched under the various tort claims Frank R. attempts to plead, Love owed no duty to Frank R. not to violate RPC 5-300(A), nor did he owe any other legally cognizable duty of care to Frank R. "[T]he attorney is not burdened with any duty toward nonclients merely because of his or her status as an attorney." *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 960, cited in *Burger v. Pond* (1990) 224 Cal.App.3d 597.

Nevertheless, in his Opposition, Plaintiff broadly and erroneously concludes that the holding in *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104 imposes a broad duty running from counsel to third parties. This is not the case. Indeed, the holding in *Roberts, supra,* is applicable in limited circumstances and is distinguishable from this case.

California decisional law is clear that an attorney's duty of care extends to third persons, not clients, *only* when that third person is an 'intended beneficiary' of the attorney's actions. [citations omitted.] *Mattco Forge, Inc. v. Arthur Young & Co.* (1995) 38 Cal.App.4th 1337, 1356. In *Roberts, supra,* the attorneys gave a written opinion for the express purpose of it being shown to and relied upon by plaintiff. *Roberts, supra,* 57 Cal.App.3d at 111. "In that situation, the attorneys owed the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it was 'the end and aim of the transaction.'" (*Mattco, supra,* 38

**EXHIBIT 2 PAGE 479**

LOVE00853

WHITE & OLIVER
A Professional Corporation

1    Cal.App.4th at 1357.)

2        Here, in contrast, there is a lack of intent to influence Frank R. Love is the attorney for

3    Shirley, a party adverse to Frank R. Frank R. is not an entity "upon [which Love's client] had any

4    wish or obligation to confer a benefit in the transaction [litigation]." *Goodman v. Kennedy*

5    (1976) 18 Cal.3d 335, 344. At no time did Love intend to nor did he confer any conceivable

6    benefit on Frank R. that could potentially give rise to a duty of care owed by Love to Frank R.

7    Even assuming the truth of Frank R.'s allegation that Love gave Allen a "gift", such a "gift" was

8    not bestowed upon Frank R and cannot be construed as an intention to confer a benefit upon him.

9    Thus, at no time did Love owe Frank R. a duty of care.

10   III.    **THE FIRST AND SECOND CAUSES OF ACTION FAIL TO STATE CAUSES OF**

11           **ACTION FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND ARE UNCERTAIN**

12       In his Opposition, Frank R. does nothing to address the deficiencies contained in the first

13   and second causes of action. Specifically, the First and Second Cause of Action as against Love

14   is for intentional interference with contractual relationships. Those relationships alleged in the

15   First Cause of Action are: (a) contractual relationships between Frank R. and Shirley R. - FAC ¶

16   52; (b) Frank R's contractual relationships with Qualcomm for his stock and with unidentified

17   third parties - FAC ¶ 53; (c) and the contractual relationship between Frank R. and his lawyer in

18   the dissolution proceeding - FAC ¶ 54. The Second Cause of Action alleges Love's gift to Allen

19   somehow interfered with Frank R.'s agreement for payment of services to Allen, in Allen's

20   capacity as temporary judge in the dissolution proceeding. FAC ¶ 61-63.

21       Both causes of action fail to state facts sufficient to constitute causes of action against

22   Love, and are uncertain. In its decision in *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, this

23   court explained the requisites of a claim for intentional interference with contractual relations, as

24   had been addressed by the California Supreme Court in *Della Penna v. Toyota Motor Sales,*

25   *U.S.A., Inc.* (1995) 11 Cal.App.4th 376. Among the elements are that the defendant must have

26   engaged in intentional acts designed to induce a breach or disruption of the contractual

27   relationship, and actual breach or disruption of the relationship with resulting damages. *Id.* at

28   343-344. This court found that LiMandri in his complaint had stated facts sufficient to constitute

WHITE & OLIVER
A Professional Corporation

EXHIBIT 2 PAGE 480

LOVE00854

WHITE & OLIVER
A Professional Corporation

1   a cause of action, reciting LiMandri's allegations as to the specifics and the methods and conduct

2   by which there had been interference causing him damage. *Id.* at 344.

3       Frank R. fails completely to allege any such facts in either of the first two causes of

4   action. This failure is also not remedied in his Opposition. There is no allegation of intentional

5   acts by Love designed to disrupt Frank R.'s contractual relations. Similarly, there is no

6   allegation, nor can there conceivably be one, as to how Love's "gift" to Allen actually interfered

7   with the pre-nuptial agreement or property agreements between Frank R. and Shirley R., or with

8   Frank R.'s contracts for Qualcomm stock, or with Frank R.'s fee agreement with his own

9   dissolution attorney. FAC ¶ 52-54. Finally, there is no allegation as to how Love's gift to Allen

10   caused damage to Frank R. with respect to Frank R.'s obligation to pay half of Allen's fees for

11   services of temporary judge. FAC ¶ 61. To the contrary Frank R. acknowledges that he

12   challenged Allen, who withdrew. FAC ¶ 41.

13   **IV.**   **THE THIRD, FOURTH, FIFTH AND SIXTH CAUSES OF ACTION FAIL TO**

14         **STATE FACTS SUFFICIENT TO CONSTITUTE CAUSES OF ACTION**
        **AGAINST LOVE FOR INTENTIONAL OR NEGLIGENT INTERFERENCE**

15         **WITH PROSPECTIVE ECONOMIC ADVANTAGE AND ARE UNCERTAIN**

16       Again, Frank R. fails to address the deficiencies respecting his causes of action for

17   intentional and negligent interference with prospective economic advantage. Frank R.'s Third

18   and Fourth Causes of Action allege that Love (and Allen) intentionally interfered with the

19   prospective economic advantage Frank R. claims he would derive from: (a) the economic

20   relationship between Frank R. and Shirley R., who was suing him for divorce; (b) the economic

21   relationship between Frank R. and the attorney he was paying to represent him in the divorce; ©)

22   between Frank R. and Qualcomm or other unidentified third persons with whom he proposed to

23   do business; (FAC ¶ 68) and (d) with the "probable future economic" advantage Frank R. hoped

24   to derive from his economic relationship with Allen (FAC ¶ 76), which economic relationship is

25   identified as nothing more than Frank R. paying one-half of Allen's fees as a temporary judge.

26   FAC ¶ 10.

27       The Fifth Cause of Action against Love (and Allen) is for negligent interference with

28   prospective economic advantage. The economic relationships from which anticipated future

1  economic benefit with which there was alleged interference causing Frank R. damages, again

2  were: (a) the economic relationship between Frank R. and Shirley R., who was suing him for

3  divorce; (b) the economic relationship between Frank R. and the lawyer he was paying to

4  represent him in the dissolution; and (c) the economic relationship between plaintiff and

5  Qualcomm and other unspecified third persons. FAC ¶ 84. These relationships are not only

6  unidentified, there are no facts alleged that provide for how Love possibly interfered with them,

7  either intentionally or negligently. The Sixth Cause of Action again alleges that Frank R.'s

8  relationship with Allen – that for which Frank was paying half of Allen's fee for services as a

9  temporary judge (FAC ¶ 10) contained probable future economic benefit or advantage to Frank

10  R. FAC ¶ 92. Frank R. has not alleged facts, nor can it be conceived, how this was to have

11  occurred.

12      All four causes of action fail to state facts sufficient to constitute a cause of action against

13  Love for any interference with prospective economic relations, whether intentional or negligent.

14  "The tort of intentional or negligent interference with prospective economic advantage imposes

15  liability for improper methods of disrupting or diverting the business relationship of another

16  which fall outside the boundaries of fair competition." *Settimo Assoc. v. Environ Systems, Inc.*

17  (1993) 14 Cal.App.4th 842, 845. A threshold with respect to the issue of a prospective economic

18  benefit is that "it must be reasonably probable that the prospective economic advantage would

19  have been realized but for defendant's interference." *Youst v. Longo* (1987) 43 Cal.3d 64, 71.

20      There is nothing alleged in the Third through the Sixth Causes of Action to state facts or

21  even suggest how Love interfered with economic relationships which could prospectively have

22  brought economic advantage to Frank, whether it be the economic relationship alleged between

23  Frank R. and Shirley, who was suing him for divorce, between Frank R. and his divorce lawyer

24  whose fees were being paid by Frank R., or between Frank R. and Allen, half of whose fees were

25  being paid by Frank. The only other prospective economic relationship(s) is between Frank R.

26  and Qualcomm or unnamed third parties. However, the FAC is silent as to what those

27  relationships prospectively were, or how any conduct by Love interfered, particularly with those

28  of unnamed third persons. Thus, they are uncertain and completely unintelligible as to what

WHITE & OLIVER
A Professional Corporation

4

64580.1

342

1  those relationships were or how Love might have interfered with them. Code of Civil Procedure

2  section 431.20(b).

3      Moreover, a plaintiff seeking to recover for alleged intentional interference with

4  prospective economic relations has the burden of pleading that the defendant not only knowingly

5  interfered with a plaintiff's expectancy, but that the defendant's interference was wrongful by

6  some other measure beyond the fact that it amounted to interference. *See LiMandri, supra,* 52

7  Cal.App.4th at 340, citing *Della penna, supra,* 11 Cal.4th at 392-393. "It is insufficient to allege

8  the defendant engaged in tortious conduct distinct from or only tangentially related to the conduct

9  constituting the actual interference." *Id.* at 342. Notably, in *LiMandri, supra,* the Court found

10  that plaintiff failed to sufficiently plead a cause of action for intentional and negligent

11  interference with prospective economic relations. In *LiMandri,* the plaintiff (an attorney) alleged

12  that the defendant, with knowledge of plaintiff's superior lien rights to his client's settlement

13  proceeds in the underlying litigation, created a security interest in the proceeds on behalf of his

14  client lender, and asserted it as superior to plaintiff's contractual lien. *See Id.* at 341. The Court

15  found that while the act and method of filing the lien may have been independently tortious, it

16  was not the act that constituted the actual interference with plaintiff's prospective economic

17  advantage. *See Id.* at 341-342.

18      In his Opposition, it appears that Frank R. attempts to argue that Love's alleged "gift" to

19  Allen interfered with Frank R.'s prospective economic relations. However, the alleged "gift"

20  clearly does not by itself constitute the requisite essential/actual interference with any

21  conceivable prospective economic relations. Thus, even assuming the "gift" was wrongful, it

22  does not satisfy *Della Penna*'s requirement that the interference must be wrongful by some legal

23  measure other than the fact of interference itself. *See Id.*

24      Lastly, as noted herein, Love does not owe any cognizable duty of care to Frank R. Thus,

25  plaintiff has not and cannot state facts sufficient to constitute a cause of action for negligent

26  interference with prospective economic advantage. *See Id.* at 348. ("The tort of negligent

27

28

**EXHIBIT 2 PAGE 483**

---

[1]  Plaintiff has also has not cannot adequately plead a cause of action for fraudulent concealment, *see infra.*

LOVE00857

WHITE & OLIVER
A Professional Corporation

1  interference with economic relationship arises only when the defendant owes the plaintiff a duty

2  of care.")

3  **V.  THE SEVENTH CAUSE OF ACTION FAILS TO STATE FACTS SUFFICIENT TO CONSTITUTE A CAUSE OF ACTION FOR CIVIL RIGHTS VIOLATIONS AGAINST THIS DEFENDANT**

5  Defendant Love is alleged to have been a private attorney representing Shirley

6  Rogozienski in the dissolution proceeding she brought against Frank R. FAC ¶ 9. Love as a

7  private party is alleged to have made a simple gift of a membership interest in Warner Springs

8  Ranch to a third person, Attorney Allen. FAC ¶¶ 29-30. Frank R. now asserts he was denied the

9  right to a fair trial. FAC ¶ 99.

10  Assuming plaintiff's Seventh Cause of Action is premised upon a violation of his civil

11  rights under Civil Code section 52.1(b), plaintiff fails to plead any acts of interference by

12  "threats, intimidation or coercion" by Love, as required by this section. Civil Code §52.1(b);

13  *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 843, citing *Jones v. Kmart Corp.*

14  (1998) 17 Cal.4th 329, 332. Specifically, a plaintiff must plead "interference with a legal right

15  accompanied by a form of coercion." *Jones, supra*, 17 Cal.4th at 334. Plaintiff has failed to

16  allege facts to support an interference with a legal right that was accompanied by a form of

17  coercion by Love.

18  Further, Civil Code section 52.1 does not apply to private actors' putative violations of

19  legal guarantees that only limit state's powers. *See, e.g., Id.* at 333. Thus, state action is required

20  for maintaining an action under this section. *See, e.g., Id.* Frank R. has not alleged and cannot

21  allege that Love was a state actor, and as such his claim for civil rights violations against Love

22  must fail as a matter of law.

23  **VI.  THE EIGHTH CAUSE OF ACTION FAILS TO STATE FACTS SUFFICIENT TO CONSTITUTE A CAUSE OF ACTION AGAINST THIS DEFENDANT**

25  The Eighth Cause of Action fails to state any claim against Love for fraudulent

26  concealment. Frank alleges that Allen and Love did not disclose the fact of a gift to Frank R. of

27  the one-half interest in a Warner Springs membership, which gift he alleges defendants "should

28  have disclosed." FAC ¶ 103. In his Opposition, Frank R. cites to no authority that establishes

WHITE & OLIVER
A Professional Corporation

6

64580.1

344

**EXHIBIT 2 PAGE 484**

LOVE00858

1  that the counsel for a party in a litigation is in a "relationship" with the adverse party for purposes

2  of imposing a duty of disclosure under California Civil Code sections 1572 or 1709. *See, e.g.,*

3  *LiMandri, supra,* 52 Cal.App.4th at 336-337.

4       Love clearly has no fiduciary relationship with the adverse party, Frank R., nor is he in a

5  "relationship" contemplated by case law. *See Id.* at 336-337. Frank R. has not met and cannot

6  meet this burden, as none of the circumstances have been alleged, and none existed.

7       Also of relevance to this action, in *LiMandri,* the court found that there is no duty to

8  disclose an intention to commit an intentional tort. *See Id.* at 338. In fact, the court emphasized

9  that it was not aware of any authority supporting the imposition of additional liability on an

10  intentional tortfeasor for failing to disclose his or her tortious intent before committing the tort.

11  *See Id.* Thus, it follows that if it were found that Love's alleged "gift" to Allen was considered

12  tortious, which is clearly not the case, the law imposes no duty upon Love to disclose to Frank R.

13  the fact of the alleged "gift". As such, Frank R. has not and cannot allege the necessary elements

14  of an action for fraudulent concealment.

15  VII.  **THE TENTH CAUSE OF ACTION FAILS TO STATE FACTS SUFFICIENT TO**

16       **CONSTITUTE A CAUSE OF ACTION AGAINST THIS DEFENDANT**

17       Frank R. fails to allege facts sufficient to state cause of action for unfair and fraudulent

18  business practices in violation of Business and Professions Code section 17200, *et seq.* In his

19  Opposition, Frank R. does not and cannot point to any monies of his own that are in the

20  possession of Love. Moreover, he fails to acknowledge that all the rulings by Allen subsequent

21  to the "gift" have been set aside, with a new trial pending. Thus, there is no relief available under

22  the act. There is and could be no injunction as against Love under Business and Professions

23  Code section 17203 based on the conduct alleged. Similarly, there is not any allegation that Love

24  is in possession of anything of Frank R.'s which Love could be ordered to restore under section

25  17203. Love did not receive anything by way of Love's gift to Allen which would be legally

26  restorable to Frank.

27       Finally, there is no allegation, nor has California law recognized, that a violation of RPC

28  5-300(A) constitutes an unfair business practice under Business and Professions Code section

WHITE & OLIVER
A Professional Corporation

**EXHIBIT 2 PAGE 485**

LOVE00859

1    17200. Love simply represented Shirley in her divorce action against Frank R. Thus, any

2    communication or publications made by Love in the course of the divorce proceedings are

3    subject to the litigation privilege i.e, the filing of pleadings following the alleged "gift" and/or

4    communications with the opposing party or counsel. California *Civil Code* §47(b); *see, e.g.,*

5    *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212; *see also Brown v. Kennard* (2001) 94

6    Cal.App.4th 40, 45. The demurrer should be sustained without leave to amend.

7    **VIII.    THE ELEVENTH AND TWELFTH CAUSES OF ACTION FAIL TO STATE**
     **FACTS SUFFICIENT TO CONSTITUTE A CAUSE OF ACTION AGAINST**
8    **THIS DEFENDANT**

9        The Eleventh Cause of Action is not labeled, nor does it include in its contents any

10   allegations of the elements of any cognizable tort for which Frank R. could pursue relief as

11   against Love. Rather, the Eleventh Cause of Action alleges that Love and Allen breached their

12   respective duties to him in their capacities as members of the State Bar of California. FAC ¶

13   132.

14       A tort, whether intentional or negligent, involves a violation of a legal duty owed by the

15   defendant *to the injured person. Cedars-Sinai Medical Center v. The Superior Court of Los*

16   *Angeles County* (1998) 18 Cal.4th 1, 8. As discussed above, Love does not owe a duty of care to

17   Frank R.

18       Moreover, in *Cedars-Sinai, supra,* the California Supreme Court recognized that "[i]n the

19   past, we have favored remedying litigation-related misconduct by sanctions imposed within the

20   underlying lawsuit rather than by creating new derivative torts." *See Id.* at 8-9 (holding that there

21   is no tort remedy for intentional spoliation of evidence by a party to the cause of action to which

22   the spoliated evidence is relevant.) Frank R. has been provided a remedy for the alleged

23   litigation related conduct. All the rulings by Allen subsequent to the "gift" have been set aside,

24   with a new trial pending.

25       Finally, as discussed, a violation of that Rule of Professional Conduct does not give rise

26   to a civil cause of action, either for alleged willful and intentional conduct or negligent conduct.

27   RPC 1-100. "There is no independent cause of action for the breach of a disciplinary rule.

28   While the rules may provide a standard of conduct for attorneys, they do not alone support a

WHITE & OLIVER
A Professional Corporation

1    claim for damages." *Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 746

2    (citations omitted).

3    The Eleventh and Twelfth Causes of Action do not state causes of action, and the

4    allegations therein do not and cannot constitute causes of action, in California.

5    **IX.    THE THIRTEENTH CAUSE OF ACTION FAILS TO STATE FACTS SUFFICIENT**

6    **TO CONSTITUTE A CAUSE OF ACTION AGAINST THIS DEFENDANT**

7    The Thirteenth Cause of Action as against all defendants is entitled "unjust enrichment."

8    Frank R. alleges that the defendants unjustly enriched themselves to his detriment and hold monies

9    paid by Frank R. as "constructive trustees." FAC ¶ 137. Frank R. seeks imposition of a constructive

10   trust for monies paid by him and "wrongfully acquired or detained by Defendants." Prayer ¶ 3.

11   Plaintiff attempts to circumvent the requirements for maintaining a cause of action by

12   broadly concluding that "a constructive trustee may be charged with the value of the

13   "unconscionable loss he has caused the beneficiary" even though the constructive trustee received no

14   monetary benefit"" or that imposition of an involuntary trust does not require that the involuntary

15   trustee acquire the trust res directly from its rightful owner. (*See* Frank R.'s Opposition to Demurrer

16   of Defendant S. Michael Love's Demurrer to First Amended Complaint at p.13, ll. 25-26; p.14, ll.2-

17   7, citing *Elliot v. Elliot* (1964) 231 Cal.App.2d 205, 211; *GHK Associates v. Mayer Group, Inc.*

18   (1990) 24 Cal.App.3d 856.) These statements are taken out of context and are, thus, misleading.

19   Both *Elliot* and *GHK* require that a defendant wrongfully detain property of a plaintiff, for purposes

20   of imposing a constructive trust. (*Elliot, supra,* 231 Cal.App.2d at 209; *GMK, supra,* 24 Cal.App.3d

21   at 879.)

22   For example, *Elliot, supra,* involved a divorce proceeding, wherein a wife was awarded one-

23   half the principal of a promissory note, which was held by the husband as co-owner. (*Elliot, supra,*

24   231 Cal.App.2d at 209.) The husband did not collect on the note and the applicable statute of

25   limitation ran on the note. (*Id.*) The court subsequently held that the husband held the note as a

26   constructive trustee for the wife, thus awarding her judgment her one-half of the note. (*Id.*) The

27   court found that the wife's interest in the note was legally established by the divorce decree, thus

28   constituting a wrongful detention of the wife's property. (*Id.*)    **EXHIBIT 2 PAGE 487**

WHITE & OLIVER
A Professional Corporation

64580.1                                347

LOVE00861

1      The cases plaintiff cites to in his Opposition do not eliminate the requirement that to state a

2 claim for unjust enrichment, it "must be shown . . . that the acquisition of the property was wrongful

3 and that the keeping of the property by the defendant would constitute unjust enrichment."

4 *Calistoga Civic Club v. Calistoga* (1983) 143 Cal.App.3d 111, 116)  Nowhere has it been alleged or

5 could it be alleged that Love wrongfully acquired Frank R.'s property.  Love represented Shirley R.

6 in the divorce action.  There is no allegation of any conduct or identification of any property of Love

7 on which a constructive trust could or should be imposed, for a supposedly wrongful gift by Love to

8 Allen of the one half interest in the Warner Springs Ranch share.  The cause of action simply fails to

9 state any facts sufficient to constitute a cause of action for unjust enrichment or entitlement to a

10 constructive trust as against Love.  The demurrer should be sustained without leave to amend.

11 **X.**    <u>CONCLUSION</u>

12      The demurrer to each cause of action as against Love should be sustained without leave to

13 amend.  It is clear from the face of the first amended complaint, Frank R.'s second effort, that he has

14 no claim against Love other than a claim which gives no independent rise to civil liability, i.e., a

15 claim that Love is in violation of California RPC-300(A).

16

17           Respectfully submitted,

18           WHITE & OLIVER

19

20       By: _____

21              Daniel M. White

             Steven G. Amundson

22              Beth J. Manover

             Attorneys for Defendant

23              S. MICHAEL LOVE

24

25

26

27

28                                  **EXHIBIT 2 PAGE 488**

WHITE & OLIVER
A Professional Corporation.

LOVE00862

18

EXHIBIT 2 PAGE 489

RECEIVED
JUL 11 2005
BY: _____

FER ✓
CLIENT ✓
FILE ✓

1   Donald A. English, Esq.     (State Bar No. 115569)
    Christy L. Yee, Esq.        (State Bar No. 166238)
2   ENGLISH & GLOVEN
    A Professional Corporation
3   550 West "C" Street, Suite 1800
    San Diego, California 92101
4   Telephone: (619) 338-6610
    Facsimile:  (619) 338-6657
5
6   Attorneys for Defendant
    James D. Allen
7
8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF SAN DIEGO

10  FRANK E. ROGOZIENSKI,              )    Case No. GIC 843843
                                       )
11            Plaintiff                )    DEFENDANT JAMES D. ALLEN'S REPLY
                                       )    MEMORANDUM OF POINTS AND
12       v.                            )    AUTHORITIES IN SUPPORT OF
                                       )    DEMURRER TO PLAINTIFF'S FIRST
13  JAMES D. ALLEN, S. MICHAEL LOVE    )    AMENDED COMPLAINT
    and DOES 1 through 10, inclusive,  )
14                                     )    Date:      July 15, 2005
              Defendants.             )    Time:      11:00 a.m.
15                                     )    Dept:      61
                                       )    Judge:     Hon. John S. Meyer
16                                     )
                                       )
17                                     )    Complaint Filed:   March 7, 2005
                                       )    Trial Date:        None set
18  _____)

19        Defendant James D. Allen ("Mr. Allen") respectfully submits the following reply memorandum

20  of points and authorities in support of his demurrer to the first amended complaint filed by plaintiff Frank

21  E. Rogozienski ("Mr. Rogozienski").

22

23

24

25

26

27                                            **EXHIBIT 2 PAGE 490**

28                                                                                349
              JAMES D. ALLEN'S REPLY MEMORANDUM OF POINTS
                 AND AUTHORITIES IN SUPPORT OF DEMURRER

LOVE00864

TABLE OF CONTENTS

Page

I.    SUMMARY OF REPLY ................................................ 1

II.   THE DEMURRER SHOULD BE SUSTAINED WITHOUT LEAVE TO AMEND ....... 1

      A.   The Judicial Immunity Doctrine is an Absolute Defense to Each and
           Every Cause of Action Against Mr. Allen ............................. 1

           1.   Mr. Allen's Alleged Acts in the First Amended Complaint are
                Judicial Acts ........................................... 1

           2.   Mr. Allen's Voluntary Withdrawal as Temporary Judge in the
                Rogozienski Dissolution Does Not Deprive Him of the Protection
                Under the Judicial Immunity Doctrine ........................... 3

      B.   The Litigation Privilege Precludes Mr. Rogozienski's Claims against Mr. Allen .... 5

      C.   Mr. Rogozienski's Claims are Barred by the Tort Claims Act ................. 5

      D.   The Demurrer Should be Sustained as to the Eleventh Cause of Action
           for "Willful Misconduct and Intentional Infliction of Injury" and the Twelfth
           Cause of Action for "Negligence." ..................................... 6

      E.   Mr. Rogozienski Has Failed to State a Cause of Action for Civil Rights Violations . 6

III.  CONCLUSION .................................................... 7

EXHIBIT 2 PAGE 491

350

JAMES D. ALLEN'S REPLY MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF DEMURRER

L0VE00865

TABLE OF AUTHORITIES

Page(s)

### State Cases

Cedars-Sinai Medical Center v. Superior Court (1998)
18 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Frost v. Geernaert (1988)
200 Cal.App.3d 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Greene v. Zank (1984)
158 Cal.App.3d 497 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Howard v. Drapkin (1990)
222 Cal.App.3d 843 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

Moore v. Regents of the University of California (1990)
51 Cal.3d 120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

People v. Barrera (1999)
70 Cal.App.4th 541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Stasz v. Schwab (2004)
121 Cal.App.4th 420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Taliaferro v. County of Contra Costa (1960)
182 Cal.App.2d 587 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Tatum v. Southern Pacific (1967)
250 Cal.App.2d 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Urias v. Harris Farms, Inc. (1991)
234 Cal.App.3d 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Williard v. Caterpillar, Inc. (1995)
40 Cal.App.4th 892 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

### Federal Cases

Dennis v. Sparks (1980)
449 U.S. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ricotta v. State of California (S.D. Cal. 1998)
4 F.Supp.2d 961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Stump v. Sparkman (1978)
435 U.S. 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**EXHIBIT 2 PAGE 492**

LOVE00866



1

TABLE OF AUTHORITIES

2

State Statutes

3  Business and Professions Code section 6128 ............................................. 6

4  California Rule of Court 201(c) .......................................................... 1

5  California Rule of Court 201(d)(4) ...................................................... 1

6  California Rule of Court 313(d) ......................................................... 1

7  California Rule of Court 313(h) ......................................................... 1

8  Code of Civil Procedure section 170.4 .................................................. 3

9  Code of Civil Procedure section 340(c) ................................................. 5

10  Government Code section 810.2 ......................................................... 5

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 2 PAGE 493**

352

LOVE00867

## I.
### SUMMARY OF REPLY

Mr. Rogozienski's opposition to Mr. Allen's demurrer is contrary to established law protecting judicial and quasi-judicial officers from civil liability under the judicial immunity doctrine. While Mr. Rogozienski asserts that Mr. Allen's acceptance of a "gift" is an "extra-judicial act," Mr. Rogozienski ignores controlling case law that holds that even the alleged acceptance of a "gift" or bribe is an absolutely protected judicial act under the judicial immunity doctrine. This Court should disregard Mr. Rogozienski's conclusory allegation that the judicial immunity doctrine is inapplicable. Mr. Rogozienski is bound by his factual allegations of Mr. Allen's purported misconduct in the capacity as temporary judge and cannot avoid the application of the judicial immunity doctrine.

In addition, Mr. Rogozienski concedes that all of Mr. Allen's alleged acts and communications done in his capacity as temporary judge cannot be the basis for any cause of action against Mr. Allen under the litigation privilege. Moreover, Mr. Rogozienski (1) fails to provide any legal authority for his unsupportable contention that the Tort Claims Act is not applicable to the claims against Mr. Allen, and (2) concedes his failure to comply with the pre-filing requirements under the Tort Claims Act.

The absolute defenses of judicial immunity, the litigation privilege, and the Tort Claims Act shield Mr. Allen from liability for each of the claims asserted against him in the first amended complaint. Mr. Rogozienski can allege no facts to support any viable claim against Mr. Allen, and no amendment should be allowed. The demurrer should be sustained, without leave to amend.[1]

## II.
### THE DEMURRER SHOULD BE SUSTAINED WITHOUT LEAVE TO AMEND

A.    The Judicial Immunity Doctrine is an Absolute Defense to Each and Every Cause of Action Against Mr. Allen.

1.    Mr. Allen's Alleged Acts in the First Amended Complaint are Judicial Acts.

Mr. Rogozienski's contention that Mr. Allen's alleged act of "accepting a gift" from Mr. Love while Mr. Allen was acting as temporary judge in the Rogozienski dissolution was not a "judicial act" ignores established case law protecting judicial and quasi-judicial officers from the very acts Mr. Rogozienski claims Mr. Allen engaged in — the alleged acceptance of a "bribe," "corruption," failure

---

[1]    Mr. Rogozienski also raises two technical grounds in opposition to Mr. Allen's demurrer, both of which are without merit. First, Mr. Allen has complied with California Rule of Court 313(h) by lodging copies of federal authorities cited in his moving and reply papers before the hearing in this matter. Second, Mr. Allen's opening memorandum of points and authorities is in compliance with California Rule of Court 201(c) in that the typeface used is Times Roman and 12 point type. Moreover, Mr. Allen's memorandum of points and authorities is also in compliance with California Rule of Court 201(d)(4) in that the lines on each pages is one and a half spaced and numbered consecutively. In addition, the points and authorities does not exceed 15 pages and is in compliance with California Rule of Court 313(d).

353

EXHIBIT 2 PAGE 494

JAMES D. ALLEN'S REPLY MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF DEMURRER

LOVE00868

1    to disclose alleged conflicts of interest, and improper rulings as a result of an alleged acceptance of a
2    bribe. (See e.g., Howard v. Drapkin (1990) 222 Cal.App.3d 843, 848; Frost v. Geernaert (1988) 200
3    Cal.App.3d 1104, 1107; Ricotta v. State of California (S.D. Cal. 1998) 4 F.Supp.2d 961, 970.)

4            Mr. Rogozienski purposefully avoids, and cannot cite any contrary authority contradicting the
     controlling case law which shields Mr. Allen from liability under the judicial immunity doctrine which
5    Mr. Allen cites in his moving papers.[2]  Mr. Rogozienski's reliance upon Greene v. Zank (1984) 158
6    Cal.App.3d 497 (citing Butz v. Economou (1978) 438 U.S. 478, 411-412) is misplaced.  The Greene
     court upheld the trial court's order sustaining the defendant's demurrer without leave to amend and
7    dismissing the entire action based upon the judicial immunity doctrine.  As set forth in Mr. Allen's
8    opening papers, it is appropriate for courts to dismiss claims against judicial or quasi-judicial officers at
     the pleading stage on demurrer based upon the absolute judicial immunity doctrine.  This is true even
9    when there are serious allegations of judicial misconduct, including intentional, malicious torts, alleged
10   violations of civil rights, and alleged bribery and corruption.

11           Simply stated, Mr. Rogozienski cannot avoid the application of the judicial immunity doctrine
     based upon his unsupportable contention that Mr. Allen's alleged acceptance of a "gift" was not a
12   judicial act within the scope of the judicial immunity doctrine.  Mr. Rogozienski's conclusory allegation
13   that the judicial immunity doctrine is inapplicable should be disregarded as it is contrary to both
14   established law and the alleged facts and judicial admissions in the first amended complaint that Mr.
     Rogozienski's claims are based solely upon alleged damages caused by the purported acceptance of a
15   bribe while Mr. Allen was acting as temporary judge.[3]

16

17

18

19                                                            **EXHIBIT 2 PAGE 495**

20           [2]    In his opposition to Mr. Love's demurrer, which will be heard concurrently with Mr.
21   Allen's demurrer, Mr. Rogozienski essentially concedes that Mr. Allen is immune from liability for any
     of Mr. Rogozienski's claims under the judicial immunity doctrine and that applicable case law, including
22   United States Supreme Court case Dennis v. Sparks (1980) 449 U.S. 24, remains "good law" and that
     "many cases have cited Dennis over the past 25 years, and none have overruled it." (Mr. Rogozienski's
23   opposition to S. Michael Love's demurrer, p. 7, fn. 3; p. 9, l. 1-3 ["Moreover, Love has no judicial
     immunity and is obligated for the damages caused by Allen by virtue of his own role in the conspiracy,
24   regardless of whether Allen is deemed immune [footnote omitted]."]  Dennis upheld a dismissal of claims
25   against a judge alleging a "corrupt conspiracy involving bribery" under the judicial immunity doctrine.

26           [3]    In ruling on demurrers, courts may properly disregard allegations that are contrary to law
     and which constitute contentions or conclusions of law.  (Moore v. Regents of the University of
27   California (1990) 51 Cal.3d 120, 125; Taliaferro v. County of Contra Costa (1960) 182 Cal.App.2d 587,
28   592.)

                                                                                        35 4

LOVE00869

1    2.    <u>Mr. Allen's Voluntary Withdrawal as Temporary Judge in the Rogozienski</u>
2    <u>Dissolution Does Not Deprive Him of the Protection Under the Judicial Immunity</u>
3    <u>Doctrine.</u>

Under the Supreme Court case <u>Stump v. Sparkman</u> (1978) 435 U.S. 349, 356-357, cited by Mr.
4    Rogozienski, the Supreme Court stated, "a judge will not be deprived of immunity because the action he
5    took was in error, was done maliciously, or was done in excess of his authority; rather, he will be subject
6    to liability only when he has acted in the 'clear absence of all jurisdiction' [citation omitted]." In <u>Stump,</u>
7    the Supreme Court reversed the Court of Appeal's holding that the trial judge had acted in "clear absence
8    of all jurisdiction" in considering a petition to sterilize a minor child. The Supreme Court stated that the
9    judge was absolutely immune from liability for his judicial acts even if his exercise of authority was
flawed by "grave procedural errors." (<u>Id.</u> at p. 359.)

Mr. Rogozienski argues, citing <u>Tatum v. Southern Pacific</u> (1967) 250 Cal.App.2d 40, 43, that Mr.
10    Allen's alleged acceptance of a "gift" from Mr. Love disqualified him from acting as temporary judge
11    in the Rogozienski dissolution and, therefore, Mr. Allen had no jurisdiction to make subsequent rulings
12    after Mr. Allen's disqualification. <u>Tatum</u> does not support Mr. Rogozienski's contention. Rather, <u>Tatum</u>
merely recites the general rule that the events giving rise to disqualification, not the finding of
13    disqualification, controls for purposes of determining when a judge could be disqualified. (<u>Id.</u> at p. 43.)

14    There is no legal authority to support the proposition that a judge who is disqualified from a case
is without jurisdiction after the disqualification occurs. More importantly, there is no authority to support
15    Mr. Rogozienski's assertion that Mr. Allen's alleged acts after his disqualification from the Rogozienski
16    dissolution deprives him of protection under the judicial immunity doctrine.

17    California courts have held that a disqualified judge is not void of jurisdiction after
disqualification and that rulings made by the disqualified judge are merely voidable if raised by an
18    interested party, but are not void. In <u>Urias v. Harris Farms, Inc.</u> (1991) 234 Cal.App.3d 415, the Court
19    of Appeal held that despite the language in Code of Civil Procedure section 170.4 which provides that
20    "a disqualified judge shall have no power to act in any proceeding after his or her disqualification . . .",
"the actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly
21    raised by an interested party" [citation omitted]. (<u>Id.</u> at p. 424.) The Court of Appeal noted that the
22    actions of a disqualified judge are not without jurisdiction but, rather, is "more accurately one [in which
the judge is acting] in excess of jurisdiction." (<u>Id.</u>; see also <u>People v. Barrera</u> (1999) 70 Cal.App.4th 541;
23    549 ["under section 170 et seq., judgments or orders by disqualified judges have been considered merely
24    voidable, not void."]; see also <u>Taliaferro, supra,</u> 182 Cal.App.2d 587, 592-594 [claims for damages
25    against justice of peace dismissed on demurrer under judicial immunity doctrine even though justice of
26    the peace had no jurisdiction to issue warrant against the plaintiff].) Acts which are done "in excess of
jurisdiction" are absolutely protected under the judicial immunity doctrine. (<u>Stump, supra,</u> 435 U.S. at
27    p. 356-357.)

**EXHIBIT 2 PAGE 496**
28                                                                                            355
JAMES D. ALLEN'S REPLY MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF DEMURRER

LOVE00870

1   Moreover, California courts have held that a litigant's sole remedy for complaints of bias,

2   corruption, or misconduct by judicial or quasi-judicial officers lies in challenging the order or act, not in

3   a civil lawsuit against the judicial or quasi-judicial officer. (See e.g., Stasz v. Schwab (2004) 121

4   Cal.App.4th 420, 440.) In Stasz, the Court of Appeal upheld the trial court's order sustaining a demurrer

5   without leave to amend as to an action brought against the American Arbitration Association ("AAA")

6   based upon the plaintiff's allegation that the arbitration was conducted in "clear absence of jurisdiction"
    and that judicial immunity did not apply to the claims.  In affirming the trial court's order dismissing the
    entire action against AAA, the Court of Appeal stated:

7       We hold that bias in the arbitration process should be remedied by
        challenging the arbitration award, not by seeking to impose liability on the

8       arbitrator or the sponsoring organization . . .

9       'Upon application of a party, the court shall vacate an award where . . .
        there was evident partiality by an arbitrator appointed as a neutral for

10      corruption in any of the arbitrators or misconduct prejudicing the rights of
        any party . . . we believe that the proper remedy lies therein rather than in

11      a civil suit against the arbitrator. [Citation omitted.]

12      (Id. at p. 441-442, emphasis added.)

13      The Court of Appeal expressly rejected the plaintiff's contention that the arbitration proceedings

14   should have been automatically stayed pending the outcome of her appeal and was thus conducted in

15   clear absence of jurisdiction stripping AAA of immunity. (Id.) In so doing, the Court of Appeal stated

16   that the plaintiff's remedy for an alleged violation of the automatic stay statute was to "seek a stay of the
    arbitration proceedings and, possibly, to petition the trial court to vacate the award on that ground, not

17   to seek to impose liability on the AAA." (Id. at p. 443, emphasis added.)

18      Here, Mr. Rogozienski cannot claim that by virtue of Mr. Allen's disqualification as temporary

19   judge in the Rogozienski dissolution that Mr. Allen had no jurisdiction to make rulings that would be

20   protected by the judicial immunity doctrine. Under Urias, Stasz, and other applicable authorities cited

21   herein and in Mr. Allen's moving papers, Mr. Allen had jurisdiction to act after his disqualification and
    he is, thus, insulated from liability for his judicial acts under the judicial immunity doctrine. Moreover,

22   as Mr. Rogozienski has already requested and obtained an order setting aside certain of Mr. Allen's

23   rulings (First Amended Complaint, ¶ 43), Mr. Rogozienski has already obtained his sole remedy for his
    alleged claims of Mr. Allen's misconduct and is precluded from seeking damages from Mr. Allen in the

24   instant lawsuit.[4]

25   _____                      **EXHIBIT 2 PAGE 497**

26      [4]   Each of Mr. Rogozienski's motions and applications in the Rogozienski dissolution action,
    including Mr. Rogozienski's motion to set aside Mr. Allen's rulings and petition for error coram vobis,

27   were based upon the identical allegations that Mr. Rogozienski is making in this action -- that Mr. Allen

28   improperly accepted a "gift" from Mr. Love and made biased rulings as temporary judge.

                                                                                356

    JAMES D. ALLEN'S REPLY MEMORANDUM OF POINTS
    AND AUTHORITIES IN SUPPORT OF DEMURRER

LOVE00871

1    **B.    The Litigation Privilege Precludes Mr. Rogozienski's Claims against Mr. Allen.**

2          Mr. Rogozienski concedes that none of the acts or communications allegedly committed by Mr.

3    Allen in his capacity as temporary judge can be the basis of any cause of action.  The only alleged
communications Mr. Rogozienski contends subject Mr. Allen to liability are alleged statements to the

4    press (First Amended Complaint, ¶ 44; Exhibit "1" to the Notice of Lodgment.)  In support of his

5    contention, Mr. Rogozienski asserts that Mr. Allen and his counsel purportedly spoke with "one or more
reporters and made threatening, misleading and disparaging remarks about the truth of Allen's

6    involvement in the gift to him of the Love's Unit 850B interest in Warner Springs Ranch."  (Mr.

7    Rogozienski's opposition, p. 4, l. 4-5.)  Mr. Rogozienski further alleges, on information and belief, that

8    "Allen and Allen's counsel made these statements as a part of and in furtherance of a conspiracy, to
discredit plaintiff and coerce plaintiff into accepting Allen's rulings, and to bolster and support actions

9    Allen had previously taken in his judicial capacity."  (Ibid. at p. 4, l. 7-10.)

10         Mr. Rogozienski's contentions and allegations in the first amended complaint regarding the

11   alleged statements to the press fail to support any viable claim against Mr. Allen.[5]  Moreover, by Mr.

12   Rogozienski's own admission, the alleged statements were done to "bolster and support actions Allen
had previously taken in his judicial capacity" and are thereby within the purview of the judicial immunity

13   doctrine.  As such, Mr. Rogozienski's claims against Mr. Allen are barred and the demurrer should be

14   sustained, without leave to amend.

15   **C.    Mr. Rogozienski's Claims are Barred by the Tort Claims Act.**

          Mr. Rogozienski admits his failure to comply with the pre-filing requirements under the Tort

16   Claims Act.  Without citation to any legal authority or fact for which this Court may take judicial notice,

17   Mr. Rogozienski asserts that Mr. Allen is not a public employee as his salary was not being paid from

18   public funds.[6]  Mr. Rogozienski's contention is contrary to Government Code section 810.2, which
defines a public employee to include an "officer" or "judicial officer" "whether or not compensated for

19   such office."[7]  Moreover, Mr. Allen has asked this Court to take judicial notice of the Order, Stipulation

20   and Oath for Temporary Judge which demonstrates that Mr. Allen was a temporary judge duly appointed

21                                                                **EXHIBIT 2 PAGE 498**

22   _____

23          [5]    The first amended complaint is devoid of any claims, such as libel or slander, which could
be based upon the alleged statements to the press.  Even if Mr. Rogozienski were permitted to amend to

24   allege such causes of action (which he should not), such claims would be time-barred under the one year
statute of limitations under Code of Civil Procedure section 340(c).

25

26          [6]    The first amended complaint is devoid of any allegations that Mr. Allen is not a public
employee and not paid from public funds.  (See Exhibit "1" to Notice of Lodgment.)

27          [7]    Judicial immunity also applies regardless of whether the judicial or quasi-judicial officer
is paid by the court or private parties.  (See e.g., Howard, supra, 222 Cal.App.3d at p. 848.)

28                                                                                                    35

1  by the Superior Court and vested with "full judicial powers" and, therefore, is an employee within the

2  meaning of the Tort Claims Act. (See Exhibit "2" to Notice of Lodgment; Request for Judicial Notice.)

3        Simply stated, Mr. Rogozienski's claims against Mr. Allen cannot stand based upon his admitted failure to comply with the Tort Claims Act.

4  **D.**    **The Demurrer Should be Sustained as to the Eleventh Cause of Action for "Willful**

5        **Misconduct and Intentional Infliction of Injury" and the Twelfth Cause of Action for**

6        **"Negligence."**

        Mr. Rogozienski's reliance upon the Rules of Professional Conduct, Business and Professions

7  Code 6128, and certain Penal Code sections cited in the first amended complaint (¶¶ 122, 123) as a basis

8  for his eleventh and twelfth causes of action is improper. As set forth in Mr. Allen's opening papers, the

9  Rules of Professional Conduct cannot create liability for damages in a civil action. Rather, the rules are intended to allow the State Bar to discipline lawyers, and are not intended to create civil causes of action.

10  Moreover, Business and Professions Code section 6128 which provides that an attorney is "guilty of a

11  misdemeanor" for certain misconduct as well as the Penal Code section cited by Mr. Rogozienski likewise cannot be the basis for civil liability.[8] The statutes are intended to be used by the State Bar in

12  connection with disciplinary action or in criminal proceedings, not civil proceedings such as the instant

13  lawsuit. As such, Mr. Rogozienski's eleventh and twelfth causes of action cannot stand as a matter of

14  law.

15  **E.**    **Mr. Rogozienski Has Failed to State a Cause of Action for Civil Rights Violations.**

        Although not apparent on the face of the first amended complaint, in his opposition, Mr.

16  Rogozienski asserts that he has stated a claim against Mr. Allen under Civil Code section 52.1. However,

17  there is no authority (and, hence, none cited by Mr. Rogozienski) which authorizes Mr. Rogozienski to

18  bring a claim under this statute (or any other authorities) based upon his alleged denial of a right to fair trial by virtue of Mr. Allen's alleged conduct. Mr. Rogozienski claims that his civil rights were violated

19  when Mr. Allen purportedly accepted a "gift" which constituted "an act of coercion which immediately

20  disqualified him from further or thereafter acting as a temporary judge in the underlying proceeding and

21  raised serious and obvious concerns regarding his impartiality." Based upon Mr. Rogozienski's own admission and his failure to cite any applicable supporting legal authority, Mr. Rogozienski has failed

22  to state a claim for civil rights violations. Moreover, Mr. Rogozienski's admission concedes that Mr.

23  Allen's alleged acts as temporary judge are protected under the judicial immunity doctrine and the

24  litigation privilege, as discussed herein. Simply stated, the demurrer should be sustained, without leave to amend.

25

**EXHIBIT 2 PAGE 499**

26

      [8]    Mr. Rogozienski's reliance upon Williard v. Caterpillar, Inc. (1995) 40 Cal.App.4th 892,

27  920 is unavailing as Williard was expressly overruled by the California Supreme Court in Cedars-Sinai Medical Center v. Superior Court (1998) 18 Cal.4th 1.

28                                          358

                    JAMES D. ALLEN'S REPLY MEMORANDUM OF POINTS

                    AND AUTHORITIES IN SUPPORT OF DEMURRER

LOVE00873

III.

## CONCLUSION

Mr. Allen should not be required to defend Mr. Rogozienski's baseless claims which are precluded as a matter of law under the judicial immunity doctrine, the litigation privilege, and the Tort Claims Act. This Court should not allow Mr. Rogozienski to amend as Mr. Rogozienski cannot possibly plead any facts which would avoid the absolute defenses raised by this demurrer. Moreover, as Mr. Rogozienski has already voluntarily amended once by filing a first amended complaint before effecting service on Mr. Allen, Mr. Rogozienski has already had ample opportunity to allege additional facts to support his claims, which are insufficient to cure the fatal defects in his pleading. The demurrer should be sustained, without leave to amend.

Dated: _July 8, 2005_

ENGLISH & GLOVEN
A Professional Corporation

By: _Donald A. English_
Donald A. English
Christy L. Yee
Attorneys for Defendant
James D. Allen

**EXHIBIT 2 PAGE 500**

359

L0VE00874

19

EXHIBIT 2 PAGE 501

L0VE00875

RECEIVED

JUL 1 1 2005

BY: _____

1 | Donald A. English, Esq.      (State Bar No. 115569)
Christy I. Yee, Esq.      (State Bar No. 166238)
2 | ENGLISH & GLOVEN
A Professional Corporation
3 | 550 West "C" Street, Suite 1800
San Diego, California 92101
4 | Telephone: (619) 338-6610
Facsimile:  (619) 338-6657
5 |

6 | Attorneys for Defendant
James D. Allen
7 |

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **FOR THE COUNTY OF SAN DIEGO**

10 | FRANK E. ROGOZIENSKI,          )     Case No. GIC 843843
|                                          )
11 |                                          )     **DEFENDANT JAMES D. ALLEN'S NOTICE**
|              Plaintiff           )     **OF LODGMENT OF FEDERAL**
12 |                                          )     **AUTHORITIES IN SUPPORT OF**
|                                          )     **DEMURRER TO PLAINTIFF'S FIRST**
13 |      v.                           )     **AMENDED COMPLAINT**
|                                          )
14 |                                          )
|                                          )     Date:        July 15, 2005
15 | JAMES D. ALLEN, S. MICHAEL LOVE  )     Time:        11:00 a.m.
and DOES 1 through 10, inclusive,    )     Dept:        61
16 |                                          )     Judge:       John S. Meyer
|                                          )
17 |              Defendants.         )
|                                          )     Complaint Filed:    March 7, 2005
18 | _____  )     Trial Date:         None set

19 |      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

20 |      PLEASE TAKE NOTICE that defendant James D. Allen hereby lodges the following federal

21 | authority in support of his demurrer to plaintiff Frank E. Rogozienski's First Amended Complaint:

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 |                                          **EXHIBIT 2 PAGE 502**

28 |
                                                          360

LOVE00876

| | | |
|---|---|---|
| 1 | Exhibit A: | Bradley v. Fisher (1871) 80 U.S. 335. |
| 2 | Exhibit B: | Dennis v. Sparks (1980) 449 U.S. 24. |
| 3 | Exhibit C: | Moore v. Brewster (9th Cir. 1996) 96 F.3d 1240. |
| 4 | Exhibit D: | Ricotta v. State of California (S.D. Cal. 1998) 4 F.Supp.2d 961. |
| 5 | Exhibit E: | Stump v. Sparkman (1978) 435 U.S. 349. |

Dated: _July 8, 2005_

ENGLISH & GLOVEN
A Professional Corporation


By: _Donald A. English_
Donald A. English
Christy I. Yee
Attorneys for Defendant
James D. Allen

**EXHIBIT 2 PAGE 503**

361

**EXHIBIT 2 PAGE 504**    362

EXHIBIT A

L0VE00878

Westlaw.

80 U.S. 335 (Mem)

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

Page 1

▷

Supreme Court of the United States
BRADLEY
v.
FISHER.

December Term, 1871

ERROR to the Supreme Court of the District of Columbia.

This was an action brought by Joseph H. Bradley, who was, in 1867, an attorney-at-law, practicing in the Supreme Court of the District of Columbia, against George P. Fisher, who was then one of the justices of that court, to recover damages alleged to have been sustained by the plaintiff, by reason of the wilful, malicious, oppressive, and tyrannical acts and conduct of the defendant, whereby the plaintiff was deprived of his right to practice as an attorney in that court. The case was thus:

On the 10th of June, 1867, the trial of John H. Surratt, for the murder of the late President Lincoln, was begun in the Criminal Court of the District and continued until the 10th of August, when the jury, failing to agree on a verdict, was discharged. The defendant was the presiding judge in the court during the progress of the trial, and until its termination, *337 and the plaintiff was one of the attorneys who defended the prisoner. Immediately on the discharge of the jury, the court thus held by the defendant made the following order, which with its recitals was entered of record:

'On the 2d day of July last, during the progress of the trial of John H. Surratt for the murder of Abraham Lincoln, immediately after the court had taken a recess until the following morning, as the presiding justice was descending from the bench, Joseph H. Bradley, Esq., accosted him in a rude and insulting manner, charging the judge with having offered him (Mr. Bradley) a series of insults, from

the bench from the commencement of the trial. The judge disclaimed any intention of passing any insult whatever, and assured Mr. Bradley that he entertained for him no other feelings than those of respect. Mr. Bradley, so far from accepting this explanation or disclaimer, threatened the judge with personal chastisement. No court can administer justice or live if its judges are to be threatened with personal chastisement on all occasions whenever the irascibility of counsel may be excited by imaginary insult. The offence of Mr. Bradley is one which even his years will not palliate. It cannot be overlooked or go unpunished.

'It is, therefore, ordered that his name be stricken from the roll of attorneys practicing in this court.

'GEORGE P. FISHER,

'Justice of the Supreme Court, D. C.'

The present suit was founded upon this order, which was treated in the declaration as an order striking the name of the plaintiff from the roll of attorneys of the *Supreme Court of the District*, and not as an order merely striking his name from the roll of attorneys practicing in the *Criminal Court of the District*. The declaration had two counts, and was entitled and filed in the Supreme Court of the District.

The *first* count alleged that the defendant caused the order (which was set out at length) to be recorded 'on the minutes of the Criminal Court, *being one of the branches of the said Supreme Court*;' that the several statements, contained in the order were untrue, and were specifically denied; and that the defendant 'falsely, fraudulently, corruptly, and maliciously *338 intended thereby to give a color of jurisdiction' for making the order that the name of the plaintiff 'be stricken from' the *roll of attorneys practicing in this court*,' whereby the plaintiff had been injured, and claimed damages,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 505**        363

LOVE00879

80 U.S. 335 (Mem)                                                                     Page 2

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

$20,000.

The *second* count alleged that the defendant 'wantonly, corruptly, arbitrarily, and oppressively intending to remove the plaintiff from his office as an attorney-at-law, 'caused to be entered *on the records of the Supreme Court of the District of Columbia, Criminal Court*, March Term, 1867,' the order in question, which was set forth at length, '*the same being an order removing the plaintiff from the office of an attorney-at-law in the said Supreme Court of the District of Columbia*,' whereby he was greatly disturbed in the enjoyment of his office and prevented from having the use and benefit thereof, in so full and ample a manner as he otherwise might and would have had.

The declaration also averred that the order was made without notice of any kind to the plaintiff, and was summary, that there was no complaint made by him to the justice, and that he did not accost him while the court was in session, nor immediately on the court's taking a recess and as the presiding judge was descending from the bench, as was stated in the order, nor did he, the plaintiff, at the time and place mentioned in the order, address the justice at all after the court had taken the recess, until the judge had passed some time in a private room, and had left the same and gone out of the court-house; and the great body of auditors, jurors, witnesses, clerks, and officers of the court, and the jury impanelled, and the prisoner on trial had left the court-house; and so the declaration proceeded to say, 'the said judge *wilfully, maliciously, corruptly, and unlawfully fabricated the said order to give color and pretence to his jurisdiction in the premises.*'

By reason of which unlawful, wrongful, unjust, and oppressive acts of the defendant, the plaintiff alleged that he had been deprived of emoluments, and had lost sums of money which would otherwise have accrued to him from *339 the enjoyment of his office and from his practice as an attorney in the courts of the county and district, &c., &c., and therefore he claimed $20,000 damages.

*Pleas:* 1st, the general issue, 'not guilty;' and 2d, a special plea, that before and at the time of the

alleged commission, &c., the defendant was one of the justices of the Supreme Court of the District of Columbia, *and, as such justice, was regularly and lawfully holding, by appointment of said Supreme Court of the District of Columbia*, in general term, at the city of Washington, in said District, a court of record, to wit, the Criminal Court of said District, created by authority of the United States of America, and having general jurisdiction for the trial of crimes and offences arising within said District, and that the said supposed trespass consisted of an order and decree of said Criminal Court, made by said defendant in the lawful exercise and performance of his authority and duty, as the presiding justice of said Criminal Court, for official misconduct and misbehavior of said plaintiff (he being one of the attorneys of said Criminal Court), occurring in the presence of the said defendant as the justice of said Criminal Court holding the same as aforesaid and not otherwise; as appears from the record of said Criminal Court and the order or decree of the defendant so made as aforesaid.

Wherefore he prayed judgment, if the plaintiff ought to have or maintain his aforesaid action against him, &c.

The defendant joined issue on this plea.

On the trial the plaintiff produced the order entered by the Criminal Court, which was admitted to be in the handwriting of the defendant, and offered to read it in evidence, but upon objection of the defendant's counsel to its admissibility, it was excluded, and the plaintiff excepted. Subsequently the plaintiff read in evidence the order, as entered, from the records of the Criminal Court, and offered to show that the order was prepared, written, and published by the defendant with express malice against the plaintiff, to defame and injure him, and without the defendant having any jurisdiction to make the order; and that there was no altercation *340 on the 2d July, 1867, between him and the judge, and that no words passed between them; and that they were not near each other when the Criminal Court took its recess, until the next day or immediately thereafter, and as the presiding justice

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 506**                          364

L0VE00880

80 U.S. 335 (Mem)                                                    Page 3

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

thereof was descending from the bench; but upon objection of the defendant's counsel the proof was excluded, and the plaintiff excepted.

The plaintiff also offered to prove that the only interview between him and the judge, which occurred on the 2d of July, 1867, after the Criminal Court had taken a recess, began after the court had adjourned, and the judge had left the court-room and the building and returned to the court-room, and in that interview he did not address the judge in a rude and insulting manner; that he did not charge him with having offered him, the plaintiff, a series of insults from the bench from the commencement of the trial; that the judge did not disclaim any intention of passing any insult whatever, nor assure the plaintiff that he entertained for him no other feelings but those of respect; that the plaintiff did not threaten the judge with personal chastisement, but to the contrary thereof, the said judge was from the opening of the interview violent, abusive, threatening, and quarrelsome; but upon objection the proof was excluded, and the plaintiff excepted.

The plaintiff thereupon asked a witness to state what passed between the plaintiff and defendant on the said 2d of July, 1867, the time when the parties met, and whether it was before the adjournment of the court on that day, or after it had adjourned, and how long after it had adjourned, and to state all he knew relating to that matter; the object of the evidence being to contradict the recitals in the order, and show that the justice had no jurisdiction in the premises, and had acted with malice and corruptly. But upon objection the evidence was excluded, and the plaintiff excepted. And the court ruled that, on the face of the record given in evidence, the defendant had jurisdiction and discretion to make the order, and he could not be held responsible in this private action for so doing, and instructed the jury that *341 the plaintiff was not entitled to recover. The jury accordingly gave a verdict for the defendant, and judgment being entered thereon, the plaintiff brought the case to this court on a writ of error.

To understand one point of the case better, it may be mentioned that in *Ex parte Bradley*, [FN1]

this court granted a peremptory mandamus to the Supreme Court of the District to restore Mr. Bradley to his office of attorney and counsellor in *that* court, from which in consequence of the matter with Judge Fisher in the Criminal Court, he had been removed; this court, that is to say the Supreme Court of the United States, holding that the Criminal Court of the District was, at the time the order in question was made, a different and separate court from the Supreme Court of the District of Columbia, as organized by the act of March 3d, 1863.

1. An order of the Criminal Court of the District of Columbia, made in 1867, striking the name of an attorney from its roll, did not remove the attorney from the bar of the Supreme Court of the District, the Criminal Court being at that time a separate and independent court; and in an action by the attorney against the judge of the Criminal Court, that order was inadmissible to show a removal by order of the defendant, or by order of the court held by him, from the Supreme Court, notwithstanding that an act of Congress, passed in 1870, changed the independent character of the Criminal Court, and declared that its judgments, decrees, and orders should be deemed the judgments, decrees, and orders of the Supreme Court of the District. The act of Congress, in enlarging the operation of the order, did not alter its original character.*336

2. Judges of courts of record of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction as to their liability made between acts done by them in excess of their jurisdiction and acts done by them in the clear absence of all jurisdiction over the subject-matter.

3. The power to remove attorneys from the bar is possessed by all courts which have authority to admit attorneys to practice; but, except where the matters constituting the grounds of its action occur in open court in the presence of its judges, the power of the court should not be exercised without notice to the offending party of the grounds of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 507          365

80 U.S. 335 (Mem)                                                                  Page 4

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

complaint against him, and affording him ample opportunity of explanation and defence.

4. The obligation which attorneys assume when they are admitted to the bar is not simply to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but includes abstaining out of court from insulting language and offensive conduct towards the judges personally for their judicial acts. A threat of personal chastisement, made by an attorney to a judge out of court for his conduct during the trial of a cause pending, is good ground for striking the name of the attorney from the rolls of attorneys practicing in the court. Such an order is a judicial act for which the judge is not liable to the attorney in a civil action.

West Headnotes

**Attorney and Client** ⚖=43
45k43 Most Cited Cases
The obligation which attorneys assume when they are admitted to the bar is not discharged by merely observing the rules of. courteous demeanor in open court, but includes. abstaining out of court from insulting language and offensive conduct towards the judges personally for their judicial acts. A threat of personal chastisement, made by an attorney to a judge out of court for his conduct during the trial of a cause pending, is good ground for striking off the attorney from the rolls of attorneys practicing in the court.

**Judges** ⚖=36
227k36 Most Cited Cases
Judges of courts of record of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly; otherwise, as to acts done by them in the clear absence of all jurisdiction over the subject-matter.

FN1 7 Wallace, 364.

It may also be stated that on the 21st of June, 1870,

after the decision just mentioned, Congress passed an act entitled, 'An act relating to the Supreme Court of the District of Columbia,' [FN2] which declared 'that the several general terms and special terms of the circuit courts, district courts, and criminal courts authorized by the act approved March 3d, 1863, entitled 'An act to reorganize the courts in the District of Columbia, and for other purposes,' which have been or may be held, shall be, and are declared to be severally, terms of the Supreme Court of the District of Columbia; and the judgments, decrees, sentences, orders, proceedings, and acts of said general terms, special terms, circuit courts, district courts, and criminal courts heretofore or hereafter rendered, made, or had, shall be deemed judgments, decrees, sentences, orders, proceedings, and acts of said Supreme Court.'

FN2 16 Stat. at Large, 160.

It may be well also, as counsel in argument refer to it, to state that an act of Congress of March 2d, 1831, [FN3] enacted:

FN3 4 Id. 487.

'That the power of the several courts of the United States to issue attachments and *inflict summary punishments* for contempt of court, shall not be construed to extend to any cases except *342 the misbehavior of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice; the misbehavior of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts.'

*Messrs. J. M. Harris and R. T. Merrick, for the plaintiff in error:*

1. By the act of Congress of June, 1870, the judgments, decrees, and orders of the Criminal Court of the District are to be deemed the judgments, decrees, and orders of the Supreme Court. All the effects, therefore, of the decision by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 508**     366

80 U.S. 335 (Mem)                                                              Page 5

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

this court of the case *Ex parte Bradley*, and argument that the order of the Criminal Court is not an order removing or disbarring the plaintiff from the Supreme Court, fall to the ground, in virtue of this act, and irrespectively of other reasons which might be adduced.

2. The judge relies in effect upon the order of court made by him. The plaintiff in reply alleges that the judge has himself fabricated the statement of facts set forth in that order—made it falsely and fraudulently—and by such fabrication, and by a false and fraudulent statement that certain things which never took place at all, did take place, corruptly sought to give himself jurisdiction in the case where he has acted. Now, the evidence which the plaintiff offered and which the court refused, tended directly to prove that the whole statement ordered by the judge to be put on record, was false and fabricated; and that it was made but to give color to a usurped jurisdiction; in other words, that the statement was fraudulently made. Certainly the plaintiff had a right to show *such* facts; for the judge had no power or jurisdiction to make the order complained of, if the matters recited never occurred. Under such circumstances, a judge, knowing the facts, is liable, even though he did not act corruptly; [FN4] and *à fortiori* is liable in a case where he did so act.

FN4 Houlden *v.* Smith, 14 Queen's Bench, 841.*343

3. The courts of the District are, of course, courts of the United States; and whether the proceeding for which this action is brought, be regarded as a punishment for contempt, or as a punishment for alleged misbehavior in office—a matter which the form of the order leaves quite uncertain—it was in the face of the statute of March 2d, 1831. This is undoubtedly so if it was for contempt; and even if it was for misbehavior in office the statute would still seem to apply; for it prohibits a summary proceeding except in the cases which the act specifies; cases which all look to misconduct that interferes with the administration of justice. But for a man who may have been once admitted to the bar, to threaten out of court, with assault, another man who happens to be a judge, and so occasionally in

court, is neither misbehavior in office nor a contempt of court.

4. But if the offence for which Mr. Bradley was disbarred was misbehavior in office, and if that be not within the statute of March 2d, 1831, still, undoubtedly, he should have had notice and an opportunity of defending himself. Admit that the court may proceed summarily, still summary jurisdiction is not arbitrary power; and a summons and opportunity of being heard is a fundamental principle of all justice. [FN5] The principle has been declared by this court in *Ex parte Garland*, [FN6] to be specifically applicable to the case of disbarring an attorney; and so declared for obvious reasons. Without then having summoned Mr. Bradley, and having given to him an opportunity to be heard, the court had no jurisdiction of Mr. Bradley's person or of any case relating to *him*. It is not enough that it have jurisdiction over the subject-matter of the complainant generally; it must have jurisdiction over the particular case, and if it have not, the judgment is void *ab initio*. [FN7] The whole subject is set forth in Smith's Leading Cases, [FN8] where the authorities are collected *344 and the principle deduced, that when the record shows that the court has proceeded without notice to the party condemned, the judgment will be void, and may be disregarded in any collateral proceeding.

FN5 Rex *v.* Chancellor of Cambridge, 2 Lord Raymond, 1348.

FN6 4 Wallace, 378.

FN7 Mitchell *v.* Foster, 12 Adolphus & Ellis, 472; United States *v.* Arredondo, 6 Peters, 709; Walden *v.* Craig's Heris, 14 Id. 154.

FN8 Vol. 1, p. 1023, edition of 1866, Crepps *v.* Durden.

*Mr. A. G. Riddle and W. A. Cook, contra.*

Mr. Justice FIELD delivered the opinion of the court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 509**        367

L0VE00883

80 U.S. 335 (Mem)                                                                                              Page 6

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

In 1867, the plaintiff was a member of the bar of the Supreme Court of the District of Columbia, and the defendant was one of the justices of that court. In June, of that year, the trial of one John H. Suratt, for the murder of Abraham Lincoln, was commenced in the Criminal Court of the District, and was continued until the tenth of the following August, when the jury were discharged in consequence of their inability to agree upon a verdict. The defendant held that court, presiding at the trial of Suratt from its commencement to its close, and the plaintiff was one of the attorneys who defended the prisoner. Immediately upon the discharge of the jury, the court, thus held by the defendant, directed an order to be entered on its records striking the name of the plaintiff from the roll of attorneys practicing in that court. The order was accompanied by a recital that on the second of July preceding, during the progress of the trial of Suratt, immediately after the court had taken a recess for the day, as the presiding judge was descending from the bench, he had been accosted in a rude and insulting manner by the plaintiff, charging him with having offered the plaintiff a series of insults from the bench from the commencement of the trial; that the judge had then disclaimed any intention of passing any insult whatever, and had assured the plaintiff that he entertained for him no other feelings than those of respect, but that the plaintiff, so far from accepting this explanation, or disclaimer, had threatened the judge with personal chastisement.

The plaintiff appears to have regarded this order of the Criminal Court as an order disbarring him from the Supreme Court of the District; and the whole theory of the *345 present action proceeds upon that hypothesis. The declaration in one count describes the Criminal Court as one of the branches of the Supreme Court, and in the other count represents the order of the Criminal Court as an order removing the plaintiff from the office of an attorney-at-law in the Supreme Court of the District. And it is for the supposed removal from that court, and the assumed damages consequent thereon, that the action is brought.

Yet the Criminal Court of the District was at that time a separate and independent court, and as distinct from the Supreme Court of the District as the Circuit Court is distinct from the Supreme Court of the United States. Its distinct and independent character was urged by the plaintiff, and successfully urged, in this court, as ground for relief against the subsequent action of the Supreme Court of the District, based upon what had occurred in the Criminal Court. And because of its distinct and independent character, this court held that the Supreme Court of the District possessed no power to punish the plaintiff on account of contemptuous conduct and language before the Criminal Court, or in the presence of its judge. By this decision, which was rendered at the December Term of 1868, [FN9] the groundwork of the present action of the plaintiff is removed. The law which he successfully invoked, and which protected him when he complained of the action of the Supreme Court of the District, must now equally avail for the protection of the defendant, when it is attempted to give to the Criminal Court a position and power which were then denied. The order of the Criminal Court, as it was then constituted, was not an order of the Supreme Court of the District, nor of one of the branches of that court. It did not, for we know that in law it could not, remove the plaintiff from the office of an attorney of that court, nor affect his right to practice therein.

    FN9 Ex parte Bradley, 7 Wallace, 364.

This point is distinctly raised by the special plea of the defendant, in which he sets up that at the time the order *346 complained of was made, he was regularly and lawfully holding the Criminal Court of the District, a court of record, having general jurisdiction for the trial of crimes and offences arising within the District, and that the order complained of was an order of the Criminal Court, made by him in the lawful exercise and performance of his authority and duty as its presiding justice, for official misconduct of the plaintiff, as one of its attorneys, in his presence; and upon this plea the plaintiff joined issue.

The court below, therefore, did not err in excluding the order of removal as evidence in the cause, for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 510**        368

LOVE00884

80 U.S. 335 (Mem)                                                                                       Page 7

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

the obvious reason that it did not establish, nor tend to establish, the removal of the plaintiff by any order of the defendant, or of the court held by him, from the bar of the Supreme Court of the District. And the refusal of the court below to admit evidence contradicting the recitals in that order, could not be the ground of any just exception, when the order itself was not pertinent to any issue presented. Nor is this conclusion affected by the act of Congress passed in June, 1870, nearly three years after the order of removal was made, and nearly two years after the present action was commenced, changing the independent character of the Criminal Court and declaring that its judgments, decrees, and orders should be deemed the judgments, decrees, and orders of the Supreme Court of the District. [FN10] If the order of removal acquired from this legislation a wider scope and operation than it possessed when made, the defendant is not responsible for it. The original act was not altered. It was still an order disbarring the plaintiff only from the Criminal Court, and any other consequences are attributable to the action of Congress, and not to any action of the defendant.

FN10 16 Stat. at Large, 160.

But this is not all. The plea, as will be seen from our statement of it, not only sets up that the order of which the plaintiff complains, was an order of the Criminal Court, but that it was made by the defendant in the lawful exercise and performance of his authority and duty as its presiding *347 justice. In other words, it sets up that the order for the entry of which the suit is brought, was a judicial act, done by the defendants as the presiding justice of a court of general criminal jurisdiction. If such were the character of the act, and the jurisdiction of the court, the defendant cannot be subjected to responsibility for it in a civil action, however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff. For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to

every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility. [FN11]

FN11 Justice Mayne, in Taaffe v. Downes, reported in a note to 3d Moore's Privy Council, 41.

The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any wellordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country. It has, as Chancellor Kent observes, 'a deep root in the common law.' [FN12]

FN12 Yates v. Lansing, 5 Johnson, 291.

Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry. This was adjudged in the case of Floyd and Barker, reported by Coke, in 1608, [FN13] where it was laid down that the judges of the realm could not be drawn in question for any supposed corruption impeaching *348 the verity of their records, except before the king himself, and it was observed that if they were required to answer otherwise, it would 'tend to the scandal and subversion of all justice, and those who are the most sincere, would not be free from continual calumniations.'

FN13 12 Coke, 25.

The truth of this latter observation is manifest to all persons having much experience with judicial proceedings in the superior courts. Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 511**   369

LOVE00885

80 U.S. 335 (Mem)                                                                                Page 8

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility. Yet it is precisely in this class of cases that the losing party feels most keenly the decision against him, and most readily accepts anything but the soundness of the decision in explanation of the action of the judge. Just in proportion to the strength of his convictions of the correctness of his own view of the case is he apt to complain of the judgment against him, and from complaints of the judgment to pass to the ascription of improper motives to the judge. When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision, often finds vent in imputations of this character, and from the imperfection of human nature this is hardly a subject of wonder. If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away. Few persons sufficiently irritated to institute an action against a judge for his judicial acts would hesitate to ascribe any character to the acts which would be essential to the maintenance of the action.

*349 If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be degraded and his usefulness destroyed, but he would be subjected for his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show to the judge before whom he might be summoned by the losing party—and that judge perhaps one of an inferior jurisdiction—that he had decided as he did with judicial integrity; and the second judge would be subjected to a similar

burden, as he in his turn might also be held amenable by the losing party.

Some just observations on this head by the late Chief Justice Shaw, will be found in *Pratt v. Gardner*, [FN14] and the point here was adjudged in the recent case of *Fray v. Blackburn*, [FN15] by the Queen's Bench of England. One of the judges of that bench was sued for a judicial act, and on demurrer one of the objections taken to the declaration was, that it was bad in not alleging malice. Judgment on the demurrer having passed for the defendant, the plaintiff applied for leave to amend his declaration by introducing an allegation of malice and corruption; but Mr. Justice Compton replied: 'It is a principle of our law that no action will lie against a judge of one of the superior courts for a judicial act, though it be alleged to have been done maliciously and corruptly; therefore the proposed allegation would not make the declaration good. The public are deeply interested in this rule, which indeed exists for their benefit, and was established in order to secure the independence of the judges, and prevent them being harassed by vexatious actions;'—and the leave was refused. [FN16]

FN14 2 Cushing, 68.

FN15 3 Best & Smith, 576.

FN16 In *Scott v. Stansfield* (3 Law Reports, Exchequer, 220), a judge of a county court was sued for slander, and he put in a plea that the words complained of were spoken by him in his capacity as such judge, while sitting in his court, and trying a cause in which the plaintiff was defendant. To this plea a replication was filed, that the words were spoken falsely and maliciously, and without any reasonable, probable, or justifiable cause, and without any foundation whatever, and not *bonâ fide* in the discharge of the defendant's duty as judge, and were wholly irrelevant to the matter before him. To the replication the defendant demurred; and the Court of Exchequer held the demurrer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 512**          370

L0VE00886

80 U.S. 335 (Mem)

Page 9

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

well taken. 'I am of opinion,' said the Chief Baron, 'that our judgment must be for the defendant. The question raised upon this record is whether an action is maintainable against the judge of a county court, which is a court of record, for words spoken by him in his judicial character, and in the exercise of his functions as judge in the court over which he presides, where such words would as against an ordinary individual constitute a cause of action, and where they are alleged to have been spoken maliciously and without probable cause, and to have been irrelevant to the matter before him. The question arises, perhaps, for the first time, with reference to a county court judge, but a series of decisions uniformly to the same effect, extending from the time of Lord Coke to the present time, establish the general proposition that no action will lie against a judge for any acts done or words spoken in his judicial capacity in a court of justice. This doctrine has been applied not only to the superior courts, but to the court of a coroner, and to a court martial, which is not a court of record. It is essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. *This provision of the law is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence, and without fear of consequences.'*

*350 In this country the judges of the superior courts of record are only responsible to the people, or the authorities constituted by the people, from whom they receive their commissions, for the manner in which they discharge the great trusts of their office. If in the exercise of the powers with which they are clothed as ministers of justice, they act with partiality, or maliciously, or corruptly, or

arbitrarily, or oppressively, they may be called to an account by impeachment and suspended or removed from office. In some States they may be thus suspended or removed without impeachment, by a vote of the two houses of the legislature.

In the case of *Randall* v. *Brigham*, [FN17] decided by this court, at the December Term of 1868, we had occasion to consider at some length the liability of judicial officers to answer in a civil action for their judicial acts. In that case the plaintiff *351 had been removed by the defendant, who was one of the justices of the Superior Court of Massachusetts, from the bar of that State, and the action was brought for such removal, which was alleged in the declaration to have been made without lawful authority, and wantonly, arbitrarily, and oppressively. In considering the questions presented the court observed that it was a general principle, applicable to all judicial officers, that they were not liable to a civil action for any judicial act done by them within their jurisdiction; that with reference to judges of limited and inferior authority it had been held that they were protected only when they acted within their jurisdiction; that if this were the case with respect to them, no such limitation existed with respect to judges of superior or general authority; that they were not liable in civil actions for their judicial acts, even when such acts were in excess of their jurisdiction, 'unless, perhaps, when the acts in excess of jurisdiction are done maliciously or corruptly.' The qualifying words were inserted upon the suggestion that the previous language laid down the doctrine of judicial exemption from liability to civil actions in terms broader than was necessary for the case under consideration, and that, if the language remained unqualified it would require an explanation of some apparently conflicting adjudications found in the reports. They were not intended as an expression of opinion that in the cases supposed such liability would exist, but to avoid the expression of a contrary doctrine.

FN17 7 Wallace, 523.

In the present case we have looked into the authorities and are clear, from them, as well as from the principle on which any exemption is maintained,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 513**

371

L0VE00887

80 U.S. 335 (Mem)                                        Page 10

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

that the qualifying words used were not necessary to a correct statement of the law, and that judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over *352 the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend. Thus, if a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offences, jurisdiction over the subject of offences being entirely wanting in the court, and this being necessarily known to its judge, his commission would afford no protection to him in the exercise of the usurped authority. But if on the other hand a judge of a criminal court, invested with general criminal jurisdiction over offences committed within a certain district, should hold a particular act to be a public offence, which is not by the law made an offence, and proceed to the arrest and trial of a party charged with such act, or should sentence a party convicted to a greater punishment than that authorized by the law upon its proper construction, no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction, or of the jurisdiction of the court held by him, for these are particulars for his judicial consideration, whenever his general jurisdiction over the subject-matter is invoked. Indeed some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, or that of the court held by him, or the

manner in which the jurisdiction shall be exercised. And the same principle of exemption from liability which obtains for errors committed in the ordinary prosecution of a suit where there is jurisdiction of both subject and person, applies in cases of this kind, and for the same reasons.

The distinction here made between acts done in excess *353 of jurisdiction and acts where no jurisdiction whatever over the subject-matter exists, was taken by the Court of King's Bench, in *Ackerley v. Parkinson.* [FN18] In that case an action was brought against the vicar-general of the Bishop of Chester and his surrogate, who held the consistorial and episcopal court of the bishop, for excommunicating the plaintiff with the greater excommunication for contumacy, in not taking upon himself the administration of an intestate's effects, to whom the plaintiff was next of kin, the citation issued to him being void, and having been so adjudged. The question presented was, whether under these circumstances the action would lie. The citation being void, the plaintiff had not been legally brought before the court, and the subsequent proceedings were set aside, on appeal, on that ground. Lord Ellenborough observed that it was his opinion that the action was not maintainable if the ecclesiastical court had a general jurisdiction over the subject-matter, although the citation was a nullity, and said, that 'no authority had been cited to show that the judge would be liable to an action where he has jurisdiction, but has proceeded erroneously, or, as it is termed, *inverso ordine.*' Mr. Justice Blanc said there was 'a material distinction between a case where a party comes to an erroneous conclusion in a matter over which he has jurisdiction and a case where he acts wholly without jurisdiction;' and held that where the subject-matter was within the jurisdiction of the judge, and the conclusion was erroneous, although the party should by reason of the error be entitled to have the conclusion set aside, and to be restored to his former rights, yet he was not entitled to claim compensation in damages for the injury done by such erroneous conclusion, as if the court had proceeded without any jurisdiction. [FN19]

FN18 3 Maule & Selwyn, 411.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 514**     372

L0VE00888

80 U.S. 335 (Mem)

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

FN19 Calder v. Halket, decided by the Judicial Committee of the Privy Council (3 Moore's Privy Council Rep. 28), goes to the extent of holding that an action will not lie even against a judge of an inferior court of limited jurisdiction, for his judicial acts, when acting without jurisdiction, unless he knew or had the means of knowing of the defect of jurisdiction, and that it lies upon the plaintiff in every such case to prove that fact.

*354 The exemption of judges of the superior courts of record from liability to civil suit for their judicial acts existing when there is jurisdiction of the subject-matter, though irregularity and error attend the exercise of the jurisdiction, the exemption cannot be affected by any consideration of the motives with which the acts are done. The allegation of malicious or corrupt motives could always be made, and if the motives could be inquired into judges would be subjected to the same vexatious litigation upon such allegations, whether the motives had or had not any real existence. Against the consequences of their erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort. But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, the judges of these courts can only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed.

If, now, we apply the principle thus stated, the question presented in this case is one of easy solution. The Criminal Court of the District, as a court of general criminal jurisdiction, possessed the power to strike the name of the plaintiff from its rolls as a practicing attorney. This power of removal from the bar is possessed by all courts which have authority to admit attorneys to practice. It is a power which should only be exercised for the most weighty reasons, such as would render the continuance of the attorney in practice incompatible with a proper respect of the court for itself, or a proper regard for the integrity of the profession.

And, except where matters occurring in open court, in presence of the judges, constitute the grounds of its action, the power of the court should never be exercised without notice to the offending party of the grounds of complaint against him, and affording him ample opportunity of explanation and defence. This is a rule of natural justice, and is as applicable to cases where a proceeding is taken to reach the right of an attorney to practice his profession as *355 it is when the proceeding is taken to reach his real or personal property. And even where the matters constituting the grounds of complaint have occurred in open court, under the personal observation of the judges, the attorney should ordinarily be heard before the order of removal is made, for those matters may not be inconsistent with the absence of improper motives on his part, or may be susceptible of such explanation as would mitigate their offensive character, or he may be ready to make all proper reparation and apology. Admission as an attorney is not obtained without years of labor and study. The office which the party thus acquires is one of value, and often becomes the source of great honor and emolument to its possessor. To most persons who enter the profession, it is the means of support to themselves and their families. To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family. A removal from the bar should therefore never be decreed where any punishment less severe--such as reprimand, temporary suspension, or fine--would accomplish the end desired.

But on the other hand the obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts. 'In matters collateral to official duty,' said Chief Justice Gibson in the case of *Austin and others*, 'the judge is on a level with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 515    373

L0VE00889

80 U.S. 335 (Mem)                                                        Page 12

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

the members of the bar as he is with his fellow-citizens, his title to distinction and respect resting on no other foundation than his virtues and qualities as a man. But it is nevertheless evident that professional fidelity may be violated by acts which fall without the lines of professional functions, and which may have been performed out of the pale of the court. Such would be the *356 consequences of beating or insulting a judge in the street for a judgment in court. No one would pretend that an attempt to control the deliberation of the bench, by the apprehension of violence, and subject the judges to the power of those who are, or ought to be, subordinate to them, is compatible with professional duty, or the judicial independence so indispensable to the administration of justice. And an enormity of the sort, practiced but on a single judge, would be an offence as much against the court, which is bound to protect all its members, as if it had been repeated on the person of each of them, because the consequences to suitors and the public would be the same; and whatever may be thought in such a case of the power to punish for contempt, there can be no doubt of the existence of a power to strike the offending attorney from the roll.

The order of removal complained of in this case, recites that the plaintiff threatened the presiding justice of the Criminal Court, as he was descending from the bench, with personal chastisement for alleged conduct of the judge during the progress of a criminal trial then pending.

The matters thus recited are stated as the grounds for the exercise of the power possessed by the court to strike the name of the plaintiff from the roll of attorneys practicing therein. It is not necessary for us to determine in this case whether under any circumstances the verity of this record can be impeached. It is sufficient to observe that it cannot be impeached in this action or in any civil action against the defendant. And if the matters recited are taken as true there was ample ground for the action of the court. A greater indignity could hardly be offered to a judge than to threaten him with personal chastisement for his conduct on the trial of a cause. A judge who should pass over in silence an offence of such gravity would soon find himself a

subject of pity rather than of respect.

The Criminal Court of the District erred in not citing the plaintiff, before making the order striking his name from the roll of its attorneys, to show cause why such order should not be made for the offensive language and conduct stated, *357 and affording him opportunity for explanation, or defence, or apology. But this erroneous manner in which its jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever over its attorneys.

We find no error in the rulings of the court below, and its judgment must, therefore, be affirmed, and it is so ordered.

JUDGMENT AFFIRMED.

Mr. Justice DAVIS, with whom concurred Mr. Justice CLIFFORD, dissenting.

I agree that judicial officers are exempt from responsibility in a civil action for all their judicial acts in respect to matters of controversy within their jurisdiction. I agree, further, that judges of superior or general authority are equally exempt from liability, even when they have exceeded their jurisdiction, unless the acts complained of were done maliciously or corruptly. But I dissent from the rule laid down by the majority of the court, that a judge is exempt from liability in a case like the present, where it is alleged not only that his proceeding was in excess of jurisdiction, but that he acted maliciously and corruptly. If he did so, he is, in my opinion, subject to suit the same as a private person would be under like circumstances.

I also dissent from the opinion of the majority of the court for the reason that it discusses the merits of the controversy, which, in the state of the record, I do not consider open for examination.

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 516**    374

L0VE00890

80 U.S. 335 (Mem)

80 U.S. 335, 1871 WL 14737 (U.S.Dist.Col.), 20 L.Ed. 646, 13 Wall. 335

(Cite as: 80 U.S. 335)

L.Ed. 646, 13 Wall. 335

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

375

**EXHIBIT 2 PAGE 517**

L0VE00891

EXHIBIT B

**EXHIBIT 2 PAGE 518**

376

L0VE00892

WestLaw.

101 S.Ct. 183

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

(Cite as: 449 U.S. 24, 101 S.Ct. 183)

Briefs and Other Related Documents

Supreme Court of the United States
Orville E. DENNIS, Petitioner,
v.
Sidney SPARKS and R. L. Lynd, d/b/a Sidney A.
Sparks, Trustee.
No. 79-1186.

Argued Oct. 8, 1980.
Decided Nov. 17, 1980.

Civil rights action was brought against state court judge and others who were alleged to have conspired to bribe the judge to obtain an injunction. The district court dismissed. The Court of Appeals for the Fifth Circuit, 588 F.2d 124, affirmed. On rehearing en banc, the Court of Appeals, 604 F.2d 976, reversed and certiorari was granted. The United States Supreme Court, Justice White, held that: (1) fact that the action was properly dismissed as to the immune state court judge did not require dismissal of the action against the remaining private parties accused of conspiring with the judge, and (2) allegations that an official act of the state court judge was the product of a corrupt conspiracy involving bribery of the judge were sufficient to assert action under color of state law on the part of the private parties.

Affirmed.

West Headnotes

[1] Civil Rights ⟨⟩1341
78k1341 Most Cited Cases
(Formerly 78k204.1, 78k204, 78k13.7)

[1] Conspiracy ⟨⟩13
91k13 Most Cited Cases

Fact that the state court judge who issued the challenged injunction had been dismissed from the civil rights action on grounds of immunity did not preclude maintenance of the action against the private parties who were accused to have conspired with the judge to obtain the injunction in violation of the plaintiff's civil rights. 42 U.S.C.A. § 1983.

[2] Civil Rights ⟨⟩1326(5)
78k1326(5) Most Cited Cases
(Formerly 78k198(4), 78k13.5(4))
"To act under color of state law" for purposes of civil rights statute does not require that the defendant be an officer of the state; it is enough that he is a willful participant in joint action with the state or its agents; private persons, jointly engaged with state officials in the challenged action, are acting under color of law for purposes of the civil rights statute. 42 U.S.C.A. § 1983.

[3] Civil Rights ⟨⟩1396
78k1396 Most Cited Cases
(Formerly 78k236, 78k13.12(8))

[3] Conspiracy ⟨⟩18
91k18 Most Cited Cases
Allegation that an official act of a state court judge was the product of a corrupt conspiracy involving bribery of the judge was sufficient to assert that the private parties who conspired with the judge were acting under color of state law for purposes of the civil rights statute. 42 U.S.C.A. § 1983.

[4] Judges ⟨⟩38
227k38 Most Cited Cases
State judge may be found criminally liable for violation of civil rights even though the judge may be immune from damages under the civil statute. 18 U.S.C.A. § 242; 42 U.S.C.A. § 1983.

[5] Civil Rights ⟨⟩1376(3)
78k1376(3) Most Cited Cases
(Formerly 78k214(3), 78k13.8(2))

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 519**

L0VE00893

101 S.Ct. 183

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

(Cite as: 449 U.S. 24, 101 S.Ct. 183)

Page 2

The immunities of state officials recognized for purposes of the federal civil rights statute are the equivalents of those that were recognized at the common law. 42 U.S.C.A. § 1983.

[6] Civil Rights ⇐1407
78k1407 Most Cited Cases
(Formerly 78k240(5), 78k13.13(1))
Burden is on the state official claiming immunity in the civil rights action to demonstrate his entitlement. 42 U.S.C.A. § 1983.

[7] Witnesses ⇐68
410k68 Most Cited Cases
Historically, doctrine of judicial immunity does not preclude a judge from responding as a witness when his coconspirators are sued.

[8] Judges ⇐36
227k36 Most Cited Cases
Judicial immunity arose because it was in the public-interest to have judges who were at liberty to exercise their independent judgment about the merits of the case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption.

**184 Syllabus [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*24 After a Texas state court's injunction against respondents' production of minerals from certain oil leases was dissolved by an appellate court as having been illegally issued, respondents filed suit in Federal District Court alleging a cause of action for damages under 42 U.S.C. § 1983 against the judge who issued the injunction, the corporation that had obtained the injunction, its owner, and the sureties on the injunction bond (one of whom is the petitioner). Respondents claimed that the injunction had been corruptly issued as the result of a conspiracy between the judge and the other defendants, thus causing a deprivation of property

without due process of law. The District Court dismissed the action, holding that the judge was immune from liability in a § 1983 suit because the injunction was a judicial act within the jurisdiction of the state court, and that with the dismissal of the judge the remaining defendants could not be said to have conspired "under color" of state law within the meaning of § 1983. The Court of Appeals agreed that the judge was immune from suit, but ultimately reversed as to the dismissal of the claims against the other defendants.

*Held:* The action against the private parties accused of conspiring with the judge is not subject to dismissal. Private persons, jointly engaged with state officials in a challenged action, are acting "under color" of law for purposes of § 1983 actions. And the judge's immunity from damages liability for an official act that was allegedly the product of a corrupt conspiracy involving bribery of the judge does not change the character of his action or that of his co-conspirators. Historically at common law, judicial **185 immunity does not insulate from damages liability those private persons who corruptly conspire with a judge. Nor has the doctrine of judicial immunity been considered historically as excusing a judge from responding as a witness when his co-conspirators are sued, even though a charge of conspiracy and judicial corruption will be aired and decided. *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 distinguished. The potential harm to the public from denying immunity to co-conspirators if the factfinder mistakenly upholds a charge of a corrupt conspiracy is outweighed by the benefits of providing a remedy *25 against those private persons who participate in subverting the judicial process and in so doing inflict injury on other persons. Pp. 186-188.

5th Cir., 604 F.2d 976, affirmed.

Finley L. Edmonds, Corpus Christi, Tex., for petitioner.

Garland F. Smith, Weslaco, Tex., for respondents.

Justice WHITE delivered the opinion of the Court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378

EXHIBIT 2 PAGE 520

LOVE00894

101 S.Ct. 183

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

(Cite as: 449 U.S. 24, 101 S.Ct. 183)

Page 3

In January 1973, a judge of the 229th District Court of Duval County, Tex., enjoined the production of minerals from certain oil leases owned by respondents. In June 1975, the injunction was dissolved by an appellate court as having been illegally issued. Respondents then filed a complaint in the United States District Court purporting to state a cause of action for damages under 42 U.S.C. § 1983. [FN1] Defendants were the Duval County Ranch Co., Inc., which had obtained the injunction, the sole owner of the corporation, the judge who entered the injunction, and the two individual *26 sureties on the injunction bond, one of whom is now petitioner in this Court. Essentially, the claim was that the injunction had been corruptly issued as the result of a conspiracy between the judge and the other defendants, thus causing a deprivation of property, i. e., two years of oil production, without due process of law.

> FN1. Title 42 U.S.C. § 1983 provides:
> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

All defendants moved to dismiss, the judge asserting judicial immunity and the other defendants urging dismissal for failure to allege action "under color" of state law, a necessary component of a § 1983 cause of action. The District Court concluded that because the injunction was a judicial act within the jurisdiction of the state court, the judge was immune from liability in a § 1983 suit, whether or not the injunction had issued as the result of a corrupt conspiracy. Relying on *Haldane v. Chagnon*, 345 F.2d 601 (CA9 1965), the District Court also ruled that with the dismissal of the judge the remaining defendants could not be said to have conspired under color of state law within the

meaning of § 1983. The action against them was accordingly dismissed "for failure to state a claim upon which relief can be granted."

In a *per curiam* opinion, a panel of the Court of Appeals for the Fifth Circuit affirmed, agreeing that the judge was immune from suit and that because "the remaining defendants, who are all private citizens, did not conspire with any person against whom a valid § 1983 suit can be stated," *Sparks v. Duval County Ranch Co.*, 588 F.2d 124, 126 (1979) , existing authorities in the Circuit required dismissal of the claims against these defendants as well. [FN2] The case was reconsidered en banc, prior Circuit authority was overruled and the District Court judgment was reversed insofar **186 as it had dismissed claims against the defendants other than the judge. *Sparks v. Duval County *27 Ranch Co.*, 604 F.2d 976 (1979). The court ruled that there was no good reason in law, logic, or policy for conferring immunity on private persons who persuaded the immune judge to exercise his jurisdiction corruptly. Because the judgment below was inconsistent with the rulings of other Courts of Appeals [FN3] and involves an important issue, we granted the petition for certiorari. 445 U.S. 942, 100 S.Ct. 1336, 63 L.Ed.2d 775. We now affirm.

> FN2. *Slavin v. Curry*, 574 F.2d 1256 (1978); *Perez v. Borchers*, 567 F.2d 285 (1978); *Humble v. Foreman*, 563 F.2d 780 (1977); *Hill v. McClellan*, 490 F.2d 859 (1974); *Guethy v. Ford*, 431 F.2d 660 (1970).

> FN3. *Kurz v. Michigan*, 548 F.2d 172 (CA6 1977); *Hazo v. Geltz*, 537 F.2d 747 (CA3 1976); *Hansen v. Ahlgrimm*, 520 F.2d 768 (CA7 1975); *Sykes v. California*, 497 F.2d 197 (CA9 1974). See also *Haldane v. Chagnon*, 345 F.2d 601, 604-605 (CA9 1965); but see *Briley v. California*, 564 F.2d 849, 858, n.10 (CA9 1977). The Court of Appeals for the First Circuit has for some time held the present views of the Fifth Circuit. *Slotnick v. Staviskey*, 560 F.2d 31 (1977); *Kermit*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

379

EXHIBIT 2 PAGE 521

LOVE00895

101 S.Ct. 183

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185    Page 4

(Cite as: 449 U.S. 24, 101 S.Ct. 183)

*Construction Corp. v. Banco Credito y Ahorro Ponceno,* 547 F.2d 1 (1976). The Court of Appeals of the Eighth Circuit has recently agreed. *White v. Bloom,* 621 F.2d 276 (1980).

[1] Based on the doctrine expressed in *Bradley v. Fisher,* 13 Wall. 335, 20 L.Ed. 646 (1872), this Court has consistently adhered to the rule that "judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities. *Pierson v. Ray,* 386 U.S. 547 [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967); *Stump v. Sparkman,* 435 U.S. 349 [98 S.Ct. 1099, 55 L.Ed.2d 331] (1978)." *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 734-735, 100 S.Ct. 1967, 1976, 64 L.Ed.2d 641 (1980). The courts below concluded that the judicial immunity doctrine required dismissal of the § 1983 action against the judge who issued the challenged injunction, and as the case comes to us, the judge has been properly dismissed from the suit on the immunity grounds. It does not follow, however, that the action against the private parties accused of conspiring with the judge must also be dismissed.

[2][3][4] As the Court of Appeals correctly understood our cases to hold, to act "under color of" state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged *28 with state officials in the challenged action, are acting *see* "under color" of law for purposes of § 1983 actions. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966). [FN4] Of course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge. But here the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in

this respect that the judge himself is immune from damages liability. Immunity does not change the character of **187 the judge's action or that of his co-conspirators. [FN5] Indeed, his *29 immunity is dependent on the challenged conduct being an official judicial act within his statutory jurisdiction, broadly construed. *Stump v. Sparkman,* 435 U.S. 349, 356, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978); *Bradley v. Fisher, supra,* at 352, 357. Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983 as it has been construed in our prior cases. The complaint in this case was not defective for failure to allege that the private defendants were acting under color of state law, and the Court of Appeals was correct in rejecting its prior case authority to the contrary.

FN4. In this respect, our holding in *Adickes v. S. H. Kress & Co.* was as follows:

"The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or unlawful; *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961); see *United States v. Classic,* 313 U.S. 299, 326 [61 S.Ct. 1031, 1043, 85 L.Ed. 1368] (1941); *Screws v. United States,* 325 U.S. 91, 107-111 [65 S.Ct. 1031, 1038- 1040, 89 L.Ed.2d 1495] (1945); *Williams v. United States,* 341 U.S. 97, 99-100 [71 S.Ct. 576, 578, 95 L.Ed. 774] (1951). Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents,'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

380

EXHIBIT 2 PAGE 522

LOVE00896

101 S.Ct. 183                                                                    Page 5

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

(Cite as: 449 U.S. 24, 101 S.Ct. 183)

*United States v. Price*, 383 U.S. 787, 794 [86 S.Ct. 1152, 1156, 16 L.Ed.2d 267] (1966)." 398 U.S., at 152, 90 S.Ct. at 1605 (Footnote omitted.)

FN5. Title 18 U.S.C. § 242, the criminal analog of § 1983, also contains a color-of-state-law requirement and we have interpreted the color-of-state-law requirement in these sections coextensively. *Adickes v. S. H. Kress & Co., supra*, at 152, n.7, 90 S.Ct., at 1605 n.7. A state judge can be found criminally liable under § 242 although that judge may be immune from damages under § 1983. See *Imbler v. Pachtman*, 424 U.S. 409, 429, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976); *O'Shea v. Littleton*, 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974). In either case, the judge has acted under color of state law.

[5][6] Petitioner nevertheless insists that unless he is held to have an immunity derived from that of the judge, the latter's official immunity will be seriously eroded. We are unpersuaded. The immunities of state officials that we have recognized for purposes of § 1983 are the equivalents of those that were recognized at common law. *Owen v. City of Independence*, 445 U.S. 622, 637-638, 100 S.Ct. 1398, 1408-1409, 63 L.Ed.2d 673 (1980); *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976); *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and the burden is on the official claiming immunity to demonstrate his entitlement. Cf. *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). Thus, in *Owen v. City of Independence, supra*, a municipality's claim that it could assert the immunity of its officers and agents in a § 1983 damages action was rejected since there was no basis for such a right at common law. Here, petitioner has pointed to nothing indicating that, historically, judicial immunity insulated from damages liability those private persons who corruptly conspire with the judge. [FN6]

FN6. Insofar as the immunity issue is concerned, it is interesting to note that petitioner observes that he would not be immune in the Texas courts, even if the judge is. Brief for Petitioner 28.

In *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), we recognized that the Speech or Debate Clause conferred immunity *30 upon a Senator's aide as well as the Senator, but only in those situations where the conduct of the aide would be a protected legislative act if performed by the Senator himself. *Id.*, at 618, 92 S.Ct., at 2623. Here, there could be no claim that petitioner or any of the other private parties was actually performing a judicial act or was in any sense an official aide of the judge. Not surprisingly, petitioner does not argue that judges must conspire with private parties in order that judicial duties may be properly accomplished.

[7] It is urged that if petitioner and other private co-conspirators of the judge are to be subject to § 1983 damages actions and if a case such as this is to go to trial, the charge of conspiracy and judicial corruption will necessarily be aired and decided, the consequence being that the judge, though not a party and immune from liability, will be heavily involved, very likely as a witness forced to testify about and defend his judicial conduct. It is true that, based on the Speech or Debate Clause, we have held that Members of Congress need not respond to questions about their legislative acts, *Gravel v. United States, supra*, at 616-617, 92 S.Ct., at 2622-2623; and, in general, the scope of state legislative immunity for purposes of § 1983 has been patterned after immunity under the Speech or Debate Clause. **188*Supreme Court of Virginia v. Consumers Union*, 446 U.S., at 732-734, 100 S.Ct., at 1974-1976. But there is no similar constitutionally based privilege immunizing judges from being required to testify about their judicial conduct in third-party litigation. Nor has any demonstration been made that historically the doctrine of judicial immunity not only protected the judge from liability but also excused him from responding as a witness when his co-conspirators are sued. Even if the judge were excused from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

381

**EXHIBIT 2 PAGE 523**

L0VE00897

101 S.Ct. 183

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

(Cite as: 449 U.S. 24, 101 S.Ct. 183)

testifying, it would not follow that actions against private parties must be dismissed.

Of course, testifying takes time and energy that otherwise might be devoted to judicial duties; and, if cases such as this *31 survive initial challenge and go to trial, the judge's integrity and that of the judicial process may be at stake in such cases. But judicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens. *O'Shea v. Littleton*, 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974). Neither are we aware of any rule generally exempting a judge from the normal obligation to respond as a witness when he has information material to a criminal or civil proceeding. [FN7] Cf. *United States v. Nixon*, 418 U.S. 683, 705-707, 94 S.Ct. 3090, 3106-07, 41 L.Ed.2d 1039 (1974).

> FN7. Whether the federal courts should be especially alert to avoid undue interference with the state judicial system flowing from demands upon state judges to appear as witnesses need not be addressed at this time.

[8] Judicial immunity arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption. *Pierson v. Ray, supra*, at 554, 87 S.Ct., at 1217-1218; *Bradley v. Fisher*, 13 Wall., at 349, 350 n. In terms of undermining a judge's independence and his judicial performance, the concern that his conduct will be examined in a collateral proceeding against those with whom he allegedly conspired, a proceeding in which he cannot be held liable for damages and which he need not defend, is not of the same order of magnitude as the prospects of being a defendant in a damages action from complaint to verdict with the attendant possibility of being held liable for damages if the factfinder mistakenly upholds the charge of malice or of a corrupt

conspiracy with others. These concerns are not insubstantial, either for the judge or for the public, but we agree with the Court of Appeals that the potential harm to the public from denying immunity to private co-conspirators *32 is outweighed by the benefits of providing a remedy against those private persons who participate in subverting the judicial process and in so doing inflict injury on other persons.

The judgment of the Court of Appeals is

*Affirmed.*

449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185

Briefs and Other Related Documents (Back to top)

• 1980 WL 339381 (Appellate Brief) Motion of the American Civil Liberties Union for Leave to File, and Brief Amici Curiae (Jun. 10, 1980)

• 1980 WL 339380 (Appellate Brief) Reply Brief of Respondents (May. 21, 1980)

• 1980 WL 339379 (Appellate Brief) Brief for the Petitioner (May. 08, 1980)

• 1980 WL 339382 (Appellate Brief) Brief of Amicus Curiae State of Florida (May. 05, 1980)

• 1980 WL 339383 (Appellate Brief) Brief of the State of Texas As Amicus Curiae in Support of Petitioner (May. 05, 1980)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 524**

LOVE00898

EXHIBIT C

**EXHIBIT 2 PAGE 525**

383

WestLaw.

96 F.3d 1240

96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624

(Cite as: 96 F.3d 1240)

Page 1

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Lawrence MOORE, Plaintiff-Appellant,
v.
Rudi M. BREWSTER; Kathy Lowe; Don Hendrix;
Lewis Levy; Levy, Goldman &
Levy, Inc.; Steven Sayler; Hillyer & Irwin, Inc.,
Defendants-Appellees.
Nos. 94-56334, 94-56429.

Submitted Aug. 9, 1996. [FN*]

FN* The panel unanimously finds this case
suitable for decision without oral
argument. Fed.R.App.P. 34(a) and Ninth
Circuit Rule 34.4.

Decided Sept. 23, 1996.

Litigant sued judge, law clerk, clerk of court,
attorneys and law firms, alleging that conduct with
regard to supersedeas bond posted to stay execution
of judgment constituted due process violation, civil
conspiracy, fraud, and intentional infliction of
emotional distress. The United States District
Court for the Southern District of California, John
Rhoades, Sr., J., granted summary judgment for
attorneys, and dismissed for failure to state claim
upon which relief could be granted the claims
against judge, law clerk, and clerk of court.
Litigant appealed, and filed motion to amend
complaint, which was denied. Litigant appealed
denial of motion to amend. The Court of Appeals,
Fletcher, Circuit Judge, held that: (1) judge, law
clerk and clerk of court had judicial immunity;
(2) issue preclusion barred action against attorney
and law firm for allegedly wrongfully obtaining

offset against supersedeas bond; (3) litigant failed
to establish fraud or civil conspiracy; (4) litigant
failed to plead fraud with adequate particularity; (5)
litigant's claim for intentional infliction of
emotional distress based on allegedly improper
handling of supersedeas bond was precluded by
California's litigation privilege; and (6) motion to
amend should have been dismissed for lack of
jurisdiction.

Affirmed.

West Headnotes

[1] Federal Courts ⟸776
170Bk776 Most Cited Cases
Dismissal based on judicial immunity is reviewed
de novo.

[2] Judges ⟸36
227k36 Most Cited Cases
Judge enjoyed absolute judicial immunity from
action in which it was alleged that his conduct with
regard to supersedeas bond constituted a due
process violation, civil conspiracy, fraud, and
intentional infliction of emotional distress, despite
plaintiff's allegations of legal error and conspiracy
between judge and litigant, as judge was acting
within his jurisdiction, and challenged actions were
judicial acts. U.S.C.A. Const.Amend. 5.

[3] Judges ⟸36
227k36 Most Cited Cases
Judicial or quasi-judicial immunity available to
federal officers is not limited to immunity from
damages, but extends to actions for declaratory,
injunctive and other equitable relief.

[4] Judges ⟸36
227k36 Most Cited Cases
Judicial immunity applies however erroneous the
act may have been, and however injurious in its
consequences it may have proved to the plaintiff.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

384

**EXHIBIT 2 PAGE 526**

96 F.3d 1240

96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624                    Page 2

(Cite as: 96 F.3d 1240)

**[5] Judges ☞36**
227k36 Most Cited Cases
Grave procedural errors or acts in excess of judicial authority do not deprive judge of judicial immunity.

**[6] Judges ☞36**
227k36 Most Cited Cases
Judicial immunity is not negated by allegations that judge conspired with one party to rule against another party.

**[7] Judges ☞36**
227k36 Most Cited Cases
Judge will be subject to liability despite doctrine of judicial immunity, where he has acted in clear absence of all jurisdiction.

**[8] Judges ☞36**
227k36 Most Cited Cases
Only judicial acts are protected by judicial immunity.

**[9] Judges ☞36**
227k36 Most Cited Cases
Clerk of federal district court was protected by absolute immunity for actions he performed in connection with allegedly improper handling of supersedeas bond, as those acts were within his quasi-judicial duties, even if he deceived litigant regarding status of bond and improperly conducted hearing to assess costs, in coordination with judge.

**[10] Judges ☞36**
227k36 Most Cited Cases
Law clerk for judge enjoyed absolute judicial immunity in connection with allegedly improper handling of bond, as she was assisting judge in carrying out judicial functions.

**[11] Judges ☞36**
227k36 Most Cited Cases
Under functional approach to judicial immunity, pursuant to which absolute immunity extends to certain individuals other than judges who perform functions closely associated with judicial process, immunity flows from nature of responsibilities of individual official.

**[12] Federal Courts ☞776**
170Bk776 Most Cited Cases
Availability of defense based on issue preclusion is reviewed de novo.

**[13] Judgment ☞720**
228k720 Most Cited Cases
Issue preclusion barred action against attorney and law firm for allegedly wrongfully obtaining offset against supersedeas bond, as propriety of offset had already been litigated and held not to have been abuse of discretion.

**[14] Judgment ☞720**
228k720 Most Cited Cases

**[14] Judgment ☞724**
228k724 Most Cited Cases
Doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding.

**[15] Judgment ☞632**
228k632 Most Cited Cases
Defense of issue preclusion may be pled against party to prior judgment by stranger to such judgment.

**[16] Federal Courts ☞776**
170Bk776 Most Cited Cases
Summary judgment is reviewed de novo. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[17] Conspiracy ☞19**
91k19 Most Cited Cases
Litigant could not recover under California law for civil conspiracy in connection with attorney's allegedly improper handling of supersedeas bond, as he produced no evidence of wrongful act or wrongful intent.

**[18] Conspiracy ☞1.1**
91k1.1 Most Cited Cases

**[18] Conspiracy ☞5**
91k5 Most Cited Cases
Indispensable elements of civil conspiracy under California law include wrongful act and knowledge

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 527**                    385

L0VE00901

on part of alleged conspirators of conspiracy's unlawful objective.

**[19] Attorney and Client** ☜114
45k114 Most Cited Cases
Under California law, litigant could not recover for fraud in connection with allegedly improper handling of supersedeas bond where he neither alleged a single misrepresentation by attorney, nor alleged scienter, intent to defraud, or reliance on anything attorney did or said.

**[20] Federal Civil Procedure** ☜636
170Ak636 Most Cited Cases
Litigant failed to plead fraud under California law with adequate particularity, in connection with allegedly improper handling of supersedeas bond, where he failed to identify any specific statements or actions by attorney, let alone explain in what way such statements or actions were fraudulent. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[21] Damages** ☜57.49
115k57.49 Most Cited Cases
(Formerly 115k50.10)
Litigant's claim under California law for intentional infliction of emotional distress based on allegedly improper handling of supersedeas bond was precluded by California's litigation privilege; all of challenged communications were made by litigants during the course of judicial proceedings, and all had a logical relation to the object of litigation, i.e., the bond. West's Ann.Cal.Civ.Code § 47(b)(2).

**[22] Torts** ☜122
379k122 Most Cited Cases
(Formerly 379k16)
California's litigation privilege protects communications made in judicial or quasi-judicial proceedings; by litigants or other participants authorized by law; to achieve the objects of the litigation; and that have some connection or logical relation to the action. West's Ann.Cal.Civ.Code § 47(b)(2).

**[23] Damages** ☜57.49
115k57.49 Most Cited Cases
(Formerly 115k50.10)

Under California law, litigation privilege applies in actions alleging intentional infliction of emotional distress. West's Ann.Cal.Civ.Code § 47(b)(2).

**[24] Federal Courts** ☜683
170Bk683 Most Cited Cases
Motion to amend should have been dismissed for lack of jurisdiction, where it was filed after movant filed notice of appeal, which divested district court of jurisdiction.

**[25] Federal Courts** ☜681.1
170Bk681.1 Most Cited Cases
Filing of notice of appeal, divested the district court of jurisdiction over action.
*1242 Lawrence Moore, San Diego, CA, in pro. per.

Thomas C. Stahl, Assistant United States Attorney, San Diego, CA; Melissa Cook, Strauss, Kissane & Cook, San Diego, CA; Norman R. Allenby, Hillyer & Irwin, San Diego, CA, for defendants-appellees.

Appeals from the United States District Court for the Southern District of California, John S. Rhoades, District Judge, Presiding. D.C. No. CV-94- 00002-JSR.

Before: FLETCHER and TASHIMA, Circuit Judges; and RESTANI, [FN**] Judge, United States Court of International Trade.

> FN** Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

FLETCHER, Circuit Judge:

Lawrence Moore appeals pro se the dismissal under Rule 12(b)(6) of his claims against United States District Judge Rudi M. Brewster, his law clerk Kathy Lowe, the clerk of court Don Hendrix, and the dismissal on summary judgment of his claims against attorneys Lewis Levy and Steven Sayler and their respective law firms, Levy, Goldman & Levy, Inc., and Hillyer & Irwin, Inc. Moore alleged that the defendants illegally conspired to deprive him of the proceeds of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 528**    386

LOVE00902

96 F.3d 1240                                                                                   Page 4

96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624

(Cite as: 96 F.3d 1240)

judgment in his favor in a separate action. We have jurisdiction, 28 U.S.C. § 1291, and we affirm.

### I

Moore, an electrician, once worked for Fischbach & Moore, Inc. ("Fischbach"), a defense contractor, where he was represented *1243 by Local 569 of the International Brotherhood of Electrical Workers ("Local 569").

In 1985, Moore brought an action in federal court against Local 569. Judge Brewster presided over the trial, and the jury found for Moore, awarding him over $66,000 in damages. Local 569 appealed and posted a supersedeas bond of $70,000 to stay the execution of Moore's judgment. In 1993, the Ninth Circuit affirmed the judgment for Moore. *Moore v. Local Union 569 of the IBEW,* 989 F.2d 1534, 1544-46 (9th Cir.1993), *cert. denied,* 510 U.S. 1117, 114 S.Ct. 1066, 127 L.Ed.2d 385 (1994) ("*Moore I* "). During trial and on appeal, Local 569 was represented by Lewis Levy, an attorney with the firm of Levy, Goldman & Levy ("LG & L").

In 1987, Moore brought a separate, ultimately unsuccessful, action against Fischbach. Judge Brewster approved an arbitration award for Fischbach of over $244,000 in fees under the fee-shifting provision in the collective bargaining agreement. Moore appealed this award. In 1995, the Ninth Circuit reversed, holding that the fee-shifting provision violated the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(4). *Moore v. Local 569 of the IBEW,* 53 F.3d 1054 (9th Cir.1995) , *cert. denied,* — U.S. —, 116 S.Ct. 908, 133 L.Ed.2d 840 (1996) ("*Moore II* "). Fischbach was represented by Steven C. Sayler, an attorney with the firm of Hillyer & Irwin ("H & I").

Shortly after the Ninth Circuit affirmed the $66,000 judgment for Moore against Local 569, Moore moved for a release of the proceeds of the $70,000 bond posted by Local 569. Several of Moore's judgment creditors filed claims against the bond. In a bond disposition hearing Judge Brewster distributed over $45,000 to Fischbach to satisfy its

fee awards and granted an offset of over $14,000 to Local 569 for reporter transcript costs taxed to Moore as a losing appellant. During the proceedings regarding the bond, Levy represented Local 569 and Sayler represented Fischbach. In 1995, the Ninth Circuit affirmed in part and reversed in part, holding that Judge Brewster had jurisdiction over the distribution of the bond proceeds, and that the offset for Local 569 was proper, but that the distribution to Fischbach was improper in light of the Ninth Circuit's ruling that the fee award to Fischbach violated the LMRDA. *Moore v. Local 569 of the IBEW,* No. 94-55120, 1995 WL 268650 (9th Cir. May 8, 1995) (citing *Moore II,* 53 F.3d 1054) ("*Moore III* ").

In January 1994, Moore filed this action against Judge Brewster, Kathy Lowe (his law clerk), Don Hendrix (Clerk of the United States District Court for the Southern District of California), Levy, LG & L, Sayler, and H & I. Moore alleged that the conduct of the defendants with regard to the $70,000 bond constituted a Due Process violation, civil conspiracy, fraud, and intentional infliction of emotional distress. The court granted summary judgment for the private attorney defendants and dismissed under Rule 12(b)(6) the claims against Judge Brewster and the court personnel defendants.

On August 25, 1994, Moore appealed these dismissals (Appeal No. 94-56334). On August 29, 1994, Moore filed a motion for leave to amend his complaint. On September 16, 1994, the district court denied Moore's motion. Moore appealed this latter decision (Appeal No. 94-56429). On July 31, 1996 Moore filed a motion requesting that this court take judicial notice of two orders and a letter concerning distribution of related funds.

### II

[1] The district court dismissed the claims against Judge Brewster, Lowe, and Hendrix on the ground of judicial immunity. Dismissal based on judicial immunity is reviewed de novo, *Crooks v. Maynard,* 913 F.2d 699, 700 (9th Cir.1990) (citing *Brewer v. Blackwell,* 692 F.2d 387, 390 (5th Cir.1982)).

[2][3] Judge Brewster enjoys absolute judicial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 529**      387

LOVE00903

96 F.3d 1240                                                                        Page 5

96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624

(Cite as: 96 F.3d 1240)

immunity from Moore's action. A judge is generally immune from a civil action for damages. *Mireles v. Waco*, 502 U.S. 9, 9, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991). "The judicial or quasi-judicial immunity available to federal officers is not limited to immunity from damages, but extends to actions for declaratory, injunctive and other equitable relief." *1244*Mullis v. Bankruptcy Court for the District of Nevada*, 828 F.2d 1385, 1394 (9th Cir.1987), *cert. denied*, 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988). *Cf. Pulliam v. Allen*, 466 U.S. 522, 541-42, 104 S.Ct. 1970, 1980-81, 80 L.Ed.2d 565 (1984) (state officials enjoy judicial or quasi-judicial immunity from damages only).

[4][5] Moore's allegations of legal error do not deprive Judge Brewster of judicial immunity. This immunity applies " 'however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.' " *Cleavinger v. Saxner*, 474 U.S. 193, 199-200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646). "Grave procedural errors or acts in excess of judicial authority do not deprive a judge of this immunity." *Schucker v. Rockwood*, 846 F.2d 1202, 1204 (9th Cir.), *cert. denied*, 488 U.S. 995, 109 S.Ct. 561, 102 L.Ed.2d 587 (1988).

[6] Nor is judicial immunity lost by allegations that a judge conspired with one party to rule against another party: "a conspiracy between judge and [a party] to predetermine the outcome of a judicial proceeding, while clearly improper, nevertheless does not pierce the immunity extended to judges...." *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir.1986) (en banc). Even if, as Moore alleges, Judge Brewster conspired with Sayler to act as an advocate for Fischbach, and interfered with the release of the bond proceeds for the benefit of Fischbach, judicial immunity would bar Moore's action against Judge Brewster.

[7][8] While the doctrine of judicial immunity knows two limits, neither applies to Judge Brewster. First, a judge "will be subject to liability ... when he has acted in the 'clear absence of all jurisdiction.'

" *Stump v. Sparkman*, 435 U.S. 349, 356-57, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978) (quoting *Bradley*, 80 U.S. (13 Wall.) at 351). Judge Brewster, however, was acting well within his jurisdiction, as the Ninth Circuit explained in another of Moore's appeals:

In the instant case the contested orders were made well after the issuance of the [Ninth Circuit's] mandate. Moreover, the order regarding Local 569's entitlement to an offset was made pursuant to the district court's authority to tax costs, and the orders regarding [Moore's judgment creditors] were made pursuant to Fischbach's writ of execution and the [other] creditors filing of valid liens. The district court had jurisdiction to make those orders in this case.

*Moore III*, No. 94-55120, 1995 WL 268650 at *1. Second, only judicial acts are protected. *Stump*, 435 U.S. at 360, 98 S.Ct. at 1106. Judge Brewster's distribution of the $70,000 bond to Moore's creditors following a hearing is a function normally performed by a judge. Moreover, the parties believed they were dealing with Judge Brewster in his judicial capacity. Indeed, Moore's complaint repeatedly refers to Judge Brewster as having acted "under color of law" and as an "officer of the court."

[9] Hendrix, while acting as Clerk of the United States District Court for the Southern District of California, in many of his actions performed quasi-judicial functions as to which he was entitled to absolute immunity. *Mullis*, 828 F.2d at 1390; *Sharma v. Stevas*, 790 F.2d 1486 (9th Cir.1986); *Morrison v. Jones*, 607 F.2d 1269, 1273 (9th Cir.1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). Even if, as Moore alleges, Hendrix deceived Moore regarding the status of the bond and improperly conducted hearings to assess costs, all in coordination with Judge Brewster, such acts would fall within Hendrix's quasi-judicial duties and are thus protected by absolute immunity.

[10][11] Lowe, while acting as law clerk for Judge Brewster, enjoyed absolute judicial immunity. In determining this, we follow the reasoning adopted by the Second Circuit in *Oliva v. Heller*, 839 F.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 530**    388

L0VE00904

96 F.3d 1240                                                                Page 6
96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624
(Cite as: 96 F.3d 1240)

37 (2nd Cir.1988). The concern for the integrity of the judicial process that underlies the absolute immunity of judges is reflected in the extension of absolute immunity to "certain others who perform functions closely associated with the judicial process." *Id.* at 39 (quoting *Cleavinger v. Saxner,* 474 U.S. 193, 200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985)). Under this functional approach, immunity flows from the *1245 nature of the responsibilities of the individual official. *Id.* Because a law clerk is "probably the one participant in the judicial process whose duties and responsibilities are most intimately connected with the judge's own exercise of the judicial function," we find that Lowe, who was clearly assisting the judge in carrying out judicial functions, is covered by the doctrine of absolute immunity. *See also Mitchell v. McBryde,* 944 F.2d 229, 230 (5th Cir.1991) ( "[I]t is plain from the reasoning underlying our prior decisions that the judge's law clerk, when assisting the judge in carrying out the former's judicial functions, is likewise entitled to absolute immunity.").

**III**

[12] The district court granted summary judgment for Levy and LG & L on the ground of issue preclusion. The availability of a defense based on issue preclusion is reviewed de novo, *Pardo v. Olson & Sons, Inc.,* 40 F.3d 1063, 1066 (9th Cir.1994).

[13][14][15] Issue preclusion bars Moore's action against Levy and LG & L. The doctrine of issue preclusion "prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding." *Robi v. Five Platters, Inc.,* 838 F.2d 318, 322 (9th Cir.1988) (quoting *Segal v. AT & T, Inc.,* 606 F.2d 842, 845 (9th Cir.1979)). The defense of issue preclusion may be pled against a party to a prior judgment by a stranger to such judgment *Green v. Ancora-Citronelle Corp.,* 577 F.2d 1380, 1383-84 & n. 2 (9th Cir.1978). Moore alleges that Levy and LG & L, while acting as counsel for Local 569, wrongfully levied a $14,000 offset against the $70,000 bond posted by Local 569. However, the propriety of this offset has been litigated and

decided; in May 1995, the Ninth Circuit held that Judge Brewster did not abuse his discretion when he granted this offset *Moore III,* 1995 WL 268650 at *2.

**IV**

[16] The district court granted summary judgment for Sayler and H & I on Moore's claims for civil conspiracy, fraud, and emotional distress. Summary judgment is reviewed de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

[17][18] Moore failed to produce sufficient evidence to survive summary judgment on his civil conspiracy claim. The indispensable elements of civil conspiracy include a wrongful act and knowledge on the part of the alleged conspirators of [the conspiracy's] unlawful objective. *Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 47 Cal.Rptr.2d 752, 757-58 (1995); *Schick v. Bach,* 193 Cal.App.3d 1321, 238 Cal.Rptr. 902, 906 (1987). Yet Moore produced no evidence of either a wrongful act or wrongful intent. Indeed, Moore's complaint alleges only that Sayler moved for the distribution of a portion of the $70,000 bond to Fischbach, served Moore with notices of liens, communicated with court personnel, and appeared before Judge Brewster regarding the bond, all of which were proper actions to realize on Fischbach's judgment against Moore.

[19] Moore failed to produce sufficient evidence to survive summary judgment on his fraud claim as well. The indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages. *Bank of the West v. Valley Nat'l Bank of Arizona,* 41 F.3d 471, 477 (9th Cir.1994) (quoting *Hackethal v. National Cas. Co.,* 189 Cal.App.3d 1102, 234 Cal.Rptr. 853, 857 (1987)). However, Moore failed to allege, let alone produce evidence of, a single example of misrepresentation by Sayler. Nor did Moore allege scienter, intent to defraud, or reliance by Moore on anything Sayler did or said.

[20] Moore also failed to plead fraud with adequate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 531**        389

LOVE00905

96 F.3d 1240                                                                    Page 7

96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624

(Cite as: 96 F.3d 1240)

particularity. *See* Fed.R.Civ.P. 9(b) ("In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity."). *See also In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc) (requiring that plaintiff include statements regarding the time, place, and *nature* of the alleged fraudulent activities). Moore failed to identify any specific statements or actions by Sayler, *1246 let alone explain in what way such statements or actions were fraudulent.

[21][22][23] Finally, Moore's action for intentional infliction of emotional distress is barred by California Civil Code § 47(b)(2), which privileges communications made during judicial proceedings. California's litigation privilege protects communications "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson,* 50 Cal.3d 205, 266 Cal.Rptr. 638, 642, 786 P.2d 365 (1990). California courts have specifically applied this litigation privilege in actions alleging intentional infliction of emotional distress. *Ribas v. Clark,* 38 Cal.3d 355, 212 Cal.Rptr. 143, 696 P.2d 637 (1985). Moore alleged that Sayler and the court improperly communicated about Fischbach's interest in the bond, that the defendants agreed to illegally deprive Moore of the bond's protections, and that the defendants fraudulently misled him. All of these alleged communications were made by litigants during the course of judicial proceedings, and all had a logical relation to the object of litigation, i.e., the bond, and therefore fall within the scope of § 47(b)(2).

## V

[24][25] Moore filed his motion to amend on August 29, 1994, four days after he filed his notice of appeal. By filing the notice of appeal, Moore divested the district court of its jurisdiction over the matter. *Davis v. United States,* 667 F.2d 822, 824 (9th Cir.1982). Accordingly, we remand with instructions to vacate the denial of Moore's motion to amend and to dismiss the motion for lack of

jurisdiction. *See id.*

## VI

Pursuant to Moore's request, we take judicial notice of supplemental documents concerning the disbursement of funds. We affirm the order of the district court dismissing Moore's claims against United States District Judge Rudi M. Brewster, Kathy Lowe and Don Hendrix on the ground of judicial immunity, the order granting summary judgment for Levy and LG & L on the ground of issue preclusion, the order granting summary judgment for Sayler and H & I on the ground that the record contained no substantial evidence to support the claims. The court exercises its discretion not to award attorneys fees on appeal to Levy and LG & L.

96 F.3d 1240, 96 Cal. Daily Op. Serv. 7080, 96 Daily Journal D.A.R. 11,624

Briefs and Other Related Documents (Back to top)

• 1995 WL 17139216 (Appellate Brief) Reply Brief of the Appellant (Apr. 10, 1995)Original Image of this Document with Appendix (PDF)

• 1995 WL 17137611 (Appellate Brief) Answering Brief on Behalf of Defendants/Appellees Lewis Levy and Levy, Goldman & Levy (Mar. 27, 1995)Original Image of this Document (PDF)

• 1995 WL 17139215 (Appellate Brief) Appellees' Brief (Mar. 27, 1995)Original Image of this Document (PDF)

• 1995 WL 17143754 (Appellate Brief) Brief of the Appellant (Feb. 13, 1995)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 532**     390

**EXHIBIT 2 PAGE 533**

391

EXHIBIT D

Westlaw.

4 F.Supp.2d 961                                                                  Page 1

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

**H**

Motions, Pleadings and Filings

United States District Court,
S.D. California.
Thomas Daniel RICOTTA, Plaintiff,
v.
STATE OF CALIFORNIA et al., Defendant.
No. 97CV1667-J (CGA).

April 15, 1998.

Pro se plaintiff filed a civil rights, racketeering, and conspiracy suit alleging that the state, a county, numerous attorneys and state judges, the state bar, the state commission on judicial performance, a court commissioner, and plaintiff's former wife had acted together to deprive him of a fair marriage dissolution proceeding. On various motions, including motions to dismiss, the District Court, Jones, J., held that: (1) the judges and court commissioner were immune from suit; (2) the Eleventh Amendment barred suit against the court commissioner, the state bar, and the state commission on judicial performance; (3) plaintiff did not adequately allege a pattern of racketeering activity; (4) the *Rooker-Feldman* doctrine barred plaintiff's request to invalidate judgments entered against him in the dissolution proceeding; (5) the civil rights claims were time-barred; (6) plaintiff did not adequately allege civil rights claims against the county or against the individual defendants; (7) an attorney's "ghost-writing" of plaintiff's legal arguments was unprofessional conduct, but did not warrant contempt sanctions; and (8) a default that had been entered against one defendant would be set aside.

Motions granted in part and denied in part.

West Headnotes

[1] Federal Civil Procedure ⟨key⟩1824
170Ak1824 Most Cited Cases
Court may dismiss matters sua sponte over which it does not have jurisdiction. Fed.Rules Civ.Proc.Rule 12(h), 28 U.S.C.A.

[2] Federal Civil Procedure ⟨key⟩1824
170Ak1824 Most Cited Cases

[2] Federal Civil Procedure ⟨key⟩1826
170Ak1826 Most Cited Cases
Court can, sua sponte and without notice, dismiss a claim against a defendant who has not filed a motion to dismiss, where the claimant cannot possibly win relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[3] Federal Civil Procedure ⟨key⟩1772
170Ak1772 Most Cited Cases
Although there need not be an elaborate recitation of every fact plaintiff may rely upon at trial in order to withstand a motion to dismiss, there must be a finding that the complaint gives defendant fair notice of what plaintiff's claim is and the grounds upon which it rests. Fed.Rules Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

[4] Federal Civil Procedure ⟨key⟩1773
170Ak1773 Most Cited Cases
Dismissal is warranted where it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief. Fed.Rules Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

[5] Federal Civil Procedure ⟨key⟩1829
170Ak1829 Most Cited Cases

[5] Federal Civil Procedure ⟨key⟩1835
170Ak1835 Most Cited Cases
On a motion to dismiss, the complaint should be liberally construed in favor of plaintiff, and its factual allegations taken as true. Fed.Rules Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 534**

392

4 F.Supp.2d 961                                                      Page 2

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

[6] Federal Civil Procedure ☞657.5(2)
170Ak657.5(2) Most Cited Cases
Where a plaintiff appears in propria persona in a
civil rights case; the court must construe the
pleadings liberally and afford plaintiff any benefit
of the doubt. 42 U.S.C.A. § 1983; Fed.Rules
Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

[7] Federal Civil Procedure ☞657.5(2)
170Ak657.5(2) Most Cited Cases
Court giving liberal interpretation to a pro se civil
rights complaint may not supply essential elements
of a claim that were not initially pled. 42
U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rules 8(a),
12(b)(6), 28 U.S.C.A.

[8] Civil Rights ☞1394
78k1394 Most Cited Cases
(Formerly 78k234)
Vague and conclusory allegations of official
participation in civil rights violations are not
sufficient to withstand a motion to dismiss. 42
U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rules 8(a),
12(b)(6), 28 U.S.C.A.

[9] Federal Civil Procedure ☞1838
170Ak1838 Most Cited Cases
Court must give a pro se civil rights litigant leave to
amend a deficient complaint unless it is absolutely
clear that the deficiencies could not be cured by
amendment. 42 U.S.C.A. § 1983; Fed.Rules
Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

[10] Federal Civil Procedure ☞1831
170Ak1831 Most Cited Cases
Court considering a motion to dismiss for lack of
subject matter jurisdiction is free to hear evidence
regarding jurisdiction and to rule on that issue prior
to trial, resolving factual disputes when necessary.
Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

[11] Federal Civil Procedure ☞1831
170Ak1831 Most Cited Cases

[11] Federal Civil Procedure ☞1835
170Ak1835 Most Cited Cases
On a motion to dismiss for lack of subject matter
jurisdiction, no presumptive truthfulness attaches to

plaintiff's allegations, and the existence of disputed
facts will not preclude the trial court from
evaluating for itself the merits of jurisdictional
claims. Fed.Rules Civ.Proc.Rule 12(b)(1), 28
U.S.C.A.

[12] Judges ☞36
227k36 Most Cited Cases
Judges and those performing judge-like functions
are absolutely free from liability for damages for
acts performed in their official capacities.

[13] Judges ☞36
227k36 Most Cited Cases
Judicial immunity from liability applies no matter
how erroneous the act may have been, and however
injurious its consequences may have proved to
plaintiff.

[14] Judges ☞36
227k36 Most Cited Cases
Judicial immunity from liability is not affected by
the motives or intent with which judicial acts are
performed.

[15] Judges ☞36
227k36 Most Cited Cases
Judge will not be deprived of immunity from
liability because the action he took was in error, was
done maliciously, or was in excess of his authority;
rather he will be subject to liability only when he
has acted in the clear absence of all jurisdiction.

[16] Judges ☞36
227k36 Most Cited Cases
Allegations that a conspiracy produced a judicial
decision should no more pierce the judge's
immunity from liability than allegations of bad
faith, personal interest, or outright malevolence.

[17] Judges ☞36
227k36 Most Cited Cases
Public policy underlying judicial immunity from
liability is the furtherance of independent and
disinterested judicial decision making.

[18] Judges ☞36
227k36 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 535**        393

LOVE00909

4 F.Supp.2d 961                                                                Page 3

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Ninth Circuit broadly construes the scope of judicial immunity from liability.

**[19] Judges** ⟜36
227k36 Most Cited Cases
Judicial immunity from liability applies even if there are allegations that a judicial decision resulted from a bribe or a conspiracy.

**[20] Judges** ⟜36
227k36 Most Cited Cases
Judge is not immune from suit if a plaintiff seeks prospective injunctive relief.

**[21] Judges** ⟜36
227k36 Most Cited Cases
Judge is not immune from suit if he acts in clear absence of all subject matter jurisdiction or performs an act that is not judicial in nature.

**[22] Judges** ⟜36
227k36 Most Cited Cases
Act is "judicial" in nature, and thus gives rise to judicial immunity from liability, if it is a function normally performed by a judge.

**[23] Civil Rights** ⟜1376(8)
78k1376(8) Most Cited Cases
(Formerly 78k214(8))

**[23] Judges** ⟜36
227k36 Most Cited Cases
Judges were immune from a pro se plaintiff's civil rights and racketeering suit seeking compensatory and punitive damages based on allegations that the judges conspired to deprive plaintiff of a fair marriage dissolution proceeding. 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986.

**[24] Judges** ⟜36
227k36 Most Cited Cases
General rules of judicial immunity also apply to pro tem judges.

**[25] Civil Rights** ⟜1376(8)
78k1376(8) Most Cited Cases
(Formerly 78k214(8))

**[25] Judges** ⟜36
227k36 Most Cited Cases
Pro tem judge was immune from a pro se plaintiff's civil rights, racketeering, and conspiracy suit alleging that the judge was biased and refused to recuse himself from plaintiff's marriage dissolution proceeding despite his friendship with plaintiff's spouse's appellate attorney, that the judge had adjoining offices and shared a secretary with the attorney, and that the judge misapplied the law. 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986.

**[26] Civil Rights** ⟜1376(8)
78k1376(8) Most Cited Cases
(Formerly 78k214(8))

**[26] Judges** ⟜36
227k36 Most Cited Cases
Attorney had judicial immunity from a pro se plaintiff's civil rights, racketeering, and conspiracy suit alleging that the attorney acted as a pro tem judge in plaintiff's marriage dissolution proceeding while he was attorney of record for plaintiff's spouse and that he tried to intimidate plaintiff by slamming his gavel, glaring at plaintiff, and continuing the hearing, where plaintiff alleged no harm and it appeared that the attorney was erroneously assigned to the case and recused himself accordingly. 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986.

**[27] Court Commissioners** ⟜3
105k3 Most Cited Cases
Judicial immunity from liability extends to court commissioners when they perform judicial functions, even if their acts are in excess of jurisdiction or are alleged to have been malicious or corrupt. West's Ann.Cal.Gov.Code § 72190.

**[28] Judges** ⟜36
227k36 Most Cited Cases
Jurisdiction is construed broadly where the issue is a judge's immunity from liability.

**[29] Judges** ⟜36
227k36 Most Cited Cases
Acts performed in excess of jurisdictional authority

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 536**    394

L0VE00910

4 F.Supp.2d 961

4 F.Supp.2d 961    Page 4

(Cite as: 4 F.Supp.2d 961)

do not deprive the judge of immunity from liability.

**[30] Civil Rights** ⚖︎1376(8)
78k1376(8) Most Cited Cases
(Formerly 78k214(8))

**[30] Court Commissioners** ⚖︎3
105k3 Most Cited Cases
Court commissioner performed a judicial act within her jurisdiction when she signed a formal judgment confirming an judge's order awarding attorney fees against one of the parties to a marriage dissolution action, and thus she was immune from that party's pro se civil rights, racketeering, and conspiracy suit challenging her act, where the judge who made the order was unavailable due to reassignment and the order was neither dispositive nor complex, notwithstanding that the order was two years old. 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986; West's Ann.Cal.Gov.Code § 72190; West's Ann.Cal.C.C.P. § 635.

**[31] Evidence** ⚖︎43(4)
157k43(4) Most Cited Cases
Federal district court, in deciding whether a state court commissioner had judicial immunity from a suit challenging her act of signing a formal judgment confirming a judge's order awarding attorney fees, could take judicial notice of the judge's order. Fed.Rules Evid.Rule 201, 28 U.S.C.A

**[32] Federal Civil Procedure** ⚖︎1832
170Ak1832 Most Cited Cases

**[32] Federal Civil Procedure** ⚖︎2533.1
170Ak2533.1 Most Cited Cases
Court can take judicial notice of official records and reports in deciding a motion to dismiss without converting the motion into one for summary judgment. Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.; Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[33] Federal Courts** ⚖︎271
170Bk271 Most Cited Cases
Eleventh Amendment barred a pro se plaintiff's civil rights, racketeering, and conspiracy suit in federal court seeking damages against a court

commissioner for signing a formal judgment confirming a judge's order awarding attorney fees against the plaintiff in his marriage dissolution proceeding, where the commissioner was performing a judicial act within her official capacity. U.S.C.A. Const.Amend. 11; 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986.

**[34] Federal Courts** ⚖︎269
170Bk269 Most Cited Cases
Action in federal court for money damages against a state official is considered to be a suit against the state and is barred by the Eleventh Amendment if the state is the real, substantial party in interest, or if judgment is sought against the public treasury. U.S.C.A. Const.Amend. 11.

**[35] Federal Courts** ⚖︎271
170Bk271 Most Cited Cases
Eleventh Amendment barred a pro se plaintiff's civil rights, racketeering, and conspiracy suit in federal court seeking damages against the California Commission on Judicial Performance for its allegedly inadequate investigation of plaintiff's complaints about judges who participated in his marriage dissolution proceeding, even if plaintiff's request for damages were construed as a request for more funding for watch-dog agencies. U.S.C.A. Const.Amend. 11; 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986.

**[36] Federal Courts** ⚖︎265
170Bk265 Most Cited Cases

**[36] Federal Courts** ⚖︎272
170Bk272 Most Cited Cases
Eleventh Amendment bars suits in federal court against a state brought by its own citizens, whether the relief sought is money damages or an injunction. U.S.C.A. Const.Amend. 11.

**[37] Federal Courts** ⚖︎269
170Bk269 Most Cited Cases
Eleventh Amendment applies to state agencies. U.S.C.A. Const.Amend. 11.

**[38] Federal Courts** ⚖︎265
170Bk265 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 537**    395

4 F.Supp.2d 961

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Eleventh Amendment prohibits federal suits by private individuals against the state if the request for relief requires expenditures of public funds from the state treasury. U.S.C.A. Const.Amend. 11.

**[39] Federal Courts ☞271**
170Bk271 Most Cited Cases
Eleventh Amendment barred a pro se plaintiff's civil rights, racketeering, and conspiracy suit in federal court seeking damages against the California State Bar for its allegedly inadequate investigation of plaintiff's complaints about attorneys who participated in his marriage dissolution proceeding, even if plaintiff's request for damages were construed as a request for more funding for watch-dog agencies. U.S.C.A. Const.Amend. 11; 18 U.S.C.A. § 1962(c); 42 U.S.C.A. §§ 1983, 1985, 1986.

**[40] Racketeer Influenced and Corrupt Organizations ☞25**
319Hk25 Most Cited Cases
Alleged acts of attorneys, state judges, and state government agencies in conspiring to deprive plaintiff of a fair marriage dissolution proceeding did not amount to a pattern of racketeering activity to support plaintiff's civil claim for racketeering under federal law. 18 U.S.C.A. §§ 1861 et seq., 1862(c).

**[41] Racketeer Influenced and Corrupt Organizations ☞3**
319Hk3 Most Cited Cases
To state a civil claim for racketeering under federal law, plaintiff must demonstrate: (1) the conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. 18 U.S.C.A. § 1861 et seq.

**[42] Racketeer Influenced and Corrupt Organizations ☞28**
319Hk28 Most Cited Cases
To show a pattern of racketeering activity supporting a civil claim for racketeering under federal law, plaintiff must illustrate that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. 18 U.S.C.A. § 1861 et seq.

**[43] Federal Civil Procedure ☞1781**
170Ak1781 Most Cited Cases

**[43] Federal Civil Procedure ☞1837.1**
170Ak1837.1 Most Cited Cases
Court would dismiss with prejudice a federal racketeering action against a defendant even though he had not yet answered the complaint, where he was in an identical position to the other defendants, who had established via a motion to dismiss that plaintiff could not show a pattern of racketeering activity, and where the claims against him were integrally related to the claims against the moving defendants, in that plaintiff alleged that they were all involved in a conspiracy. 18 U.S.C.A. §§ 1861 et seq., 1862(c); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[44] Courts ☞509**
106k509 Most Cited Cases
Rooker-Feldman doctrine, which bars lower federal courts from reviewing state court judgments, eliminated federal subject matter jurisdiction over a pro se plaintiff's action seeking to invalidate judgments entered against him in a state marriage dissolution proceeding based on allegations that numerous attorneys, state judges, and state government agencies had conspired to deprive him of a fair trial.

**[45] Courts ☞509**
106k509 Most Cited Cases
Lower federal courts possess no power whatever to sit in direct review of state court decisions.

**[46] Courts ☞509**
106k509 Most Cited Cases
Rooker-Feldman doctrine, which bars lower federal courts from reviewing state court judgments, is jurisdictional.

**[47] Courts ☞509**
106k509 Most Cited Cases
Rooker-Feldman doctrine, which bars lower federal courts from reviewing state court judgments, applies even when the challenge to the state court decision involves federal constitutional issues.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 538**    396

LOVE00912

4 F.Supp.2d 961                                                                    Page 6

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

**[48] Courts ⟲509**
106k509 Most Cited Cases
*Rooker-Feldman* doctrine, which bars lower federal courts from reviewing state court judgments, applies even when the state court judgment at issue is not final.

**[49] Courts ⟲509**
106k509 Most Cited Cases
*Rooker-Feldman* doctrine, which bars lower federal courts from reviewing state court judgments, applies if there has already been actual consideration of and a decision on the issue presented.

**[50] Civil Rights ⟲1379**
78k1379 Most Cited Cases
(Formerly 78k210)
In deciding what limitations period applies to federal civil rights actions, federal courts look to the forum state's statute of limitations for personal injury torts. 42 U.S.C.A. §§ 1983, 1985, 1986.

**[51] Federal Courts ⟲427**
170Bk427 Most Cited Cases
Federal law determines when a federal civil rights action accrues. 42 U.S.C.A. §§ 1983, 1985, 1986.

**[52] Limitation of Actions ⟲95(15)**
241k95(15) Most Cited Cases
Federal civil rights action generally accrues when plaintiff knows or has reason to know of the injury which is the basis of his action. 42 U.S.C.A. §§ 1983, 1985, 1986.

**[53] Limitation of Actions ⟲58(1)**
241k58(1) Most Cited Cases
Pro se plaintiff's federal civil rights action challenging a state court judge's order in the plaintiff's marriage dissolution proceeding accrued when the judge orally gave and explained the order, not 17 days later when he signed a written order. 42 U.S.C.A. §§ 1983, 1985, 1986.

**[54] Limitation of Actions ⟲104.5**
241k104.5 Most Cited Cases
Doctrine of equitable tolling generally requires timely notice, lack of prejudice to the defendant,

and reasonable and good faith conduct on the part of the plaintiff.

**[55] Civil Rights ⟲1308**
78k1308 Most Cited Cases
(Formerly 78k194)
There is no exhaustion requirement for § 1983 complaints brought by nonprisoners. 42 U.S.C.A. § 1983.

**[56] Civil Rights ⟲1395(1)**
78k1395(1) Most Cited Cases
(Formerly 78k235(1))
Pro se plaintiff's complaint accusing a county of having an unwritten custom of discriminating against pro se parties failed to state a claim under federal civil rights statutes, where it did not plead facts showing that the alleged custom was widespread or that the county acted deliberately. 42 U.S.C.A. §§ 1983, 1985, 1986.

**[57] Civil Rights ⟲1345**
78k1345 Most Cited Cases
(Formerly 78k206(2.1))
Municipalities, their agencies, and their supervisory personnel cannot be held liable under § 1983 on any theory of respondeat superior or vicarious liability. 42 U.S.C.A. § 1983.

**[58] Civil Rights ⟲1351(1)**
78k1351(1) Most Cited Cases
(Formerly 78k206(3))
Municipalities can be held liable under § 1983 for deprivations of constitutional rights resulting from their policies or customs. 42 U.S.C.A. § 1983.

**[59] Civil Rights ⟲1326(4)**
78k1326(4) Most Cited Cases
(Formerly 78k198(3.1))
To maintain a § 1983 action against private parties based on alleged constitutional violations, a plaintiff must show that the actions complained of are fairly attributable to the government. 42 U.S.C.A. § 1983.

**[60] Civil Rights ⟲1326(5)**
78k1326(5) Most Cited Cases
(Formerly 78k198(4))

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 539**

397

4 F.Supp.2d 961                                                    Page 7

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Action taken by private individuals may be "under color of state law" within the meaning of § 1983 where there is significant state involvement in the action. 42 U.S.C.A. § 1983.

**[61] Civil Rights** ☞1326(5)
78k1326(5) Most Cited Cases
(Formerly 78k198(4))
"Joint action test" for imposing § 1983 liability on private parties is met if (1) state officials and the private parties have acted "in concert" in effecting a particular deprivation of constitutional rights, that is, if there is a substantial degree of cooperative action resulting in the deprivation of rights, or (2) if the state and private actors share a common, unconstitutional goal; the core question is whether the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity. 42 U.S.C.A. § 1983.

**[62] Civil Rights** ☞1326(5)
78k1326(5) Most Cited Cases
(Formerly 78k198(4))
Joint action test for imposing § 1983 liability on private parties can be met by demonstrating the existence of a conspiracy. 42 U.S.C.A. § 1983.

**[63] Civil Rights** ☞1326(9)
78k1326(9) Most Cited Cases
(Formerly 78k198(8))
Merely resorting to the courts and being on the winning side of lawsuit does not make a private party a joint actor with the judge so as to be subject to § 1983 liability. 42 U.S.C.A. § 1983.

**[64] Civil Rights** ☞1396
78k1396 Most Cited Cases
(Formerly 78k236)
Pro se plaintiff's general and conclusory allegations that various private parties including attorneys engaged in bribery of and conspiracy with judges and other state actors to deprive him of a fair marriage dissolution proceeding failed to state a federal civil rights claim against the private parties. 42 U.S.C.A. §§ 1983, 1985, 1986.

**[65] Attorney and Client** ☞32(7)

45k32(7) Most Cited Cases
Attorney's involvement in drafting 75 to 100% of a pro se plaintiff's legal arguments in his oppositions to motions to dismiss was impermissible "ghost-writing" amounting to unprofessional conduct.

**[66] Attorney and Client** ☞32(4)
45k32(4) Most Cited Cases
Licensed attorney does not violate procedural, substantive, and professional rules of a federal court by lending some assistance to friends, family members, and others with whom he may want to share specialized knowledge.

**[67] Attorney and Client** ☞32(7)
45k32(7) Most Cited Cases
Attorneys should not gather and anonymously present, or "ghost-write," legal arguments with the actual or constructive knowledge that the work will be presented in some similar form in a motion before a court.

**[68] Contempt** ☞2
93k2 Most Cited Cases

**[68] Contempt** ☞10
93k10 Most Cited Cases
Although an attorney's involvement in drafting 75 to 100% of a pro se plaintiff's legal arguments in his oppositions to motions to dismiss was impermissible "ghost-writing" amounting to unprofessional conduct, neither the attorney nor plaintiff would be held in contempt, where there were no specific rules on the subject, and where the attorney did not think her behavior was offensive and improper, had no intention to mislead or harm the court and the other parties, and was quick to admit the nature and extent of her involvement.

**[69] Federal Civil Procedure** ☞2445
170Ak2445 Most Cited Cases

**[69] Federal Civil Procedure** ☞2450
170Ak2450 Most Cited Cases
Court would set aside a default it had entered against one of multiple defendants in a pro se plaintiff's suit asserting civil rights, racketeering,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 540    398

LOVE00914

4 F.Supp.2d 961                                                          Page 8

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

and conspiracy claims arising out of an allegedly unfair marriage dissolution proceeding, where the defendant's attorney had made a good faith mistake in filing a notice of appearance in that he was representing many of the other defendants, the attorney immediately scheduled a motion to set aside upon learning of the entry, and the defendant shared in the other defendants' numerous valid defenses. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

**[70] Federal Civil Procedure ⟶2444.1**
170Ak2444.1 Most Cited Cases
The "good cause" that must be shown to set aside an entry of default is essentially the same as that for setting aside a default judgment. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

**[71] Federal Civil Procedure ⟶2444.1**
170Ak2444.1 Most Cited Cases
Court considers the following factors in determining whether to set aside an entry of default: (1) whether the moving party was willful or culpable in the default; (2) whether the nonmoving party would be prejudiced if entry of default is set aside; and (3) whether the moving party has a meritorious defense. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

**[72] Federal Civil Procedure ⟶2441**
170Ak2441 Most Cited Cases
Standards for setting aside an entry of default are less rigorous than those for setting aside a default judgment. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

*967 Thomas Daniel Ricotta, in pro per.

Daniel E. Lungren, Atty. Gen., Karen M. Walter, Deputy Atty. General, San Diego, CA, for State of Cal., Commission on Judicial Performance.

Marie M. Moffat, Gen. Counsel, Dina E. Goldman, Asst. Gen. Counsel, San Francisco, CA, for State Bar of Cal.

John J. Sansone, County Counsel, Deborah A. McCarthy, Deputy County Counsel, San Diego, CA, for County of San Diego, Judges, Judges Pro Tem, and Commissioner in Official Capacities.

Matthew D. Murphey, Murphey Law Offices, A.P.C., Carlsbad, CA, for Individual Defendants in their Private Capacities.

John Farrell, El Cajon, CA, for Potential Contemnor Lois Brown Kelly.

ORDER

JONES, District Judge.

On November 5, 1997, Thomas Ricotta ("Plaintiff") filed an Amended Complaint ("Am.Compl.") alleging the following four causes of action: 1) violations of his civil rights under 42 U.S.C. § 1983, 2) violations of the Racketeer Influenced and Corrupt Organizations Act, ("RICO") 18 U.S.C. § 1962(c), 3) conspiracy to interfere with his civil rights pursuant to 18 U.S.C. § § 1985 and 1986, and 4) a cause of action for equitable, injunctive, declaratory relief and restitution. In his Amended Complaint Plaintiff names eighteen Defendants who allegedly harmed him during dissolution proceedings initiated by his former wife on April 30, 1991, and culminated in September of 1996. For the purpose of this Order the Court has categorized the eighteen Defendants into four separate groups identified as: 1) the "County," [FN1] 2) the "State," [FN2] 3) the "Bar" [FN3] and, 4) the "Individuals." [FN4]

> FN1. Defendants include: The County of San Diego, Judge William Howatt Jr., Judge Thomas R. Murphy, Judge Marguerite L. Wagner, Judge Gerald L. Barry, Jr., Judge Ruston Maino, Judge Pro Tem Paul E. Gavin, Judge Pro Tem Gordon Meyer, and Commissioner Etta C. Gillivan.

> FN2. Defendants include: The State of California and the State of California, Commission on Judicial Performance.

> FN3. This Defendant is the State Bar of California.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 541**          399

4 F.Supp.2d 961

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

FN4. Defendants include: Paul E. Gavin, Ellen A. Ricotta, Roy Garret, Karen Guillotti, and Gordon Meyer.

This matter comes before the Court on all Defendants' (except Fred Weedon) motions to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6). The Defendants have all filed various notices of motions, memorandums of points and authorities, and notices of joinder in each others motions and memorandums. Subsequent to the filing of the motions to dismiss, Fred Weedon ("Weedon") filed a motion to set aside the entry of default. Weedon's motion is also addressed in this Order.

Additionally, the Individuals filed an ex parte application for an order to show cause why Plaintiff and his alleged ghost-writing attorney, Lois Brown Kelly, should not be held in contempt of court. On February 2, 1998, this Court issued an Order to Show Cause and has received memorandums of points and authorities, and declarations from *968 defense counsel, Plaintiff, and the claimed ghost-writing attorney Lois Brown Kelly. The request for a finding of contempt is also analyzed in this Order.

On Tuesday, February 16, 1998, the Court heard oral argument from all parties on all of the above mentioned motions, except for Weedon's request to set aside the entry of default. [FN5] Subsequently, this Court took the matters under submission, and on February 20, 1998, issued an order requesting supplemental briefing from the County and Plaintiff to explain what Judgment Plaintiff claimed Commissioner Etta C. Gillivan allegedly signed which resulted in her inclusion in his Amended Complaint.

FN5. The Court found the request to set aside the entry of default a matter suitable for disposition without oral argument pursuant to LOCAL RULE 7.1, and notified the parties that the matter would be decided on the papers.

For the reasons set forth below this Court:

[1] 1) DISMISSES with PREJUDICE Plaintiff's first and third causes of action as to all Defendants for lack of subject matter jurisdiction. [FN6]

FN6. The Court can dismiss this claim for Defendant Fred Weedon even though he has not filed a motion to dismiss because a court may dismiss matters sua sponte over which it does not have jurisdiction. See, e.g., Fiedler v. Clark, 714 F.2d 77, 78-79 (9th Cir.1983); Fed. R. Civ. P. 12(h).

[2] 2) DISMISSES with PREJUDICE Plaintiff's second cause of action for RICO violations as to all Defendants for failure to state a claim. [FN7]

FN7. The Court can dismiss a claim sua sponte for a Defendant who has not filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Yahya M.A. Omar v. Sea-Land Service, Inc., 813 F.2d 986 (9th Cir.1987). "Such a dismissal may be made without notice where the claimant cannot possibly win relief." Id. (citing Wong v. Bell, 642 F.2d 359, 361-62 (9th Cir.1981)). See discussion infra at 979.

3) DISMISSES with PREJUDICE Plaintiff's fourth cause of action for equitable relief as to all Defendants because the requested relief is beyond the Court's subject matter jurisdiction.

4) GRANTS Defendant Weedon's request to set aside the entry of default.

5) DENIES the Individual Defendants' request for finding Plaintiff and Lois Brown Kelly in contempt of court, and

6) DIRECTS the Clerk of the Court to close this case file in its entirety.

## I. Introduction

The facts and circumstances of this case arise from marriage dissolution proceedings between Plaintiff and his former wife Ellen Ricotta. On April 30, 1991, Ellen Ricotta filed a petition for dissolution against Plaintiff in San Diego County Superior

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 542**    400

4 F.Supp.2d 961                                                                          Page 10

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Court. (Am.Compl.¶ 2). The dissolution trial commenced on January 24, 1992, at which time Plaintiff was represented by counsel. (Am.Compl.¶ 10). On March 19, 1992, Judge William Howatt, Jr., issued a Statement of Decision. (Am.Compl.¶ 16). Plaintiff requested several clarification hearings which resulted in a second trial in February of 1993. (County's Mem. at 4). Since that time, there have been numerous motions and hearings, four separate appeals brought by Plaintiff, and several complaints filed by Plaintiff to the Commission on Judicial Performance and the California State Bar. (Am.Compl.¶ 5). As a result of the trials, hearings, and rehearings, Ellen Ricotta was awarded certain amounts of money and property from the marital estate. (Individuals' Mem. at 2). In addition, Plaintiff was assessed portions of Ellen Ricotta's attorneys' fees. (Individuals' Mem. at 2).

On September 15, 1997, Plaintiff filed his original complaint. On October 15, 1997, Plaintiff filed a RICO case statement. On November 5, 1997, Plaintiff filed an Amended Complaint naming Commissioner Etta C. Gillivan as a Defendant. The essence of Plaintiff's lawsuit is his contention that the Judges, Commissioner, attorneys, and individuals involved in the marriage dissolution proceedings conspired to deprive him of his rights under the First, Fourth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments of the United States Constitution. Accordingly, Plaintiff wants this Court to award damages *969 in the amount of the judgments plus interest on all monies, "he wrongfully was compelled to pay in satisfaction of judgments." (Am.Compl.¶ 113). Plaintiff also wants damages for the loss of his business reputation and credit status that prevented him from earning a livelihood. Plaintiff requests compensatory and punitive damages. (Am.Compl. ¶ 115).

**II. Overview Of The Amended Complaint**
The Court spent considerable time reading and re-reading Plaintiff's Amended Complaint. At the outset the Court must note that it found the Amended Complaint very difficult to follow. More importantly, the Amended Complaint is filled with

conclusory allegations. Plaintiff alleges that "the State Law upon which the Superior Court has (sic) seized and relinquished and will relinquish in the future is invalid, in that the law was used by a CRIMINAL ENTERPRISE, Racketeer influenced and corrupt organization act (CIVIL RICO) and a violation of plaintiff's Constitutional Rights." (Am. Compl. at 2). In support of this argument, Plaintiff summarizes a trilogy of events from the dissolution proceedings that allegedly substantiate the causes of action. For instance, Plaintiff asserts that on January 24, 1992, the first day of trial, Ellen Ricotta's attorney, Defendant Paul E. Gavin ("Gavin"), "came up to [Plaintiff] and his attorney William Pabarcus and stated 'No (curse word) San Diego attorney is going to come into my court and get any (curse word) thing.' In seven years of litigation his words have rung true. This attempt of intimidation amounts to extortion of a criminal act by a criminal enterprise." (Am.Compl.¶ 10). Plaintiff continues to accuse Defendant Gavin of wrongdoing by stating that:
[Gavin] has a history of milking a case like this one which he has called, "Cash Cow." When there is an estate of $1,000,000 he feels he has a right to 10%, and he has a history of getting $100,000 dollars in fees out of case. Then he runs just as he did in this case. Attorney Gavin also bragged how he never will compromise, unless, his client makes him. This is a statement he has made to other attorneys. He uses this symbiotic relationship with the judges to get his ill gotten gains to wine and dine judges to get personal favors to in in rich his criminal enterprise. (Am.Compl.¶ 93).

Plaintiff makes a series of allegations against various judges that presided over his dissolution proceedings. For instance, Plaintiff proclaims that:
[w]hen [Plaintiff] first entered Judge Howatt's courtroom on January 24, 1992, his clerk Karen Knard stated that the Judge hates family law and she hates family law and neither wanted any part of this case. [Plaintiff] could hear Judge Howatt's speaking to someone in his chambers. [Plaintiff] heard Judge Howatt mention his name and talking about the case. From the judge's opening statement [Plaintiff] could tell he was already

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 543**    401

L0VE00917

4 F.Supp.2d 961

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

prejudiced.
(Am.Compl.¶ 11).

Plaintiff then accuses Judge Thomas R. Murphy of bribery by stating that "Judge Murphy refused to rule and then offered [Old Republic Title Company] a bribe ... of $10,000 to close the escrow." (Am.Compl.¶ 56).

Next, Plaintiff submits a request to the Court to take judicial notice that:
the San Diego County Superior Court is corrupt by the Federal Convictions of Presiding Judge Greer, and Superior Court Judge Malkus and Superior Court Judge Adams. This Federal Case # 96-698 et. al. is the same kind Modis Aperandi of Attorneys bribing judges to get exorbitant legal fees, and gain advantage by this illegal act, but just different players ....
(90) The history of corruption in the San Diego County Courts, and chain of bias all the way to the Appeals court is the same kind of corruption as in this case, [Plaintiff] request a judge from outside San Diego County hear this case. [Plaintiff] request that the same rights afforded to Judges Greer, Malkus, and Adams be afforded him, to have unbiased judge.
(91) The plaintiff requests the court to take Judicial Notice of United States Supreme Court Justice Brandeis statement in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), "[c]rime *970 is contagious. If the government become a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."
(Am. Compl. at ¶ ¶ 89-91):

### A. First Cause Of Action

In his first cause of action Plaintiff alleges a violation of civil rights pursuant to 42 U.S.C. § 1983 . Plaintiff states that from the period of April 1991, to the present, the named Defendants through their conduct and under color of state law conspired together to deprive him of a fair and impartial trial and violated his rights under the First, Fourth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments of the United States Constitution.

(Am.Compl.¶ 97). Plaintiff further claims that the state proceedings involving the dissolution of his marriage were motivated by greed, bad faith, harassment, intimidation, and willful criminal violations under State and Federal law. (Am.Compl. ¶ 97). Plaintiff believes that federal intervention is proper because of the sale of marital property conducted within Washington State. (Am.Compl.¶ 98).

### B. Second Cause Of Action

Plaintiff's second cause of action alleges civil RICO violations pursuant to 18 U.S.C. §§ 1961(1) & (5), and 18 U.S.C. §§ 1962 *et al.* Plaintiff asserts that the requisite acts of racketeering include, but are not limited to, conduct by Defendant Gavin in his capacity as both an attorney and Judge Pro Tem. (Am.Compl.¶ 100). Plaintiff states that all Defendants associated with the conduct of Defendant Gavin, and with knowledge either directly or indirectly engaged in activities that affected both interstate and intrastate commerce. Such activity resulted in the conversion, undue influence, and bribery of California Superior Court Judges. (Am.Compl.¶ 100). Plaintiff then claims that this "criminal enterprise caused [Defendants] to fail in their duty to enforce the Oath of Office and Judicial Canons of Ethics and the laws of the State of California, obstruction of a fair administration of justice, conversion, bribery, grand theft, perjury, and conspiracy." (Am.Compl.¶ 100).

Plaintiff contends that this criminal enterprise violated:
(1) criminal statutes of the California Penal Code regarding Grand Theft P.C. 487, Conspiracy P.C. 182, Conspiracy to Falsify Public Records P.C. 134, Falsifying a Public Document P.C. 115, False Affidavit P.C. 127, Perjury P.C. 127, Subornation of Perjury P.C. 118(a); (2) Government Code violations of False Filing of Public Record § 6200 and 620; and (3) Federal violations of civil and constitutional rights under the Fifth and Fourteenth Amendments, right to due process, right to fair and impartial tribunal, right to attorney, right to cross-examine witnesses, right to be heard in court of law, Mail

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 544**    402

4 F.Supp.2d 961

4 F.Supp.2d 961
(Cite as: 4 F.Supp.2d 961)

Page 12

Fraud 18 U.S.C. § 1341, and Wire Fraud. (Am.Compl.¶ 102).

C. Third Cause Of Action

In his third cause of action Plaintiff alleges civil rights violations pursuant to 42 U.S.C. §§ 1985 and 1986. Plaintiff asserts that, "[a] person or Class of persons should not be discriminated against because they can not afford an attorney or as in the plaintiff's case not allowed to have an attorney by the court and must act in propria persona against an attorney that is a friend of the court and before the judge every day." (Am.Compl.¶ 103). Plaintiff states that he was not provided equal access or equal protection of the court and that, "this bias resulted in invidiously discriminatory conduct in violation of the Constitution." (Am.Compl.¶ 103).

Plaintiff further claims that there is an "unwritten policy in the San Diego Superior Court of discrimination against any person filing a court action in propria persona." (Am.Compl.¶ 104). In support of this assertion, Plaintiff claims to have witnessed judges berate unrepresented persons in open court with statements like," 'who do [unrepresented persons] think they are to think they can represent themselves when I went to seven years of schooling and they think they are an equal.' " (Am.Compl.¶ 105). Identified by name is Judge William Howatt Jr., who Plaintiff alleges chided him after he supposedly did a "lousy" job representing himself. Also named is Judge Gerald L. Barry Jr., *971 whom Plaintiff claims threatened him with arrest while he represented himself in a pro se capacity. (Am.Compl.¶ 105). Plaintiff further alleged that Judge Thomas R. Murphy did not allow him to represent himself at a hearing. (Am.Compl.¶ 109). Plaintiff claims that Judge Murphy had him removed from the courtroom when he asked, "Why am I held to standards of an attorney and the attorneys are not held to any standards in the North County Court?" (Am.Compl. ¶ 109).

D. Fourth Cause Of Action

Plaintiff's fourth cause of action alleges that had the

Defendants not engaged in the wrongful acts Plaintiff would have likely prevailed in the dissolution proceedings and would have received one half of his estate worth $925,000. Plaintiff, demands a "declaration that all judgments are void, receive full restitution of the amounts paid to satisfy the judgments, and recover attorneys fees and other litigation expenses incurred in the corrupt trials." (Am.Compl.¶ 110).

E. Remedies

Plaintiff seeks damages, "in the amount of judgments, together with interest thereon, to compensate plaintiff for; all monies he wrongfully has compelled to pay in satisfaction of judgments, and lose (sic) of property, and defendant's conduct which has severely damages (sic) plaintiff's business reputation, and credit status and prevented him from earning a livelihood. Including his ability to earn future livelihood." (Am.Compl.¶ 113).

Additionally, Plaintiff wants a declaration that all proceedings in the State Courts of California and the State Courts of Washington are "null, void and of no effect." (Am.Compl.¶ 115(B)). Plaintiff also requests an award of compensatory and punitive damages. Plaintiff asks that the Court establish an independent investigative agency to "prosecute government corruption and corruption in our courts." (Am.Compl.¶ 115(M)). Plaintiff also wants that the Court to order the State of California to fund an investigative body that will oversee the Commission on Judicial Performance and the State Bar of California. (Am.Compl.¶ 115(N)).

III. Legal Standards For Dismissal

[3] Defendants argue that pursuant to Fed. R. Civ. P. 12(b)(6), this Court should dismiss Plaintiff's second cause of action for violations of RICO. Under Fed. R. Civ. P. 12(b)(6), a defendant may bring a motion to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This motion tests whether the allegations of the Complaint satisfy the requirement of Fed. R. Civ. P. 8(a), which requires a "short and plain statement of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 PAGE 545    403

L0VE00919

4 F.Supp.2d 961

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Page 13

claim showing that the pleader is entitled to relief." Fed. R. Civ.P. 8(a). Although there need not be an elaborate recitation of every fact a plaintiff may rely upon at trial, in order to withstand a motion to dismiss, there must be a finding that the Complaint gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

[4][5] A dismissal is warranted where "it appears beyond doubt that the Plaintiff can prove no set of facts which would entitle him[her] to relief." *Id.* at 45-46, 78 S.Ct. 99, The Complaint should be liberally construed in favor of the Plaintiff, and its factual allegations taken as true. *Oscar v. University Students Co-operative Ass'n*, 965 F.2d 783, 785 (9th Cir.1992), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).

[6][7][8][9] Where a plaintiff appears in propria persona in a civil rights case, the court must construe the pleadings liberally and afford plaintiff any benefit of the doubt. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir.1988). In giving liberal interpretation to a pro se civil rights complaint, the Court may not, however, supply essential elements of a claim that were not initially pled. "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Ivey v. Board of Regents of the University of Alaska*, 673 F.2d 266, 268 (9th Cir.1982). Nevertheless, the Court must give a pro se litigant leave to amend the Complaint unless it is "absolutely clear that the deficiencies of the complaint *972 could not be cured by amendment." *Noll v. Carlson*, 809 F.2d 1446, 1447 (9th Cir.1987).

[10][11] Defendants also argue that this Court should dismiss Plaintiff's complaint for lack of subject matter jurisdiction. Specifically, the Defendants assert that the first and third causes of action are barred by the statute of limitations. Additionally, Defendants believe that the Court does not have subject matter jurisdiction to afford Plaintiff's requested relief in his fourth cause of

action. Under Rule 12(b)(1), a defendant may seek to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). When considering a 12(b)(1) motion to dismiss, the district court "is free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes when necessary." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983). "In such circumstances, '[n]o presumptive truthfulness attaches to plaintiff's allegations; and the existence of disputed facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.' " *Id.* (quoting *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979) ).

**IV. Parties For Whom The Entire Complaint Must Be Dismissed With Prejudice**
There are several Defendants who are entitled to immunity from suit in federal court. Accordingly, as discussed below the Amended Complaint must be dismissed with prejudice as to Defendants: 1) Howatt, 2) Murphy, 3) Wagner, 4) Barry, 5) Maino, 6) Meyer, 7) Gillivan, 8) the State of California, 9) the Commission on Judicial Performance, and 10) the California State Bar.

**A. The Judges: Howatt, Murphy, Wagner, Barry, Maino**

[12][13][14][15][16][17][18][19] Judges and those performing judge-like functions are absolutely free from liability for damages for acts performed in their official capacities. *Ashelman v. Pope*, 793 F.2d 1072 (9th Cir.1986) (en banc). Judicial immunity applies no matter how "erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Ashelman*, 793 F.2d at 1074 (citing *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (quotations omitted)). Judicial immunity is not affected "by the motives with which their [Judges] judicial acts are performed." *Id.* at 1077. Thus, intent does not play a role in the immunity analysis. *Id.* "A judge will not be deprived of immunity because the action he [she] took was in error, was done maliciously, or was in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 546**     404

L0VE00920

4 F.Supp.2d 961                                                                    Page 14

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

excess of his [her] authority; rather he [she] will be subject to liability only when he [she] has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 356-57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (quotations omitted). Further, "allegations that a conspiracy produced a certain decision should no more pierce the actor's immunity than allegations of bad faith, personal interest or outright malevolence." *Id.* at 1078 (citing *Holloway v. Walker*, 765 F.2d 517, 523 (5th Cir.1985)). The public policy that underlies judicial immunity is the furtherance of independent and disinterested judicial decision making. *Ashelman*, 793 F.2d at 1078. To effectuate this policy the Ninth Circuit broadly construes the scope of judicial immunity, which applies even if there are allegations that a judicial decision resulted from a bribe or a conspiracy. *Id.*

[20][21][22] The immunity, however, is not absolute. A Judge is not immune if a plaintiff seeks prospective injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 541-41, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). Nor is a Judge immune if he or she acts in clear absence of all jurisdiction or performs an act that is not judicial in nature. *Ashelman*, 793 F.2d at 1075. An act is judicial in nature if it is a function normally performed by a judge. *Id.* To determine if the judge acted with jurisdiction, courts analyze whether the judge acted clearly beyond the scope of subject matter jurisdiction in contrast to personal jurisdiction. *Id.*

[23] In the instant case Plaintiff is suing five Judges due to alleged misconduct that occurred during his dissolution proceedings. For example, Plaintiff states that the Judges *973 conspired "to deprive the plaintiff of a fair and impartial trial." (Am.Compl.¶ 97). For all causes of action Plaintiff requests an award of damages to compensate him for the divorce judgments he had to pay, his loss of business reputation, and other benefits. Additionally, Plaintiff requests punitive damages. Accordingly, given that neither exception to judicial immunity is applicable, and because Plaintiff seeks damages for alleged violations of his civil rights, the five judges are all immune from suit and must be dismissed from this

action with prejudice.

**B. The Pro Tem Judges Gavin And Meyer**

[24] Judges and those performing judge-like functions are absolutely free from liability for damages incurred resulting from acts performed in an official capacity. *Ashelman*, 793 F.2d at 1072. Thus, the general rules of judicial immunity also apply to Pro Tem Judges.

**1. Meyer**

[25] Plaintiff's claim against Judge Meyer is that he was biased and refused to recuse himself even though he was good friends with Ellen Ricotta's appellate attorney Roy Garrett. Meyer supposedly had adjoining offices with Garrett and shared a secretary. (Am.Compl.¶ 44). Plaintiff further explains that there was a recusal hearing and the presiding Chief Judge concluded that recusal was unnecessary. (Am.Compl.¶ 47). Plaintiff goes on to allege that Meyer applied the law incorrectly. (Am.Compl.¶ 48). In light of such allegations, Plaintiff cannot show that Meyer acted in clear absence of all jurisdiction or performed an act that is not judicial in nature. *Id.* at 1075. Thus, Meyer cannot be sued given the doctrine of judicial immunity. Additionally, the Court notes that while Plaintiff sued Meyer in his individual capacity, there are no allegations in Plaintiff's Amended Complaint concerning Meyer other than his actions while acting as Pro Tem Judge. Thus, this Amended Complaint is dismissed as to Defendant Meyer with prejudice.

**2. Gavin**

[26] Plaintiff also sues Gavin in an official capacity as a Pro Tem Judge. His allegations against Gavin in an official role amount to one sentence: "At the next hearing, on November 22, 1991, Thomas was astonished to see the judge was Paul E. Gavin acted as Judge Pro Tem as well as attorney of record for Ellen. In an attempt to intimidate Thomas, he slammed the gavel, glared at Thomas and continued the hearing." (Am.Compl.¶ 7). There are no allegations that Gavin's assignment as a Judge Pro

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 547**

405

L0VE00921

4 F.Supp.2d 961                                                                    Page 15

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Tem caused Plaintiff any harm. The Court surmises that Gavin was erroneously assigned to the case and recused himself accordingly. Thus, the Court does not see how Plaintiff could state a cause of action against Gavin for acts performed as a Judge Pro Tem. Assuming arguendo that Plaintiff could plead some facts to show that Gavin acted clearly outside the scope of his jurisdiction and caused him harm, for the reasons explained, *infra* at 977-985, all of Plaintiff's causes of action against Gavin must nonetheless be dismissed with prejudice.

**C. The Court Commissioner, Etta C. Gillivan**

[27][28][29] Judicial immunity extends to municipal court commissioners. *O'Neil v. City of Lake Oswego,* 642 F.2d 367, 368 n. 2 (9th Cir.1981) . Specifically, under the California Government Code § 72190 the Judicial Commissioner is a judicial officer. As such, judicial immunity extends to commissioners when they perform judicial functions, even if their acts are in excess of jurisdiction or are alleged to have been malicious or corrupt. *Franceschi v. Schwartz,* 57 F.3d 828, 829 (9th Cir.1995). Moreover, "[j]urisdiction is construed broadly where the issue is the immunity of a judge. [*Crooks v. Maynard,* 913 F.2d 699,] 701 [(9th Cir. 1990)]." Acts performed in excess of jurisdictional authority do not deprive the judge of immunity. *Schucker v. Rockwood,* 846 F.2d 1202, 1204 (9th Cir.), *cert. denied,* 488 U.S. 995, 109 S.Ct. 561, 102 L.Ed.2d 587 (1988). Judicial immunity "serves to protect judges not only against monetary damages, but further from vexatious litigation, which can be equally *974 chilling of judicial independence regardless of its outcome." *O'Neil,* 642 F.2d at 370.

[30] Plaintiff alleges that Commissioner Gillivan perfected an illegal judgment against him contrary to Judge Howatt's Order. Plaintiff asserts in relevant part that:

Attorney Gavin then took this illegal judgment to his friendly commissioner Etta Gillivan, on the one day she was acting as presiding judge. Thomas had already refused to allow her to hear this case, because of her close relationship with attorney Gavin. She signed the Judgment even

though there had never been hearing [sic], we were not in her Court and she had no jurisdiction. He then filed it with the San Diego County Recorders Office and Mailed it in the U.S. Mail to Thomas committing mail fraud.

(Am.Compl.¶ 54).

In his opposition Plaintiff further asserts that Ms. Gillivan acted outside her capacity in signing the judgment because:

Pursuant to the Code of Civil Procedure 635 and Special Matter Order No. 0191994, designated backup judges may sign routine orders conforming to the minutes made by the assigned independent calendar judge when the assigned judge is unavailable. This delegation of authority does not apply to judgments or orders which are either dispositive of the case or pertain to complex procedural or substantive issues.

(Pl.'s Opp. to County's Mem. at 3-4).

After hearing oral argument this Court issued an order requesting supplemental briefing. The Court directed the parties to provide a copy of the judgment Plaintiff referred to in the Amended Complaint which he alleged the Commissioner signed. (Order, Feb. 19, 1998, at 3). The attorney for the County responded that they could not find a judgment signed by Commissioner Gillivan. Plaintiff, however, pointed the Court to exhibit 10 in his RICO case statement. This is a signed order entitled "Judgment Re Attorney's Fees." The Judgment reads in its entirety:

On July 14, 1993 Judge William Howatt ruled on the matter of unresolved attorney's fees as follows:

Attorney's Fees and Costs:

Attorney's fees and costs are awarded to the petitioner from the respondent in the sum of $72,766.85. Respondent is entitled to and shall receive credit for such payment as has been previously received and/or paid over toward this obligation. The calculation accepted by the Court at this time is $72,766.85 minus $21,873.93, which leaves a balance due in the sum of $50,892.00.

It is so ordered.

(Pl.'s RICO case statement, Ex. 10).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 548**     406

4 F.Supp.2d 961                                                                    Page 16

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

[31][32] The date of the Judgment is June 2, 1995. The Judgment is signed by Gillivan and underneath her signature is stamped, "signed pursuant to § 635 C.C.P. by the supervising judge, North County Branch, as acting presiding judge." (Pl's RICO Case Statement, Ex. 10). County Counsel did provide a copy of the Order by Judge Howatt of July 14, 1993, to which the June 2, 1995, order refers. The Court can review and consider this Order of July 14, 1993, pursuant to the doctrine of Judicial Notice. Federal Rule of Evidence 201 allows a court to consider official records and reports without converting a 12(b)(6) motion into a Rule 56 motion for summary judgment. *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir.1994). This Order is entitled "Order after Hearing," and was signed by Judge Howatt on July 14, 1993. In this Order on page 3, in a section entitled, "C. Attorney Fees and Costs" is the paragraph Ms. Gillivan's Judgment copied verbatim regarding the calculation and amount of attorneys fees.

After reviewing these orders this Court finds that Commissioner Gillivan did not act in clear absence of all jurisdiction nor did she perform an act that was not judicial in nature. *Ashelman,* 793 F.2d at 1075. Rather, pursuant to Cal. Code Civ. P. § 635, she signed a judgment for an order previously issued by Judge Howatt. Under § 635, "[i]n all cases where the decision of the court has been entered in its minutes, and when the judge who heard or tried the case is unavailable, the formal judgment or order conforming*975 to the minutes may be signed by the presiding judge of the court or by a judge designated by the presiding judge." ( Cal. Code Civ. P. § 635). In the instant case Gillivan signed a formal judgment confirming an order previously given by Judge Howatt. At this time Judge Howatt was unavailable because he was no longer assigned to Family Court in North County. Thus, Gillivan performed an act judicial in nature and within her jurisdiction.

Even assuming arguendo, the truth of Plaintiff's assertion that under § 635 Judges may not sign judgments or orders that are either dispositive of the

case or pertaining to complex procedural or substantive issues, the Court's analysis remains the same. The Commissioner signed a judgment for an order regarding attorneys' fees previously given by Judge Howatt. An award of attorneys' fees is not dispositive of the case, nor is it a complex substantive or procedural issue. The Court recognizes that this Judgment was signed two years after the original order by Judge Howatt, and a year after a subsequent judgment by Judge Wagner on attorneys' fees. However, jurisdiction is broadly construed when the issue is the immunity of a judge. Judicial immunity applies no matter how "erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Ashelman,* 793 F.2d at 1074 (citing *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (quotations omitted)). Plus, "[a] judge will not be deprived of immunity because the action he [she] took was in error, was done maliciously, or was in excess of his [her] authority; rather he [she] will be subject to liability only when he [she] has acted in the clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 356-57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (quotations omitted). Thus, even if this judgment was no longer necessary and was signed in error, Plaintiff cannot show that the Commissioner, who acted in accordance to § 635, did so in clear absence of all jurisdiction. Therefore, the Commissioner must be dismissed from this case with prejudice.

[33][34] Even if the Court could not dismiss Gillivan on the above grounds, Plaintiff's claim against the Commissioner is barred by the Eleventh Amendment. Plaintiff sued the Commissioner in her official capacity for a judgment she signed while on judicial duty. As a result, Plaintiff seeks damages from the Commissioner and a ruling that all judgments entered against him are void. As discussed below this Court does not have jurisdiction to hold that all previous judgments are void. *See* discussion *infra* at 979-980. Additionally, to the extent his claim is for damages, an action for money damages against a state official is considered to be a suit against the state and is barred by the Eleventh Amendment if "the state is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 549**    407

LOVE00923

4 F.Supp.2d 961                                                      Page 17

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

the real, substantial party in interest, or if judgment is sought against the public treasury." *Shaw v. State of California Dept. of Alcoholic Beverage Control,* 788 F.2d 600, 603 (9th Cir.1986). Therefore, Plaintiff's claim against the Commissioner is barred by the Eleventh Amendment, and she must be dismissed from the complaint with prejudice.

**D. The State Of California And The Commission On Judicial Performance**

[35] Pursuant to the Eleventh Amendment of the United States Constitution the State of California and the Commission on Judicial Performance must be dismissed from this case with prejudice. First, as to the Commission on Judicial Performance, Plaintiff alleges that he filed complaints with the Commission "on every judge who had violated his rights, as well as the pro tem judges. They claimed they had no jurisdiction on the pro tem judges. And after two years of stone walling they did nothing, just as they did on Presiding Judge Greer, and Judges Malkus and Adams case." (Am.Compl. ¶ 86). With respect to the State of California Plaintiff alleges that it failed to regulate the state agency of the Commission on Judicial Performance and the State Bar of California. Plaintiff argues that the State of California should fund an investigative body annually, "that will prosecute and correct this kind violations [sic] of the law, Thomas will release them from any liability. *It has cost the taxpayer enough!* " (Am. Compl. at 38, request for relief) (emphasis in original). With respect to the RICO claims Plaintiff alleges that the State of California has failed *976 to protect its citizen's constitutional rights by not enforcing the state law on its own enforcement agencies. Plaintiff argues that the Commission on Judicial Performance has "failed by their own statistics." (RICO Case Statement at 2).

[36][37] The Eleventh Amendment provides that the power of the federal judiciary "shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST.AMEND. XI. The Eleventh Amendment

bars suits against a state brought by its own citizens, whether the relief sought is money damages or an injunction. *Shaw,* 788 F.2d at 600; *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 165-67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Plus, a suit against a state agency, in this case the Commission on Judicial Performance is considered to be a suit against the state and is also barred by the Eleventh Amendment. *Id.* (citing *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98- 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

Plaintiff argues that the Eleventh Amendment is inapplicable because "he asked the State of California to fund an investigative body as a watchdog to prosecute and correct violations against the citizens of the State of California. Plaintiff seeks no monetary relief for himself." (Pl.'s Mem. in Opp. to State's Mem. at 4). Plaintiff also requests an opportunity to amend his complaint because he admits that he erroneously sued the state instead of the chairperson of the commission.

[38] Plaintiff's argument regarding monetary relief is not persuasive. First, in his Amended Complaint Plaintiff requests a monetary award, including punitive damages, against all defendants for all causes of action. Even if the Court construed his request for damages against the State as one strictly for funding an investigative body, the Eleventh Amendment would still bar the suit. The Eleventh Amendment prohibits suits by private individuals against the State if the request for relief requires expenditures of public funds from the State treasury. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Shaw,* 788 F.2d at 603 (9th Cir.1986). Because Plaintiff requests that the State of California and/or the Commission allocate funds to establish an agency to serve as a watch dog his suit is barred by the Eleventh Amendment. Therefore, the State and the State Commission on Judicial Performance must be dismissed from the Complaint with prejudice.

Finally, this Court need not grant Plaintiff leave to file a Second Amended Complaint to name the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 550**    408

LOVE00924

4 F.Supp.2d 961                                                           Page 18

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

actual Commissioner or other employees, because such an amendment would clearly be futile. *Noll v. Carlson*, 809 F.2d 1446, 1447 (9th Cir.1987); *see also Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir.1990), *cert. denied*, 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991) (holding that a court may deny leave to amend a complaint and dismiss a case with prejudice if any amendment would be futile). As mentioned previously, because Plaintiff's proposed request for relief against the Commissioner would require the expenditure of state funds, it would be barred by the Eleventh Amendment. *Edelman*, 415 U.S. at 663, 94 S.Ct. 1347. Therefore, the State Bar and Commission on Judicial Performance are dismissed from the case with prejudice, and the Court denies Plaintiff's request to file an amended complaint to name the Chairperson of the Commission as a defendant.

**E. The State Bar**

[39] Plaintiff also sues the State Bar. The allegations against the Bar are delineated in paragraph eighty-three in which Plaintiff asserts that he filed complaints with the State Bar about attorneys Gavin and Meyer, but the State Bar refused to investigate his case. Plaintiff asserts that he appealed the Bar's inaction within the organization and to the California Supreme Court, who denied his appeal. (Am.Compl.¶ 83).

Similar to the analysis above, Plaintiff's Amended Complaint is barred by the Eleventh Amendment. In his opposition Plaintiff asserts that "[t]he relief Plaintiff asks against the State Bar of California is for the State of California to fund an investigative body as a *977 watch dog on the State Bar and to prosecute violations of Citizens rights. He is not, in essence, seeking monetary damages from the State Bar or its officials for himself." (Pl.'s Opp. to State Bar's Mem. at 3). This request for relief requires expenditures of public funds from the state treasury and is therefore prohibited by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Shaw v. State of California Department of Alcoholic Beverage Control*, 788 F.2d 600, 603 (9th Cir.1986)

Even if the Court construed the claim as one for monetary relief solely from the State Bar, the Ninth Circuit has held that "[t]he Eleventh Amendment's grant of sovereign immunity bars monetary relief from state agencies such as California's Bar Association and Bar Court." *Hirsh v. Justices of the Supreme Court of the State of California*, 67 F.3d 708, 714-15 (9th Cir.1995).

**V. Defenses That Apply To All Remaining Defendants**

**A. Plaintiff Cannot Establish A Pattern Of Racketeering As Required By RICO**

[40] Plaintiff's second cause of action is for alleged violations of RICO. Plaintiff asserts that Paul Gavin, as a professional corporation under the law of the State of California, constitutes an enterprise and that all other defendants:

associated with the enterprise described above, did knowingly conduct and participate, directly and indirectly, the affairs of that enterprise which was engaged in, and the activities of which affected interstate and intrastate commerce via U.S. Mail (§ 1341) with illegal documents, wire fraud, through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), consisting of multiple acts of conversion, undue influence and bribery of California Superior Court judges. This criminal enterprise caused them to fail in their duty to enforce the Oath of Office and Judicial Cannons of Ethic and the laws of the State of California, obstruction of a fair administration of justice, conversion, bribery, grand theft, perjury and conspiracy. (Am.Compl.¶ 100).

Plaintiff states that this alleged violation has caused him "to lose a life time of work to accrue an estate of $925,000 that was free and clear of any debt and the American Dream. This damage entitles plaintiff to compensatory damages, treble damages and other civil remedies provided by the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et. seq." (Am.Compl.¶ 32).

Plaintiff also filed a RICO case statement. The Court reviewed the Case statement and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 551**    409

4 F.Supp.2d 961                                                Page 19

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

Amended Complaint simultaneously and found them virtually identical. [FN8] Plaintiff did not use the RICO case statement to provide the Defendants and this Court with additional facts that were not asserted in his Amended Complaint.

> FN8. Even though Plaintiff filed the RICO case statement before filing his Amended Complaint, this Court will assume that it was Plaintiff's intention that the RICO case statement also be considered as a supplement to his Amended Complaint.

[41] To state a claim under RICO Plaintiff must demonstrate: (1) the conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Sun Sav. and Loan Ass'n v. Dierdorff,* 825 F.2d 187, 191 (9th Cir.1987). Because Plaintiff cannot establish a pattern of racketeering activity this cause of action must be dismissed with prejudice as to all defendants.

[42] The identification of a pattern of racketeering activity "has proven a challenging task for courts." *Sever v. Alaska Pulp Corp.,* 978 F.2d 1529, 1535 (9th Cir.1992). At minimum, to show a pattern of racketeering activity Plaintiff must illustrate that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (emphasis in original). Racketeering predicates are related if they have "similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated." *\*978 Sever,* 978 F.2d at 1535 (quoting 18 U.S.C. § 3575(e)). A Plaintiff establishes continuity by showing that the illegal conduct poses a threat of continued criminal activity. *Id.*

In *Sever,* a former employee of a timber company alleged that the defendant took retaliatory actions after he was critical of the company. Specifically, the Plaintiff alleged that he was fired and subsequently unable to find other work because the employer engaged in various acts to blacklist him

from the industry. *Id.* at 1532. The Ninth Circuit held that the Plaintiff failed to allege a pattern of racketeering activity. *Id.* at 1535. The Ninth Circuit reasoned that the collective conduct of the employer had the single purpose of impoverishing the employee. The Ninth Circuit also explained that it was persuaded by the fact that there was but a single victim involved. Moreover, there was no suggestion that the defendants would continue their behavior after they successfully blacklisted the Plaintiff, nor was their any proof that the Defendants intended harm on anyone other than the Plaintiff. Thus the Ninth Circuit concluded that the predicate acts designed to bring about a single event, to a single person, did not pose a threat of continuity as required by RICO. *Id.* at 1535.

Similar to *Sever,* in this case Plaintiff alleges that the Defendants engaged in various activities, all with the single purpose of depriving him of a fair dissolution proceeding which caused an unfavorable result. Like *Sever,* the collective acts of the Defendants alleged in Plaintiff's RICO case statement and the Amended Complaint were for the single purpose of impoverishing Plaintiff, i.e., causing him to lose his estate. As in *Sever,* there is only one single victim involved, the Plaintiff. Additionally, just like *Sever,* once the Defendants successfully "took" Plaintiff's estate there was no need for any continued tampering. Plus there is no claim that the Defendants intended to harm anyone but Plaintiff. Accordingly, like the Ninth Circuit in *Sever* this Court concludes that Plaintiff cannot establish a pattern of racketeering activity. *See also Medallion Television Enterprises v. SelecTV of California, Inc.,* 833 F.2d 1360 (9th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 105 L.Ed.2d 588 (1989) (holding that a broadcaster's misrepresentations that induced a Plaintiff to enter a joint venture did not constitute a pattern of racketeering activity, because the case involved a single victim and a single fraud which was complete once the joint venture acquired the broadcasting rights); *Jarvis v. Regan,* 833 F.2d 149, 152-53 (9th Cir.1987) (holding that the Plaintiff could not establish a pattern of racketeering by allegations that legal organizations committed three predicate acts of mail and wire fraud in obtaining a single

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 552**  410

L0VE00926

4 F.Supp.2d 961                                                   Page 20

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

federal grant to defray costs of opposing a ballet initiative). [FN9] Hence, because Plaintiff cannot establish a pattern of racketeering activity his RICO claim must be dismissed with prejudice for all Defendants. The dismissal is with prejudice because it is clear that the deficiencies in this cause of action cannot be cured by amendment. *Noll v. Carlson,* 809 F.2d 1446, 1447 (9th Cir.1987); *Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 296 (9th Cir.1990), *cert. denied,* 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991). Under no set of facts can Plaintiff establish that the various acts designed to deprive him of his marital estate constitutes a pattern of racketeering activity.

> FN9. Plaintiff's reliance on *Sun Sav. and Loan Ass'n v. Dierdorff,* 825 F.2d 187 (9th Cir.1987) is unavailing. In *Sun* the Plaintiff asserted that the president and chief executive officer of a savings and loan association solicited and received kickbacks from various customers. Even though the Plaintiff in *Sun* only cited to four predicated acts, because there were allegations of an ongoing scheme of receiving kickbacks and other favors from loan customers, the Plaintiff successfully established a pattern of racketeering. Conversely, the instant case involves one victim and one harm, and not an on going pattern of criminal behavior.

[43] This Court may dismiss this cause of action with prejudice as to Defendant Weedon even though he has not yet answered the complaint. *Yahya M.A. Omar v. Sea-Land Service, Inc.,* 813 F.2d 986 (9th Cir.1987); *Silverton v. Department of Treasury Etc.,* 644 F.2d 1341, 1345 (9th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981). In *Silverton,* the Ninth Circuit held that "[a] District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where *979 such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related." 644 F.2d at 1345. In the instant case Defendant Weedon is in an identical position to all other moving defendants who

claimed that Plaintiff cannot establish a pattern of racketeering activity. The claims against Fred Weedon are also integrally related because Plaintiff alleges that he and the other Defendants were involved in a conspiracy. Thus, as the Court has dismissed the RICO cause of action as to all Defendants with prejudice, a sua sponte dismissal of the cause of action as to Defendant Weedon is appropriate.

As further explained by the Ninth Circuit in *Omar,* a trial court may dismiss a claim sua sponte under Fed. R. Civ. P. 12(b)(6) without notice when the claimant cannot possibly win relief. The Ninth Circuit suggested that a sua sponte dismissal is even more appropriate if the Plaintiff had an opportunity to litigate the issue. 813 F.2d at 991. In the instant case under no circumstances can Plaintiff state a RICO claim based on the alleged acts of the Defendants to deprive him of his marital estate. Moreover, in opposing the motions to dismiss brought by the seventeen other Defendants, Plaintiff had adequate notice and an opportunity to litigate the issue of whether he could state a claim under RICO. Therefore, this Court sua sponte dismisses Plaintiff's second cause of action as to Defendant Weedon.

**B. This Court Does Not Have Subject Matter Jurisdiction Over Plaintiff's Fourth Cause Of Action**

[44] In Plaintiff's fourth cause of action he claims that as a result of the "unlawful and corrupt conduct of above [sic] mentioned enterprise, plaintiff was deprived of an impartial and fair trail, [sic] deprived of due process rights, and was a victim of discrimination." (Am.Compl.¶ 110). Plaintiff believes that but for the wrongful enterprise he would have prevailed and received one half of his estate of $925,000. He asserts that "[u]nder the principles of equity and California Common Law, plaintiff is entitled to declaration that all judgments are void, receive full restitution of amounts paid to satisfy judgments, recovery of attorneys' fees and other litigation expenses incurred in the corrupt trials." (Am.Compl.¶ 111). Because Plaintiff's requested relief requires the Court to assess the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 553**          411

LOVE00927

4 F.Supp.2d 961                                                                                    Page 21

4 F.Supp.2d 961

(Cite as: 4 F.Supp.2d 961)

validity of state court judgments, the claim is outside the Court's jurisdiction.

[45] As the individual Defendants assert, federal courts are courts of limited subject matter jurisdiction. For example, " 'lower federal courts possess no power whatever to sit in direct review of state court decisions.' " *Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (quoting *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 296, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970)). *See also, Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415, 44 S.Ct. 149, 68 L.Ed. 362 (1923) (holding that no court of the United States other than the Supreme Court can entertain a proceeding to reverse or modify a state judgment for errors.); *Worldwide Church of God v. McNair*, 805 F.2d 888, 890 (9th Cir.1986) (stating that district courts have no authority to review the final decisions of state courts). Only the Supreme Court of the United States has subject matter jurisdiction to review a final judgment of a state court. [FN10] *Feldman*, 460 U.S. at 474, 103 S.Ct. 1303.

> FN10. Pursuant to 28 U.S.C. § 1257, the United States Supreme Court has jurisdiction to review final judgments that are given by the highest court of the state.

[46][47][48] Under what has come to be known as the *Rooker-Feldman* doctrine, "[i]f the constitutional claims presented to a United States District Court are inextricably intertwined with the state court [decision], then the District Court is in essence being called upon to review the state court decision. This the District Court may not do." *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303. The *Rooker-Feldman* bar is jurisdictional. *Worldwide Church of God*, 805 F.2d at 890-93. The doctrine prohibits federal court review of state judgments even when the challenge to the state court decision involves federal constitutional issues. *Feldman*, 460 U.S. at 484-86, 103 S.Ct. 1303; *980 Worldwide Church of God*, 805 F.2d at 891; *Robinson v. Ariyoshi*, 753 F.2d 1468, 1472 (9th Cir.1985), *vacated on other grounds*, 477 U.S. 902,

106 S.Ct. 3269, 91 L.Ed.2d 560 (1986). [FN11] Additionally, the *Rooker-Feldman* doctrine applies even when the state court judgment at issue is not final. *Worldwide Church of God*, 805 F.2d at 893 n. 3.

> FN11. However, a district court does have jurisdiction over a "general" constitutional challenge that does not require review of a final state court decision in a particular case. *Worldwide Church of God*, 805 F.2d at 891. *See also Feldman*, 460 U.S. at 482-86, 103 S.Ct. 1303; *Dubinka v. Judges of Sup. Ct. of Cal. for the County of Los Angeles*, 23 F.3d 218, 221 (9th Cir.1994). In the instant case, Plaintiff does not claim that he is making such a "general" constitutional challenge but specifically requests that the Court find the judgments null and void.

[49] In short, the *Rooker-Feldman* doctrine bars federal litigation if, "there has already been actual consideration of and a decision on the issue presented .... If consideration and decision have been accomplished action in federal court is an impermissible "appeal" from the state court judgment." *Robinson*, 753 F.2d at 1472 (citations omitted). *See also Worldwide Church of God*, 805 F.2d at 892 (quoting *Robinson*, 753 F.2d at 1472). Hence, because Plaintiff's fourth cause of action asks the Court to review and revise a state court judgment, the claim is outside this Court's jurisdiction.

While not binding precedent, the Fifth Circuit's holding in *Hale v. Harney*, 786 F.2d 688 (5th Cir.1986), also informs and supports the Court's conclusion. [FN12] In *Hale*, the Plaintiff sought to challenge a divorce decree through an action in federal court in which he claimed that his former wife, her lawyer, and the state judge who rendered the decree conspired to violate his constitutional rights in the underlying state litigation. *Id.* at 689. The Fifth Circuit found that the Plaintiff's claims in the federal action were "inextricably intertwined" with the state court decree because much of the relief sought by the Plaintiff amounted to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2 PAGE 554**    412

LOVE00928